1  Justin L. Allamano, State Bar No. 229764
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2  Rincon Center II
   121 Spear St., Suite 200
3  San Francisco, California 94105-1582

4  Mitchell P. Brook, State Bar No. 172105
   Jeffrey D. Wexler, State Bar No. 132256
5  Andrea M. Kimball, State Bar No. 196485
   Michael J. Mancuso, State Bar No. 228669
6  LUCE, FORWARD, HAMILTON & SCRIPPS LLP
   11988 El Camino Real, Suite 200
7  San Diego, California 92130-2594
   Telephone No.: 858.720.6300
8  Fax No.: 858.720.6306
   E-Mail:    jallamano@luce.com
9              mbrook@luce.com
               jwexler@luce.com
10             akimball@luce.com
               mmancuso@luce.com
11
   Attorneys for Instant Media, Inc.
12

13                 UNITED STATES DISTRICT COURT

14            OAKLAND DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17  INSTANT MEDIA, INC.,                 Case No. C 07-02639 SBA

18                                       **PLAINTIFF INSTANT MEDIA, INC.'S**
          Plaintiff,                     **NOTICE OF MOTION AND MOTION FOR**
19                                       **PRELIMINARY INJUNCTION;**
    v.                                   **MEMORANDUM OF POINTS AND**
20                                       **AUTHORITIES**
    MICROSOFT CORPORATION,
21                                       Date:    July 17, 2007
          Defendant.                     Time:    1:00 p.m.
22                                       Ctrm.:   3

23                                       The Honorable Saundra Brown Armstrong, District
                                         Judge
24

25

26

27

28

**TO DEFENDANT MICROSOFT CORPORATION**:

PLEASE TAKE NOTICE that plaintiff Instant Media, Inc. ("Instant Media") will, and hereby does, move the Court for a preliminary injunction to enjoin defendant Microsoft Corporation and its subsidiaries, associates, agents, servants, employees, officers, directors, representatives, successors, assigns, and attorneys, as well as any person in active concert or participation with them or any related company embraced within the definition thereof contained in 15 U.S.C. § 1127 with notice of the Order, from, during the pendency of this action, using the name or designation **I'M** or **i'm**, or any user icon using either such name or designation, in connection with the sale, offering for sale, promotion, distribution, or advertising of any goods or services, including any online promotional campaigns for others, or client software or other software that can be used for reception of communications or data via the Internet, or any related consumer merchandise.

This motion shall be based upon this Notice of Motion, the Memorandum of Points and Authorities attached hereto, the Declarations of Andrew Leak, Mitchell P. Brook, and Jeffrey D. Wexler filed concurrently herewith, the [Proposed] Order lodged concurrently herewith, and such further evidence and argument as may be presented to the Court at or before the hearing on this matter.

DATED: June 12, 2007                    LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By: _____/s/ Mitchell P. Brook_____
    Mitchell P. Brook
    Attorneys for Plaintiff Instant Media, Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    Instant Media and its I'M Marks. ................................................... 2

    B.    Microsoft. ...................................................................................... 4

    C.    Microsoft's Adoption and Use of the i'm Designation. ................. 6

    D.    The Effect on Instant Media of Microsoft's Use of the i'm Mark. ........................... 8

PROCEDURAL HISTORY ........................................................................................ 9

LEGAL STANDARD ................................................................................................. 9

LEGAL ARGUMENT ................................................................................................ 9

I.    INSTANT MEDIA IS LIKELY TO PREVAIL ON THE MERITS, AND THERE ARE SERIOUS QUESTIONS GOING TO THE MERITS. ................................. 9

    A.    Microsoft's Conduct Creates a Likelihood of Reverse Confusion. ....................... 10

    B.    Microsoft's Use of the i'm Mark is Likely to Confuse Consumers into Believing that There is Some Affiliation, Connection, or Association Between Instant Media and Microsoft. ....................... 12

II.    INJUNCTIVE RELIEF IS APPROPRIATE BOTH BECAUSE INSTANT MEDIA FACES THE POSSIBILITY OF IRREPARABLE INJURY AND BECAUSE THE BALANCE OF HARDSHIPS TIPS SHARPLY IN ITS FAVOR. ................................... 19

CONCLUSION ......................................................................................................... 20

1

## **TABLE OF AUTHORITIES**

**Page**

2

3

### **CASES**

4

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
        166 F.3d 197 (3d Cir. 1999) ...................................................................... 11, 14, 15, 19

5

6

*Accuride Int'l, Inc. v. Accuride Corp.*,
        871 F.2d 1531 (9th Cir. 1989) ...................................................................... 14

7

*AMF, Inc. v. Sleekcraft Boats*,
        599 F.2d 341 (9th Cir. 1979) ...................................................................... 13, 14, 16, 17

8

9

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
        841 F.2d 486 (2d Cir. 1988) ...................................................................... 12

10

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.*,
        174 F.3d 1036 (9th Cir. 1999) ...................................................... 9, 14, 15, 17, 18, 19

11

12

*Cohn v. Petsmart, Inc.*,
        281 F.3d 837 (9th Cir. 2002) ...................................................................... 18

13

*Cunningham v. Laser Golf Corp.*,
        222 F.3d 943 (Fed. Cir. 2000) ...................................................................... 17

14

15

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
        142 F.3d 1127 (9th Cir. 1998) ...................................................... 10, 11, 12, 13, 14, 15

16

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
        967 F.2d 1280 (9th Cir. 1992) ...................................................................... 13

17

18

*Echo Drain v. Newsted*,
        307 F. Supp. 2d 1116 (C.D. Cal. 2003) ...................................................... 14, 15

19

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
        30 F.3d 466 (3d Cir. 1994) ...................................................... 9, 11, 12, 16, 18

20

21

*Glow Indus., Inc. v. Lopez*,
        252 F. Supp. 2d 962 (C.D. Cal. 2002) ...................................................... 13, 14, 16

22

*GoTo.com, Inc. v. Walt Disney Co.*,
        202 F.3d 1199 (9th Cir. 2000) ...................................................................... 9, 19

23

24

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*,
        188 F.3d 427 (7th Cir. 1999),
        *cert. denied*, 528 U.S. 1188 (2000) ...................................................... 11

25

26

*Jordan K. Rand, Ltd. v. Lazoff Bros.*,
        537 F. Supp. 587 (D.P.R. 1982) ...................................................................... 17

27

28

ii

# TABLE OF AUTHORITIES
### (cont'd)

**Page**

*Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc.,*
186 F.3d 311 (3d Cir. 1999),
*cert. denied,* 528 U.S. 1106 (2000) .................................................. 12

*M2 Software, Inc. v. Madacy Entertainment,*
421 F.3d 1073 (9th Cir. 2005),
*cert. denied,* 126 S. Ct. 1772 (2001) .................................. 13, 14, 15, 17

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha,*
290 F. Supp. 2d 1083 (C.D. Cal. 2003),
*aff'd,* 2005 U.S. App. LEXIS 135 (9th Cir. 2005) ...................... 13, 16

*Metro Pub., Ltd. v. San Jose Mercury News,*
987 F.2d 637 (9th Cir. 1993) ....................................................... 19

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
290 F.3d 578 (3d Cir. 2002) ........................................................ 20

*Nutri/System, Inc. v. Con-Stan Indus., Inc.,*
809 F.2d 601 (9th Cir. 1987) ....................................................... 17

*Rodeo Collection, Ltd. v. West Seventh,*
812 F.2d 1215 (9th Cir. 1987) ................................................... 9, 14

*Sands, Taylor & Wood Co. v. Quaker Oats Co.,*
978 F.2d 947 (7th Cir. 1992) ,
*cert. denied,* 507 U.S. 1042 (1993) ........................................ 11, 16

*Surfvivor Media, Inc. v. Survivor Prods.,*
406 F.3d 625 (9th Cir. 2005) ........................................... 10, 13, 15, 18

*Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.,*
601 F.2d 1011 (9th Cir. 1979) ................................................... 10

## STATUTES

15 U.S.C. § 1057(c) .................................................................... 9, 10

15 U.S.C. § 1125(a) ........................................................................ 12

## MISCELLANEOUS

3 J. *McCarthy on Trademarks & Unfair Competition,* § 23:10 ................... 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This action is before the Court on the motion of plaintiff Instant Media, Inc. ("Instant Media") for the issuance of a preliminary injunction enjoining defendant Microsoft Corporation ("Microsoft") from infringing Instant Media's **I'M** trademark and service mark by using the name or designation **I'M** or **i'm**, or any user icon using either such name or designation.

Instant Media is a start-up company based in Palo Alto, California. Instant Media owns a federal registration for the **I'M** word mark, and has a number of trademark applications that have been approved by the United States Patent & Trademark Office (the "PTO"). Since 2004, Instant Media has used **I'M** trademarks and service marks in connection with its business of providing content delivery via two-way communications over the Internet. Last year, Instant Media spent more than $1 million for television and Internet advertising using its **I'M** marks.

Instant Media develops software and provides Internet media content delivery to the public and its business partners. Using the **I'M** mark, Instant Media offers a free, downloadable software package to assist with Internet communication and reception of communication data from remote sources via the Internet. More than 700,000 copies of the **I'M** client software have been downloaded by users.

On or about March 1, 2007, Microsoft began to use the designation **i'm** to market and distribute its instant message program, Windows Live Messenger, which is downloadable from Microsoft's website. Users of Windows Live Messenger can communicate text, voice, video, and other data over the Internet. Microsoft has launched a campaign on its **i'm** branding that is remarkably similar to Instant Media's campaign using the identical mark, thereby overtaking Instant Media's efforts to establish its **I'M** brand.

Microsoft's conduct constitutes trademark infringement under the doctrine of reverse confusion. Reverse confusion exists where a larger, more powerful company starts using a trademark or service mark belonging to a smaller, less powerful company, thereby causing confusion as to the source of the senior user's goods or services. Microsoft's pervasive use of the **i'm** mark in connection with promotional services and communication software very similar to

those offered by Instant Media threatens to swamp Instant Media's **I'M** marks, thereby (1) destroying Instant Media's goodwill in those marks and (2) leading consumers to believe that Instant Media is improperly attempting to piggyback on Microsoft's marks and goodwill.  In order to preserve the status quo and to protect Instant Media's rights in its **I'M** marks pending resolution of this case on the merits, the Court must preliminary enjoin Microsoft from using the designation **i'm** (or any confusingly similar designation) in connection with its goods and services.

## FACTUAL BACKGROUND

### A.    Instant Media and its I'M Marks.

Instant Media is a corporation headquartered in Palo Alto, California.  *See* Declaration of Andrew Leak ("Leak Decl."), ¶ 2.  Instant Media develops software and provides Internet media content delivery to the public and its business partners.  *See id.*

One of Instant Media's product offerings is software that is presently distributed as a client-side program, downloaded from the Internet and installed on clients' computers to assist with Internet communication and reception of communication data from remote sources via the Internet.  *See id.*  Instant Media's software, which creates an Internet video platform for consumers, advertisers, and content providers, is built on patent-pending caching technology that delivers high-resolution video.  *See id.*, ¶ 3.  Instant Media's product delivers full-screen video in DVD or HD quality – video that is superior to that offered by competitors who utilize streaming technologies.  *See id.*

In conducting its business and marketing its software, Instant Media uses its trademark **I'M** and the **I'M** family of trademarks.  *See id.*  The **I'M** mark is extremely important to Instant Media because its entire branding is focused around consumers' ability to easily remember that mark and to associate it uniquely with Instant Media.  *See id.*, ¶ 4.  Instant Media also operates the website www.im.com.  *See id.*, ¶ 5, Ex. A.

Instant Media first used the word mark **I'M** in commerce on December 19, 2005.  *See id.*, ¶ 6, Ex. B.  Instant Media holds a federal trademark registration for the word mark **I'M**, issued on September 26, 2006 based on an application filed on May 10, 2004.  *See id.*, Ex. B.  That registration, in International Class 35, recites as Instant Media's services "electronic retailing

2

services via the Internet and other electronic communications networks, featuring general consumer merchandise, music, movies and related merchandise; developing on-line promotional campaigns for others in the field of entertainment." *Id.*  On July 4, 2006, the PTO allowed Instant Media's application, filed on May 10, 2004, to register a design mark for **I'M** in a circle, in International Class 35 for the same services identified in the registration for the word mark **I'M**. *See id.*, Ex. C.

On June 28, 2006, Instant Media filed an application to register the word mark **I'M** for goods in International Class 9.  *See id.*, Ex. D.  That application presently describes the subject goods as follows:

> Software for receiving, accessing, extracting, encoding, decoding, storing, organizing, managing, viewing and outputting audio, video and audiovisual and other content data; software for subscribing to news, information, audio, video and audiovisual programs, feeds and services; software for providing access to sites and data via the Internet; software implementing IPTV and Internet based content, television and movie subscription services, software for conducting commercial transactions, namely computer e-commerce software to perform electronic business transactions via a global computer network.

*Id.*

Over the past few years, Instant Media has created and promoted a marketing campaign centered around the **I'M** marks.  *See id.*, ¶ 9.  As part of that branding and promotional effort, Instant Media has applied to register three other word marks including the term **I'M**: (1) **I'M CACHED**, for International Class 9 (filed on May 10, 2004 and allowed by the PTO on August 2, 2005), *see id.*, Ex. E; (2) **I'M INTERESTED**, for International Classes 35 and 38 (filed on December 13, 2005 and published by the PTO for opposition on March 6, 2007), *see id.*, Ex. F; and (3) **I'M INTERACTIVE**, for International Class 35 (filed on May 15, 2006 and approved for publication as of May 2007), *see id.*, Ex. G.

Since 2004, Instant Media has used one or more of the **I'M** trademarks and service marks in connection with its business of providing content delivery via two-way communications over the Internet.  *See id.*, ¶ 13.  Instant Media is currently using all of the marks identified above plus others related to the **I'M** family of marks.  *See id.*  Instant Media has created a recognizable branding and media campaign centered around the **I'M** marks featuring **I'M** in conjunction with

other words – used both on Instant Media's Internet website and in commercials, marketing materials, and public relations communications. *See id.*, ¶¶ 14, 26. Additional examples of Instant Media's use of the **I'M** mark include, among others, **I'M INSTANT MEDIA**, **I'M PROUD**, **I'M CONNECTED**, **I'M SURFING**, **I'M THINKING**, **I'M HD**, **I'M COOL**, **I'M UPGRADING**, and **I'M REAL**. *See id.*, ¶ 14. Instant Media uses these marks and the associated marketing campaign to build awareness for its software and services, centered around a simple goal to get prospective users to associate its registered mark **I'M** uniquely with Instant Media. *See id.*

To date, consumers have downloaded more than 700,000 copies of Instant Media's software from the Internet. *See id.*, ¶ 15. Instant Media has expended considerable resources and time promoting the **I'M** family of marks and the advertising campaign centered around those marks. *See id.*, ¶ 16. In 2006, Instant Media spent more than $1 million to develop television commercials and to buy television and Internet advertising for the **I'M** marketing campaigns. *See id.* Instant Media has also spent considerable resources and effort over the past few years to develop commercials for television and Internet advertising using the **I'M** family of marks and **I'M** plus a modifier. *See id.* Instant Media's **I'M** commercials may still be viewed on Instant Media's website and YouTube. *See id.*, ¶ 17, Ex. H.

Instant Media has expended significant resources to seek publicity and media coverage in magazines such as *Consumer Electronics*, *PC World*, many influential technology blogs, and others. *See id.*, ¶ 26. Instant Media has engaged in a massive public relations campaign with journalists to reinforce the mark **I'M** as being associated with only Instant Media. *See id.* For example, in the summer of 2006, Instant Media sent custom-made t shirts to dozens of bloggers, journalists, and industry analysts using a theme "I'M <Journalist Name>." *See id.* In the past, journalists and bloggers have been responsive and have further promoted Instant Media's brand by, for example, entitling their articles "I'M Ready for TV" or "I'M – Instant Media." *See id.*

## B. __Microsoft__.

According to Microsoft, its popular MSN Messenger software was upgraded and rebranded in 2006 as Windows Live Messenger, and is used by millions of people every day. *See* Declaration of Mitchell P. Brook ("Brook Decl."), ¶ 5, Ex. C. Microsoft represents that

1    "Windows Live Messenger, the next version of MSN Messenger, is the world's largest easy to use

2    consumer instant messaging service," and that it is used "by more than 240 million active accounts

3    each month." *Id.*, Ex. C. Each month, Microsoft attracts 465 million users to its website,

4    www.msn.com. *See id.*, ¶ 7, Ex. E.

5        According to website traffic ratings available on Alexa.com, a company that provides

6    information concerning Internet sites, Microsoft's website msn.com and Microsoft's search engine

7    live.com are, respectively: (1) the fourth and eighth most popular websites in the United States;

8    and (2) the second and fifth most popular websites in the world. *See* Declaration of Jeffrey D.

9    Wexler ("Wexler Decl."), ¶¶ 10-12, Exs. E-G. The Alexa website also shows that, worldwide,

10    over the past three months an average of 29.612 percent of global Internet users visited msn.com

11    every day, and an average of 15.375 percent of global Internet users visited live.com every day.

12    *See id.*, ¶¶ 11-12, Exs. F, G.

13        Microsoft touts Windows Live Messenger as:

14       [T]he next generation of MSN® Messenger, the world's most widely used instant
       messaging service. Windows Live Messenger goes beyond text IM to help people

15       connect and share with voice, video and more. It also acts as a window to the
       Internet, connecting people to their e-mail, blogs, search and other Windows Live

16       services with one click of the mouse.

17    *Id.*, Ex. E, at 2.

18        Over the years, Microsoft has built its business by, *inter alia*, acquiring companies in

19    related fields. For example, a May 18, 2007 press release available on Microsoft's website reports

20    that Microsoft has acquired aQuantive, Inc., described as "the parent company of one of the

21    industry's most successful families of digital marketing service and technology companies."

22    Brook Decl., Ex. F. The press release states that such acquisition "enhanc[ed] [Microsoft's]

23    world-class advertising platforms and service beyond its current capabilities," and "provide[d]

24    Microsoft increased depth in building and supporting next generation advertising solutions and

25    environments such as cross media planning, video-on-demand and IPTV." *Id.*

26

27

28

**C.**   **Microsoft's Adoption and Use of the i'm Designation.**

On February 27, 2007, without the knowledge or consent of Instant Media, Microsoft filed in its own name three new trademark applications for **i'm**.  *See* Brook Decl., ¶ 3, Ex. A.  These three applications were filed on an intent-to-use basis and sought to register marks comprised of the letters **i'm** in stylized form: (1) in International Class 9, for "computer software for connecting users to web messaging services and for voice and video transmissions over the Internet and wireless networks"; (2) in International Class 36 for "philanthropic services concerning monetary donations made via the Internet and wireless networks"; and (3) in International Class 38 for "web messaging services having voice and video capabilities."  *Id.*, Ex. A.

Instant Media recently became aware that Microsoft was using the designation **i'm** in promoting its Windows Live Messenger software.  *See* Leak Decl., ¶ 18; Brook Decl., ¶¶ 4, 6, Exs. B, D.  According to Microsoft, the "**i'm** campaign" was launched on March 1, 2007 – two days after Microsoft filed its intent-to-use applications, *see* Brook Decl., Exs. A, B – and, since the campaign's launch, "thousands of Windows Live Messenger users have joined," *see id.*, Ex. B.

Computer users who sign on to Microsoft's web site, www.msn.com, are presented with a link using the **i'm** mark next to the word "messenger."  *See* Leak Decl., ¶ 20, Ex. I.  Users who click on that link or visit the website for Windows Instant Messenger, www.im.live.com, are confronted with repeated uses of the **i'm** mark.  *See id.*, Ex. I.  In its marketing campaign, Microsoft is using the **i'm** mark in phrases such as "I'm saving animals," *see id.*, Ex. I (in a usage similar to that of Instant Media, *see id.*, ¶ 16).  Microsoft is also using the **i'm** mark as part of its Internet address for Windows Live Messenger – www.im.live.com.  *See id.*, ¶ 20, Ex. I.  Consumers who sign up for Microsoft's **i'm** service through Windows Live Messenger can elect to become "i'm [name]."  *See id.*, ¶ 21, Ex. J.

Computer users whose computers automatically sign on to Microsoft's instant messenger services (or, at least, Microsoft's MSN Messenger version 7.5) are greeted by two windows: (1) the MSN Messenger window; and (2) the MSN Today window.  *See* Wexler Decl., ¶¶ 2-3, Exs. A, B.  Computer users who manually sign on to Microsoft's instant messenger services are taken to the MSN Messenger window.  *See id.*, ¶ 4, Ex. A.

The MSN Messenger window (1) may contain a box at the bottom of the window including the phrase "i'm MAKING A DIFFERENCE," the words "LEARN HOW," and the Windows logo above the words "Windows Live Messenger" (the "**i'm** Advertisement");[1] and (2) always contains a tab along the left side of the window bearing the mark **i'm** (the "**i'm** Tab"). *See id.*, ¶ 5, Ex. A.

Clicking on the **i'm** Advertisement link on the MSN Messenger window takes the computer user to another web page (the "**i'm** Home Page"), the URL of which is http://im.live.com/Messenger/IM/Home/?source=banner_WLM_generictagline. *See id.*, ¶ 6, Ex. C. According to the Internet Explorer description of the **i'm** Home Page appearing in the upper left hand corner of that Page, that Page is named "i'm MAKING A DIFFERENCE." *See id.*, ¶ 6. The **i'm** Home Page includes the large term **i'm** in the upper left corner of the window and the phrase "i'm MAKING A DIFFERENCE" in the upper right corner of the window. *Id.*, Ex. C. That web page states, under the caption "WHAT IS I'M":

> i'm is a new initiative from Windows Live Messenger.™ Every time you start a conversation using i'm, Microsoft shares a portion of the program's advertising revenue with some of the world's most effective organizations dedicated to social causes. We've set no cap on the amount we'll donate to each organization. The sky's the limit.

*Id.*

Clicking on the **i'm** Tab on the MSN Messenger window takes the computer user to another window within MSN Messenger, which bears the headline "i'm MAKING A DIFFERENCE WITHOUT MAKING A SACRIFICE." *Id.*, ¶ 7, Ex. D. That window states, in part, that:

> i'm is a new initiative from Windows Live Messenger™ that shares a portion of the program's advertising revenue with some of the world's most effective social cause organizations.

*Id.*, Ex. D.

On the right hand side of the MSN Today window is a link bearing the term **i'm** next to the phrase "Start making a difference in the world today" (the "**i'm** Link"). *See id.*, ¶ 8, Ex. D.

---

[1] Advertisements other than the **i'm** Advertisement sometimes appear at the bottom of the Microsoft Messenger window. *See* Wexler Decl., ¶ 5, Ex. A.

Clicking on the **i'm** Link on the MSN Today window takes the computer users to the **i'm** Home Page.  *See id.*, ¶ 9, Ex. C.

Like Instant Media's software, Microsoft's Windows Live Messenger/**i'm** software can be downloaded free of charge from the Internet and installed on consumers' computers to assist with Internet communications and receipt of content data from remote providers.  *See* Leak Decl., ¶¶ 19, 23.

**D.    <u>The Effect on Instant Media of Microsoft's Use of the i'm Mark.</u>**

Since Microsoft started using the **i'm** designation in March 2007, Instant Media has received a number of inquiries concerning instant messaging.  *See id.*, ¶ 33.

Instant Media's website <u>www.im.com</u> attracts as potential customers Internet consumers using search engines such as those offered by Google, MSN (Microsoft), and Yahoo.  *See id.*, ¶ 28.  Before March 2007, a search for the term "I'M" on Google or MSN yielded Instant Media's website as the first or second website on the list of search results.  *See id.*  Since Microsoft adopted the **i'm** mark, Microsoft's **i'm** websites have appeared first (on May 15, 2007) or first and second (on June 4, 2007) on MSN searches for the term "I'M," while Instant Media's website has dropped to fifth (on May 15, 2007) to 22nd (on June 4, 2007).  *See id.*, ¶¶ 28-30, Exs. K, L.  On both May 15, 2007 and May 30, 2007, Microsoft's **i'm** websites appeared first and second on Google searches for the term "I'M," while Instant Media's website appeared fourth.  *See id.*, ¶¶ 31-32, Exs. M, N.

Both Instant Media and Microsoft compete for placement on the list of search result standings for the search term **I'M**.  *See id.*, ¶ 27.  To that end, both companies use both paid search marketing and free search marketing on Internet search engines such as Google, MSN, and Yahoo. *See id.*  At some time between May 15, 2007 and May 30, 2007 – after Instant Media asked Microsoft to cease and desist from using the **I'M** mark – Microsoft purchased the keyword "I'M" from Google to generate hits for the Windows Live Messenger website under Google's "Sponsored Links."  *See id.*, ¶¶ 31-32, Exs. M, N; Brook Decl., ¶ 10.

Instant Media has asked Microsoft to cease use of the **I'M** designation, but Microsoft has refused.  *See* Brook Decl., ¶ 11; Leak Decl., ¶ 18.

1

**PROCEDURAL HISTORY**

2

On May 17, 2007, Instant Media filed its Complaint, naming Microsoft as the sole

3

defendant.  The Complaint includes six claims for relief: (1) the First Claim for Relief for federal

4

trademark infringement; (2) the Second Claim for Relief for federal unfair competition and false

5

designation of origin; (3) the Third Claim for Relief for California trademark infringement and

6

unfair competition; (4) the Fourth Claim for Relief for common law trademark infringement and

7

unfair competition; (5) the Fifth Claim for Relief for unjust enrichment; and (6) the Sixth Claim

8

for Relief for misappropriation.

9

**LEGAL STANDARD**

10

To obtain a preliminary injunction, Instant Media must demonstrate "either (1) a

11

combination of probable success on the merits and the possibility of irreparable injury or (2) the

12

existence of serious questions going to the merits and that the balance of hardships tips sharply in

13

[its] favor."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).  *See*, *e.g.*,

14

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir.

15

1999).  These are not two distinct tests, but "the opposite ends of a single continuum in which the

16

required showing of harm varies inversely with the required showing of meritoriousness."  *Rodeo*

17

*Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987).  Under either standard,

18

preliminary injunctive relief is appropriate in this case.

19

20

**LEGAL ARGUMENT**

I.     **INSTANT MEDIA IS LIKELY TO PREVAIL ON THE MERITS, AND THERE**

21

**ARE SERIOUS QUESTIONS GOING TO THE MERITS.**

22

"To prove trademark infringement, a plaintiff must show that: (1) the mark is valid and

23

legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark

24

to identify goods or services is likely to create confusion concerning the origin of the goods or

25

services."  *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 472 (3d Cir. 1994).  By statute,

26

Instant Media's certificate of registration for the word mark **I'M** is "prima facie evidence of the

27

validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark

28

in commerce on or in connection with the goods and services specified in the certificate."  15

1  U.S.C. § 1057(c).  Instant Media has therefore established a likelihood of success with regard to

2  validity and ownership of its federally registered mark **I'M** – the precise mark being used by

3  Microsoft.

4         Because Instant Media has made a prima facie showing concerning ownership and validity

5  of its federally registered **I'M** word mark, for purposes of this motion it need not also prove

6  ownership and validity of the **I'M** marks that have not yet been federally registered.  In any event,

7  the evidence shows that Instant Media has common law rights in its **I'M** marks established by its

8  continuous use of those marks in commerce, given that: (1) Instant Media adopted its common law

9  **I'M** marks before Microsoft adopted its **i'm** mark and that Instant Media therefore owns such

10  marks; and (2) Instant Media's unregistered **I'M** marks are arbitrary because they have no

11  connection with Instant Media's products and services, *see*, *e.g.*, *Dreamwerks Prod. Group, Inc.*

12  *v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998)), and are therefore protectable without proof of

13  secondary meaning, *see*, *e.g.*, *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601

14  F.2d 1011, 1014 (9th Cir. 1979).

15         A.    <u>**Microsoft's Conduct Creates a Likelihood of Reverse Confusion.**</u>

16         The Ninth Circuit has "recognized two distinct claims in the trademark infringement

17  context: forward confusion and reverse confusion."  *Surfvivor Media, Inc. v. Survivor Prods.*, 406

18  F.3d 625, 630 (9th Cir. 2005) (citing *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1130 n.5).

19  "Forward confusion occurs when consumers believe that goods bearing the junior mark came

20  from, or were sponsored by, the senior mark holder."  *Id.*  "By contrast, reverse confusion occurs

21  when consumers dealing with the senior mark holder believe that they are doing business with the

22  junior one."  *Id.*

23         This is a case of reverse confusion, not forward confusion.  The problem is not that

24  Microsoft is trying to pass its services off as those of Instant Media.  Rather, because Microsoft

25  chose to use a mark that is identical to Instant Media's **I'M** mark on closely related services, and

26  because of Microsoft's overwhelming fame and marketing, Microsoft is likely to cause consumers

27  to think that Microsoft is affiliated with the goods and services being sold by Instant Media.

28

Case No. C 07-02639 SBA
PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION; MEMO. OF Ps & As

1    In short, Microsoft is in the process of "swamping" the goodwill that Instant Media has in

2  its **I'M** marks, essentially depriving Instant Media of the ability to use them as marks for its own

3  goods and services.  Before Microsoft began using the **i'm** mark, consumers associated that mark

4  with Instant Media.  As a result of Microsoft's marketing and publicity blizzard, consumers will

5  come to associate Instant Media's **I'M** mark with Microsoft, even when the mark is being used by

6  Instant Media in connection with its goods and services.  As the Ninth Circuit recognized in

7  *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1129-32, this "reverse confusion" is actionable under

8  the Lanham Act.  *See id.*

9    "'Reverse confusion occurs when a larger, more powerful company uses the trademark of a

10  smaller, less powerful senior owner and thereby causes likely confusion as to the source of the

11  senior user's goods or services.'"  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166

12  F.3d 197, 207 (3d Cir. 1999) (quoting *Fisons Horticulture, Inc.*, 30 F.3d at 474).  *See, e.g., Johnny*

13  *Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999) ("'[r]everse

14  confusion occurs when a large junior user saturates the market with a trademark similar or

15  identical to that of a smaller, senior user'") (quoting *Sands, Taylor & Wood Co. v. Quaker Oats*

16  *Co.*, 978 F.2d 947, 957 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042 (1993)), *cert. denied*, 528 U.S.

17  1188 (2000).

18    In a reverse confusion case, the senior user is injured because "'the public comes to

19  assume that the senior user's products are really the junior user's or that the former has become

20  somehow connected to the latter.'"  *Johnny Blastoff, Inc.*, 188 F.3d at 436 (quoting *Sands, Taylor*

21  *& Wood Co.*, 978 F.2d at 957).  "The result of reverse confusion, which is similar to dilution, 'is

22  that the senior user loses the value of the trademark – its product identity, corporate identity,

23  control over its goodwill and reputation, and ability to move into new markets.'"  *A & H*

24  *Sportswear, Inc.*, 166 F.3d at 207 (quoting *Fisons Horticulture, Inc.*, 30 F.3d at 474).  The

25  doctrine of reverse confusion is meant to address the fact that "whatever goodwill [the senior user]

26  has built now rests in the hands of [the junior user]; if the latter should take a major misstep and

27  tarnish its reputation with the public, [the senior user] would be pulled down."  *Dreamwerks Prod.*

28  *Group, Inc.*, 142 F.3d at 1130.  The doctrine is also intended to ensure that consumers do not

1    wrongly believe that the senior user has stolen the junior user's mark.  *See, e.g., Banff, Ltd. v.*

2    *Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988).

3         "Reverse confusion doctrine protects the senior user's control of its mark and the goodwill

4    created by the mark from a junior user's employment of the mark, and protects the public from

5    being deceived into believing that the senior user's product emanates from, is connected to, or is

6    sponsored by the junior user."  *Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc.*, 186 F.3d 311, 316

7    (3d Cir. 1999), *cert. denied*, 528 U.S. 1106 (2000).  "Without the recognition of reverse confusion,

8    smaller senior users would have little protection against larger, more powerful companies who

9    want to use identical or confusingly similar trademarks."  *Fisons Horticulture, Inc.*, 30 F.3d at

10   475.  "'Were reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger

11   company could with impunity infringe the senior mark of a smaller one.'"  *Id.* (quoting *Banff, Ltd.*,

12   841 F.2d at 490-91).

13        The concerns underlying the doctrine of reverse confusion are especially applicable here.

14   Microsoft is saturating the market with its **i'm** mark and is destroying Instant Media's goodwill in

15   its **I'M** marks.  Instant Media should not be forced to entrust its reputation and its marks to

16   Microsoft.   Nor should Instant Media be subjected to the likelihood that a substantial number of

17   consumers may believe that it is Instant Media – not Microsoft – which is committing

18   infringement, a belief that would be especially damaging to Instant Media to the extent that

19   consumers might conclude that Instant Media is improperly attempting to piggyback on

20   Microsoft's use of the **i'm** mark in connection with charitable services.

21        **B.    Microsoft's Use of the i'm Mark is Likely to Confuse Consumers into**
              **Believing that There is Some Affiliation, Connection, or Association Between**
22            **Instant Media and Microsoft.**

23        "The question in [reverse confusion] cases is whether consumers doing business with the

24   senior user might mistakenly believe that they are dealing with the junior user."  *Dreamwerks*

25   *Prod. Group, Inc.*, 142 F.3d at 1130.  The question in this case is whether a reasonable consumer

26   encountering goods or services from Instant Media might mistakenly believe that such goods or

27   services are affiliated with, connected with, associated with, sponsored by, or approved by

28   Microsoft.  *See id.*; 15 U.S.C. § 1125(a).

In *Dreamwerks Prod. Group*, the Ninth Circuit applied the eight-factor test set forth in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), to evaluate whether there is a likelihood of confusion, *i.e.*, whether "a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1129-30. The eight *Sleekcraft* factors are: (1) strength of the mark; (2) proximity (*i.e.*, relatedness) of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Sleekcraft Boats*, 599 F.2d at 348-49.

"The factors should not be rigidly weighed. . . . 'Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion.'" *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1129 (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)). *See, e.g.*, *Surfvivor Media, Inc.*, 406 F.3d at 631 (the *Sleekcraft* "test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them"). The courts have recognized that "three of the *Sleekcraft* factors are particularly important in determining whether reverse confusion has occurred . . . : (1) the strength or arbitrariness of the mark; (2) the relatedness (or proximity) of the parties' goods; and (3) the similarity of the marks." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1090 (C.D. Cal. 2003), *aff'd*, 2005 U.S. App. LEXIS 135 (9th Cir. 2005). *See, e.g.*, *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1130 (referring to these factors as "pivotal"); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002) ("[t]he Ninth Circuit has suggested that [these] factors are especially pertinent in reverse confusion cases").

    **1.**    **Strength of the Mark**. "The purpose of examining the strength of the plaintiff's mark is to determine the scope of trademark protection to which the mark is entitled." *Surfvivor Media, Inc.*, 406 F.3d at 631 (footnote omitted). "The more unique the mark, the greater the degree of protection." *Id. See M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005) ("[t]he more distinctive a mark, the greater its conceptual strength; in other words, a

Case No. C 07-02639 SBA
PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION; MEMO. OF Ps & As

1   mark's conceptual strength is proportional to the mark's distinctiveness"), *cert. denied*, 126 S. Ct.

2   1772 (2006).

3       "In a reverse confusion case, the court evaluates the conceptual strength of the senior

4   user's mark and the commercial strength of the junior user's mark." *Echo Drain v. Newsted*, 307

5   F. Supp. 2d 1116, 1123 (C.D. Cal. 2003) (citing *Glow Indus., Inc*, 252 F. Supp. 2d at 987 n.112).

6   In this case, a finding of infringement is supported because (1) Instant Media's **I'M** marks are

7   conceptually strong and (2) Microsoft's **i'm** mark is commercially strong (and is growing in

8   commercial strength by the day).

9           a.       <u>Conceptual Strength of Instant Media's Marks</u>.  "As in direct confusion

10  claims, a district court should weigh a conceptually strong mark in the plaintiff's favor." *A & H*

11  *Sportswear, Inc.*, 166 F.3d at 231-32.  "A mark's [conceptual] strength can be measured in terms

12  of its location along a continuum stretching from arbitrary, inherently strong marks, to suggestive

13  marks, to descriptive marks, to generic, inherently weak marks." *Rodeo Collection, Ltd.*, 812 F.2d

14  at 1218.  "Whether a mark is weak and descriptive or strong and distinctive can be determined

15  only by reference to the goods or services that it identifies." *Id.* at 1218.

16      The **I'M** mark, as used by Instant Media, is "arbitrary" because it has "no intrinsic

17  connection with the product with which the mark is used." *Brookfield Communs., Inc.*, 174 F.3d

18  at 1058 n.19.  *See Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1131 ("'[a]rbitrary' marks are

19  common words that have no connection with the actual product").  The conjunction "I'm" –

20  meaning "I am" – neither describes nor suggests the services offered by Instant Media.

21      For purposes of the *Sleekcraft* analysis, arbitrary marks are considered to be strong.  *See*

22  *Brookfield Communs., Inc.*, 174 F.3d at 1058; *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d

23  1531, 1536 (9th Cir. 1989).  Because Instant Media's **I'M** marks are arbitrary, they are entitled to a

24  broader range of protection.

25          b.       <u>Commercial Strength of Microsoft's Marks</u>.  "[I]n reverse confusion

26  cases, the inquiry focuses on the strength of a junior mark" because "[t]he strength of the junior

27  mark is closely related to how much the market is saturated by the junior mark." *M2 Software,*

28  *Inc.*, 421 F.3d at 1089 (citing *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1130 n.5, for the

14

proposition that "because reverse confusion occurs when a senior user loses its goodwill as a result of saturation by a bigger, more powerful junior user's mark, the inquiry focuses on the strength of the junior mark"). *See*, *e.g.*, *Echo Drain*, 307 F. Supp. 2d at 1124 ("in a reverse confusion case, a court should 'evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark'") (quoting 3 J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 23:10).

"In a reverse confusion case, the court considers two factors while analyzing commercial strength: '(1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark.'" *Echo Drain*, 307 F. Supp. 2d at 1124 (quoting *A & H Sportswear, Inc*., 166 F.3d at 230-31). "In a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *A & H Sportswear, Inc*., 166 F.3d at 230-31.

Here, Microsoft's **i'm** mark has acquired great commercial strength in a short period of time. According to Microsoft, Windows Live Messenger is used by more than 240 million active accounts each month," and more than 465 million users visit MSN's website each month. *See* Brook Decl., Exs. C, E. Every time that a computer user signs on to Windows Live Messenger or visits MSN's website, he or she is confronted with Microsoft's **i'm** mark. *See* Wexler Decl., Exs. A-D. Microsoft's website www.msn.com and its search engine www.live.com are among the top eight most popular websites in the United States and the world. *See id.*, ¶¶ 10-12, Exs. E-G. Nearly ***30 percent*** of the computer users ***in the world*** visit www.msn.com ***every day***, *see id.*, Ex. F, and are exposed to Microsoft's **i'm** mark on that website, *see* Leak Decl., Ex. I. Furthermore, Microsoft concedes that thousands of Windows Live Messenger users have already joined Microsoft's "**i'm** campaign." *See* Brook Decl., Ex. B.

**2.**    **Proximity of the Goods.** "The standard for deciding whether the parties' goods or services are 'related' is whether customers are 'likely to associate' the two product lines." *Surfvivor Media, Inc.*, 406 F.3d at 632 (quoting *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1131).

1  "We must also consider whether the buying public could reasonably conclude that the products

2  came from the same source." *Id.* (citing *Sleekcraft Boats*, 599 F.2d at 348). *See, e.g.*, *Fisons*

3  *Horticulture, Inc.*, 30 F.3d at 481 (in determining whether goods are sufficiently related for there

4  to be a likelihood of confusion, "[t]he question is whether the consumer might . . . reasonably

5  conclude that one company would offer both of these related products"); *Sands, Taylor & Wood*

6  *Co.*, 978 F.2d at 958 ("[a] 'closely related' product is one 'which would be reasonably thought by

7  the buying public to come from the same source, or thought to be affiliated with, connected with,

8  or sponsored by the trademark owner'") (citation omitted). In the context of reverse confusion,

9  the question is "whether a consumer who bought or saw the advertising for [defendants'] products

10  could reasonably assume that the same source also offered" Instant Media's goods and services.

11  *Fisons Horticulture, Inc.*, 30 F.3d at 481.

12      Here, the goods and services offered by Instant Media under the **I'M** mark are identical or

13  very similar to those offered by Microsoft under the **i'm** mark. Instant Media's software, available

14  by a free download from the Internet, is designed to assist with Internet communication and

15  reception of communication data from remote sources via the Internet, including high-resolution

16  video and other data. *See* Leak Decl., ¶ 3. Similarly, Microsoft's Windows Live Messenger, also

17  available by a free download from the Internet, allows computer users to communicate by sharing

18  voice, video, and other data. *See* Brook Decl., Ex. E, at 2; *id.*, Ex. A. Assuming *arguendo* that

19  there could be some question as to whether the parties' respective goods and services are related,

20  Microsoft's acquisition of aQuantive, Inc. – a company offering the same sort of video products as

21  Instant Media – puts any such question to rest. *Compare id.*, Ex. F, *with* Leak Decl., ¶ 3.

22      **3.    Similarity of the Marks.** "'In judging similarity, trademarks should be considered

23  as they are encountered in the marketplace, taking into account the normal circumstances

24  surrounding purchases of the type of goods they represent." *Matrix Motor Co., Inc.*, 290 F. Supp.

25  2d at 1093 (quoting *Glow Indus., Inc.*, 252 F. Supp. 2d at 994).

26      "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*

27  *Boats*, 599 F.2d at 351. The parties' marks are identical on the level of sight, even though Instant

28  Media holds a registration for the word mark **I'M** and Microsoft is using those letters in a lower

16

case font, given that, for purposes of determining the likelihood of confusion, "[r]egistrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 949-50 (Fed. Cir. 2000). Because both Instant Media and Microsoft are using the identical word "I'm" as their marks, the competing marks are identical in sound and meaning. Furthermore, there is no difference between the terms **I'M** and **i'm** when they are used for searches on Internet search engines.

**4. Evidence of Actual Confusion.** "Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft Boats*, 599 F.2d at 352. However, "[t]he failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion makes its absence generally unnoteworthy." *Brookfield Communs., Inc.*, 174 F.3d at 1050. This rule applies with particular force in a situation such as this one "when a suit for injunctive relief from a competitor's use is brought at the incipiency of the alleged infringement. At that stage, plaintiff should not be expected to stand by and await the dismal proof." *Jordan K. Rand, Ltd. v. Lazoff Bros.*, 537 F. Supp. 587, 596 (D.P.R. 1982).

Although evidence of actual confusion is unnecessary to prove a likelihood of confusion, Instant Media notes that, since Microsoft started using the **i'm** mark in March 2007, Instant Media has seen a dramatic increase in the number of inquiries that it has received concerning instant messaging. *See* Leak Decl., ¶ 33.

**5. Marketing Channels Used.** "'Convergent marketing channels increase the likelihood of confusion.'" *M2 Software, Inc.*, 421 F.3d at 1083 (quoting *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987)). Both Instant Media and Microsoft offer free downloadable software on their websites to consumers and the general public. *See* Leak Decl., ¶¶ 22-23. Both Instant Media and Microsoft seek publicity and positive product reviews in the same trade journals. *See id.*, ¶ 26. Both Instant Media and Microsoft compete for consumers using Internet search engines and, in order to attract such consumers, both companies use both

1    paid search marketing and free search marketing on Internet search engines such as Google, MSN,

2    and Yahoo.  *See id.*, ¶¶ 27-32, Exs. K-N.

3         **6.        Type of Goods and Degree of Care.**  Likelihood of confusion is determined on the

4    basis of a "reasonably prudent consumer."  In general, where the consumer is purchasing

5    relatively expensive goods or services, he or she is presumed to be more sophisticated and "more

6    discerning."  *Brookfield Communs., Inc.*, 174 F.3d at 1060.  "On the other hand, when dealing

7    with inexpensive products, customers are likely to exercise less care, thus making confusion more

8    likely."  *Id.*  Because both Instant Media and Microsoft are using **I'M** marks in connection with

9    *free* Internet software and services, *see* Leak Decl., ¶ 23, consumers are likely to exercise very

10   little care.

11        **7.        Defendant's Intent.**  In a reverse confusion case, the intent inquiry focuses on the

12   question whether the defendant "consider[ed] the likelihood of confusion with other companies'

13   marks and products (as opposed to considering the likelihood that someone would contest its new

14   mark)."  *Fisons Horticulture, Inc.*, 30 F.3d at 480.  "'Absence of malice is no defense to trademark

15   infringement.'"  *Surfvivor Media, Inc.*, 406 F.3d at 634 (quoting *Cohn v. Petsmart, Inc.*, 281 F.3d

16   837, 843 (9th Cir. 2002)).

17        Because the parties have not conducted any discovery, Instant Media is unable at this time

18   to introduce direct evidence of Microsoft's intent.  However, Instant Media notes that: (1) given

19   Microsoft's size, sophistication, and experience with intellectual property issues, it is

20   inconceivable that Microsoft did not conduct a trademark search concerning the availability of the

21   **i'm** mark before deciding to adopt that mark and to file applications to register such mark; and (2)

22   such a search would have necessarily revealed Instant Media's registration of the word mark **I'M**

23   and applications for other **I'M** marks.  Under these circumstances, Microsoft should certainly have

24   been aware of the likelihood that its use of the **i'm** mark was likely to cause confusion with Instant

25   Media's use of that mark.  *See Surfvivor Media, Inc.*, 406 F.3d at 634 ("'where the alleged

26   infringer adopted his mark with knowledge, actual or constructive, that it was another's

27   trademark,' resolution of this factor favors" the plaintiff) (quoting *Brookfield Communs., Inc.*, 174

28   F.3d at 1059).

Case No. C 07-02639 SBA
PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION; MEMO. OF Ps & As

8.    **Likelihood of Expansion.**  The factor of likelihood of expansion "is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market."  *A & H Sportswear, Inc.*, 166 F.3d at 234.

Given Microsoft's pervasive presence in the computer industry and the broad range of goods and services offered by Microsoft, it should be beyond dispute that the consuming public might expect Microsoft to offer ***any*** goods or services that are related to computers.  Indeed, Microsoft on May 18, 2007 acquired aQuantive, Inc., a company whose services – described by Microsoft as including "cross media planning, video-on-demand and IPTV" – overlap with the high-quality video services offered by Instant Media.  *Compare* Brook Decl., Ex. F *with* Leak Decl., ¶ 3.

II.    **INJUNCTIVE RELIEF IS APPROPRIATE BOTH BECAUSE INSTANT MEDIA FACES THE POSSIBILITY OF IRREPARABLE INJURY AND BECAUSE THE BALANCE OF HARDSHIPS TIPS SHARPLY IN ITS FAVOR.**

The fact that Instant Media has demonstrated a likelihood of succeeding on its trademark infringement claim supports a presumption of irreparable injury.  In trademark cases, the law is settled that a "showing of likelihood of success on the merits in [a] trademark infringement claim [allows the Court to] presume irreparable injury."  *GoTo.com*, 202 F.3d at 1209.  *See*, *e.g.*, *Brookfield Communs., Inc.*, 174 F.3d at 1066; *Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993).

In any event, Instant Media will suffer irreparable injury – and the balance of hardships tips sharply in its favor – because Microsoft's pervasive use of the **i'm** designation will, unless preliminarily enjoined, swamp Instant Media's **I'M** marks and cause consumers to associate those marks with Microsoft – not Instant Media.  Instant Media would thereby be deprived of the goodwill that it has built up in its **I'M** marks by, *inter alia*, providing its software to more than 700,000 consumers and spending more than $1 million in developing television commercials and buying television and Internet advertising exposure.  *See id.*, ¶¶ 15-17, Ex. H.

1    By contrast, Microsoft would suffer **no** injury were the Court to preliminarily enjoin it

2    from using the **i'm** designation.  Virtually all computer users wishing to access the services being

3    offered by Microsoft under the **i'm** designation will do so through the links provided on

4    www.msn.com or the Windows Live Messenger window.  Such computer users will be equally

5    able to link to such services regardless of whether they are designated with the term **i'm** or in

6    some other manner.  Even assuming *arguendo* that a preliminary injunction might cause some

7    injury to Microsoft, "the injury a defendant might suffer if an injunction were imposed may be

8    discounted by the fact that the defendant brought that injury upon itself."  *Novartis Consumer*

9    *Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002).

10                                    <u>**CONCLUSION**</u>

11    For the reasons set forth herein, Instant Media respectfully asks the Court to preliminarily

12    enjoin Microsoft from using the **i'm** mark (or any confusingly similar mark) to designate its

13    services.

14    DATED: June 12, 2007                    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

15

16                                By:    /s/ Mitchell P. Brook
17                                        Mitchell P. Brook
                                          Attorneys for Plaintiff Instant Media, Inc.
18

19

20

21    201001132.1

22

23

24

25

26

27

28