1   ARNOLD & PORTER LLP
    Suzanne V. Wilson (State Bar #152399)
2   suzanne.wilson@aporter.com
    Charles C. Cavanagh (State Bar #198468)
3   charles.cavanagh@aporter.com
    Elizabeth G. Frank (State Bar #245676 )
4   elizabeth.frank@aporter.com
    777 South Figueroa Street, 44th Floor
5   Los Angeles, California  90017-5844
    Telephone:  (213) 243-4000
6   Facsimile:  (213) 243-4199

7
    Catherine R. Rowland (*Pro Hac Vice*)
8   catherine.rowland@aporter.com
    555 Twelfth Street, N.W.
9   Washington, D.C.  20004
    Telephone:  (202) 942-5000
10  Facsimile:  (202) 942-5999

11  *Attorneys for Defendant Microsoft Corporation*

12

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                       OAKLAND DIVISION

16

17  INSTANT MEDIA, INC., a Delaware         )   Case No. CV 07-02639 SBA
    corporation,                            )
18                                          )
                    Plaintiff,              )   **DEFENDANT MICROSOFT**
19                                          )   **CORPORATION'S OPPOSITION TO**
            v.                              )   **PLAINTIFF INSTANT MEDIA, INC.'S**
20                                          )   **MOTION FOR PRELIMINARY INJUNCTION**
    MICROSOFT CORPORATION, a                )
21  Washington corporation,                 )
                                            )   Judge:    Hon. Saundra Brown Armstrong
22                  Defendant.              )   Date:     July 24, 2007
                                            )   Time:     1:00 p.m.
23  _____ )   Ctrm.:    3

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3
Page

4

I.      INTRODUCTION ................................................................................................ I

5

II.     FACTUAL BACKGROUND ............................................................................... 2

6

    A.      Microsoft Corporation, The "i'm" Initiative, and Windows Live
         Messenger ................................................................................................ 2

7

8
         1.      Windows Live Messenger ................................................................ 3

9
         2.      Microsoft's "i'm" Initiative ............................................................ 3

10
         3.      Microsoft's Advertising and Promotion of the i'm Initiative ......... 4

11
         4.      Microsoft's Applications to Register the "i'm" Mark .................... 5

12
         5.      The "i'm" Initiative Is Unrelated to Instant Media's Products or
            Services ............................................................................................ 5

13

14
         6.      Microsoft's Acquisition of aQuantive is Irrelevant to Instant
            Media's Claims ............................................................................... 6

15
    B.      Instant Media, Inc. and Its I'M Player ..................................................... 6

16
         1.      Instant Media's I'M Player ............................................................. 6

17
         2.      Instant Media's Advertising and Promotion of Its I'M Services .... 7

18
         3.      Instant Media's Trademarks ............................................................ 8

19
    C.      Significant Harm Will Result From Entry of An Injunction ................... 9

20

III.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION .......... 9

21
    A.      Instant Media's Trademark Rights ......................................................... 10

22
    B.      No Likelihood Of Confusion Exists Between the Parties' Non-
         Competitive Goods ................................................................................. 10

23
         1.      Standard for Likelihood of Confusion in a Reverse Confusion Case ........... 10

24
         2.      Instant Media's Mark Is Conceptually Weak but Commercially
            Stronger ......................................................................................... 11

25

26
         3.      The Parties Do Not Use Their Marks In Connection With Related
            Goods ............................................................................................ 15

27
         4.      The Parties' Marks Are Not Similar .............................................. 16

28
            a.      The Parties' Marks Look Different ................................... 16

- i -

1        b.  Instant Media and Microsoft's Marks Have Different

2          Meanings ........................................................................... 17

3     5.  Instant Media's Customers Are Likely to Exercise a High Degree

        of Care ............................................................................................. 17

4        a.  Instant Media's Individual Consumers ............................... 18

5        b.  Instant Media's Business Customers .................................. 18

6     6.  The Parties' Marketing Channels Are Distinct ............................... 19

7     7.  There is No Evidence That the Parties Are Likely to Expand Their

8        Use ................................................................................................... 20

9     8.  There Is No Evidence That Microsoft Has Acted With the Intent to

        Infringe ............................................................................................ 21

10    9.  Microsoft's Evidence Affirmatively Demonstrates the Absence of

11       Confusion ......................................................................................... 21

12       a.  Consumer Survey Proves No Likelihood of Reverse

        Confusion ............................................................................ 21

13       b.  Plaintiff Has No Evidence of Actual Confusion ................................ 23

14  C.  Instant Media Has Presented No Evidence Of Irreparable Harm ............................. 24

15  D.  The Balance Of Hardships Tips Sharply In Microsoft's Favor .................................. 24

16 IV.  INSTANT MEDIA SHOULD BE REQUIRED TO POST A BOND ................................... 25

17 V.  CONCLUSION ........................................................................................................................... 25

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**CASES**

4

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
    447 F. Supp. 2d 266 (S.D.N.Y. 2006) .......................................................... 20, 21

5

*A& H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*
    237 F.3d 198 (3d Cir. 2000) ........................................................................... 14

6

*AMF, Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979) ............................................. 10, 20, 22, 24

7

8

*Alchemy II Inc. v. Yes! Entm't Corp.,*
    844 F. Supp. 560 (C.D. Cal. 1994) ................................................................. 23

9

10

*Altira Group LLC v. Philip Morris Cos.,*
    207 F. Supp. 2d 1193 (D. Colo. 2002) ............................................................ 18

11

*Cairns v. Franklin Mint Co.,*
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...................................................... 21, 22

12

*Cohn v. Petsmart, Inc.,*
    281 F.3d 837 (9th Cir. 2002) .......................................................................... 10

13

14

*CyberMedia, Inc. v. Symantec Corp.,*
    19 F. Supp. 2d 1070 (N.D. Cal. 1998) ............................................................ 25

15

*Dep't of Parks & Recreation v. Bazaar Del Mundo, Inc.,*
    448 F.3d 1118 (9th Cir. 2006) ........................................................................ 10

16

17

*Dreamwerks Prod. Group, Inc. v. SKG Studio,*
    142 F.3d 1127 (1998) ...................................................................................... 10

18

*Duluth News-Tribune v. Mesabi Publ'n Co.,*
    84 F.3d 1093 (8th Cir. 1996) .......................................................................... 23

19

20

*Echo Drain v. Newsted,*
    307 F. Supp. 2d 1116 (C.D. Cal. 2003) ................................................. 15, 22, 23

21

*Entrepreneur Media, Inc. v. Smith,*
    279 F.3d 1135 (9th Cir. 2002) ........................................................................ 12

22

23

*Freedom Card, Inc. v. JPMorgan Chase & Co.,*
    432 F.3d 463 (3d Cir. 2005) ........................................................................... 13

24

*Garden of Life, Inc. v. Letzer,*
    318 F. Supp. 2d 946 (C.D. Cal. 2004) ............................................................ 10

25

26

*Glow Indus., Inc. v. Lopez,*
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ............................................. 11, 12, 13, 14, 19, 24

27

28

*GoTo.com v. Walt Disney Co.*,
　　202 F.3d 1199 (9th Cir. 2000)...................................................................................... 24

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
　　991 F.2d 1072 (2d Cir. 1993)........................................................................................ 17

*Halo Mgmt., LLC v. Interland, Inc.*,
　　308 F. Supp. 2d 1019 (N.D. Cal. 2003) ............................................................ 12, 18, 24

*Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*,
　　952 F. Supp. 1084 (D.N.J. 1997) .................................................................................. 15

*International Jensen, Inc. v. Metrosound U.S.A., Inc.*,
　　4 F.3d 819 (9th Cir. 1993)............................................................................................ 24

*Jupiter Hosting v. Jupitermedia Corp.*,
　　76 U.S.P.Q.2d 1042 (N.D. Cal. 2004) ............................................................... 12, 23, 24

*Levi Strauss & Co. v. Blue Bell, Inc.*,
　　778 F.2d 1352 (9th Cir. 1985)............................................................................ 2, 11, 21

*Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*,
　　290 F. Supp. 2d 1083 (C.D. Cal. 2003) ........................................................ 11, 13, 15, 17

*Mattel, Inc. v. MCA Records, Inc.*,
　　28 F. Supp. 2d 1120 (CD Cal. 1998) ............................................................................ 23

*Mejia & Assoc. v. IBM Corp.*,
　　920 F. Supp. 540 (S.D.N.Y. 1996)................................................................................ 17

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
　　856 F.2d 1445 (9th Cir. 1988)............................................................................ 11, 12, 18

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
　　331 F. Supp. 2d 1214 (C.D. Cal. 2004) .................................................................. *passim*

*Petro Stopping Ctrs, L.P. v. James River Petroleum, Inc.*,
　　130 F.3d 88 (4th Cir. 1997).......................................................................................... 13

*Playboy Enters., Inc. v. Netscape*,
　　55 F. Supp. 2d 1070 (C.D. Cal. 1999) ........................................................................... 22

*Playmakers LLC v. ESPN Inc.*,
　　297 F. Supp. 2d 1277, 1284 (W.D. Wash. 2003)............................................................ 21

*Playmakers LLC v. ESPN, Inc.*,
　　376 F.3d 894 (9th Cir. 2004)........................................................................................ 10

*PostX Corp. v. docSpace Co.*,
　　80 F. Supp. 2d 1056 (N.D. Cal. 1999) ..................................................................... 13, 24

*Sanofi-Synthelabo v. Apotex, Inc.*,
　　470 F.3d 1368 (Fed Cir. 2006)..................................................................................... 25

- iv -

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ................................................................................... 22

*Southwest Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ..................................................................................... 25

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004) ....................................................................... 15

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996) ................. 15

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ................................................................................ 17, 20

*Walter v. Mattel, Inc.*,
    31 F. Supp. 2d 751 (C.D. Cal. 1998) .......................................................................... 14

**STATUTES & RULES**

Fed. R. Civ. P. 65 ............................................................................................................ 25

Fed. R. Evid. 801 ............................................................................................................ 23

Fed. R. Evid. 802 ............................................................................................................ 23

**OTHER AUTHORITIES**

2 McCarthy, *McCarthy on Trademarks and*
    *Unfair Competition* § 11:85 ...................................................................................... 11

4 J. McCarthy, *McCarthy on Trademarks and*
    *Unfair Competition* § 23:10 (4th ed. 2007) ........................................................... 1, 14

6 McCarthy, *McCarthy on Trademarks and*
    *Unfair Competition* § 32:189 .................................................................................... 21

Case No. C 07-02639 SBA
DEFENDANT MICROSOFT CORPORATION'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

# I.  **INTRODUCTION**

Plaintiff's motion for a preliminary injunction should be denied.  There is no likelihood of reverse confusion between plaintiff Instant Media, Inc.'s ("Instant Media" or "Plaintiff") mark (the I'M mark), which is used with its Internet TV and media player software, and defendant Microsoft Corporation's ("Microsoft") use of (the "**i'm** mark") for a philanthropic marketing initiative aimed at socially-responsible people who are instant messaging users.  No preliminary injunction should issue where:

- The **i'm** initiative is unrelated to Plaintiff's media player.  The **i'm** initiative is not software -- it is a marketing campaign that targets socially-responsible instant messaging users.  The **i'm** initiative does not compete with or target the same customers as Instant Media's player.[1]  *See* 4 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:10 (4th ed. 2007) ("Reverse confusion will not be likely if the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers.") (hereinafter "McCarthy").

- In mid-2005, Instant Media conceded to the United States Patent and Trademark Office ("PTO") the narrow scope of rights in its I'M mark due to the number of similar marks:

   > [O]wners of I'M or IM registrations are not entitled to a broad scope of protection for their marks . . . , but instead may only claim protection with respect to *closely related* goods or services.

   Cavanagh Decl. ¶¶ 21-22, Ex. AA & CC (emphasis added).

- The purported confusion evidence presented by Plaintiff does not reflect any *trademark* confusion.[2]  Plaintiff's vague statement that an unknown number of anonymous individuals contacted it about *instant messaging* does not constitute confusion as a result of Microsoft's use of the **i'm** mark to identify a *philanthropic marketing* campaign.

- Instant Media's search engine rankings are irrelevant here.  The search engines' respective

---

[1] Pursuant to its main website at www.im.com, Instant Media's customers appear to be predominantly other businesses.  Declaration of Charles Cavanagh ("Cavanagh Decl.") ¶ 10, Ex. N.

[2] Plaintiff's statement regarding the inquiries of third parties is not admissible evidence.  *See* "Microsoft's Objections to Evidence Submitted by Plaintiff", filed concurrently herewith.

- 1 -

algorithms determine the rankings, not Microsoft.  The results of searches on popular Internet search engines only demonstrate that many businesses in addition to Microsoft or Instant Media show up when users search on "I'm."  These search results would not confuse any prudent consumer.

- The parties' respective marks are markedly different in appearance and convey different meanings to potential consumers.

- A survey of Instant Media's prospective individual customers reveals *no* likelihood of reverse confusion caused by Microsoft's use of its **i'm** mark.  Survey evidence is direct evidence of whether a likelihood of confusion exists.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) ("Survey evidence and testimony may . . . outweigh whatever circumstantial evidence [of confusion] has been introduced.").  In contrast, Instant Media does not submit a survey to support its confusion claim.

- Microsoft has presented significant evidence of the harm that an injunction will impose on it, as well as on the organizations that the **i'm** initiative benefits.  These costs include, among others, substantial re-branding costs and disruption of the initiative.

Microsoft's use of the **i'm** mark is not likely to create confusion among Instant Media's business or individual customers.  The factors relevant to the reverse confusion inquiry lead to the conclusion that no confusion exists and Instant Media's motion should therefore be denied.

## II.  FACTUAL BACKGROUND

### A.     Microsoft Corporation, The "i'm" Initiative, and Windows Live Messenger

Microsoft's **i'm** initiative is a philanthropic marketing campaign used exclusively with Microsoft's Windows Live Messenger 8.1 ("WLM") instant messaging software.  Declaration of Tara Kriese ("Kriese Decl.") ¶ 8.  Under the initiative, Microsoft will donate a portion of the advertising revenue generated by participating WLM users to ten social cause organizations.  Participating WLM users select a specific organization that they wish to benefit from their instant messaging from any of the ten social-cause organizations.  *Id.*  WLM, which allows consumers to engage in real-time communication with other WLM users over the Internet, does not compete with Instant Media's products and services.  *Id.* ¶¶ 3, 7.

- 2 -

**1.     Windows Live Messenger**

Microsoft's WLM is one of many popular competing instant messaging services,[3] including America Online's ("AOL") AIM, ICQ, Yahoo! Messenger, and Google's GTalk.[4]  *Id.*  Users download WLM for free from a Microsoft website.[5]  *Id.*, ¶ 4.  Instant messaging has grown at a rapid pace in the United States and throughout the world due to the increased availability of broadband Internet access.  There are currently over 77,425,000 estimated instant messenger users in the United States and approximately 368,000,000 users worldwide.  *Id.*, ¶ 3.

WLM does not compete with any Instant Media products or services.  Unlike Plaintiff's products and services, WLM is not a media player or an Internet media platform.  *Id.* ¶ 7.  WLM is distinct from Instant Media's products or services in that it does not enable users to broadcast video or audio programs over the Internet; it does not support a subscription service by which video or audio files are automatically downloaded to the user's computer; it has no caching technology for videos; and it does not provide any retailing services – consumers cannot buy products through WLM (or the **i'm** initiative discussed below).  *Id.*

**2.     Microsoft's "i'm" Initiative**

Microsoft's "**i'm**" initiative is free, voluntary, and only available to users of WLM 8.1.  *Id.* ¶¶ 8, 10.  A WLM user joins the "**i'm**" initiative by visiting a Microsoft website, such as im.live.com (the "**i'm** Website"), and clicking on the "Join Now" button.  *Id.*, ¶ 12.  The user identifies his or her country of residence for eligibility (only U.S. residents are eligible) and designates one of the ten participating social cause organizations – the Humane Society, American Red Cross, UNICEF, Susan G. Komen Race for the Cure, Boys and Girls Clubs of America, National AIDS Fund, National Multiple Sclerosis Society, Ninemillion.org, Sierra Club and Stopglobalwarming.org – to benefit from his or her instant messaging.  *Id.*, ¶¶ 9, 12, 13.  Thereafter, every time the participant sends an

---

[3] Instant messaging is a form of electronic communication, enabling real-time communication between people connected to a network (such as the Internet) and logged onto either the same or compatible services.  Kriese Decl. ¶ 2.  Instant messaging is referred to as "IM" or "im'ing."  *Id.*

[4] AOL's AIM service is the most popular IM service in the U.S.  Kriese Decl. ¶ 23.

[5] Additional information about WLM is set forth in the Declaration of Tara Kriese, ¶¶ 2-7.

- 3 -

instant message using WLM, the organization will be credited for that message.[6]  The **i'm** logo appears by the "Display Name" of the WLM user and is visible to the participating user and other WLM users with which he or she instant messages.[7]  Kriese Decl. ¶ 13.

Microsoft does not use and has no intent to use its **i'm** mark to designate any other services. *Id.*  Microsoft has pledged to donate a minimum of $1 million dollars (*i.e.*, $100,000 each) at the end of 2007 to the ten designated organizations, with the exact amount to be donated to each organization based upon the number of instant messages sent by participating WLM users.[8]  *Id.*, ¶ 9.  Microsoft chose the mark "**i'm**" for use with the initiative because it suggests "IM," the common abbreviation for "instant messaging," and it indicates that participants are individually taking steps to be socially responsible (*e.g.*, "i'm making a difference").  *Id.*, ¶ 19.  In addition, the **i'm** logo suggests instant messaging by use of the "i" next to a speech balloon instead of an apostrophe, and the logo mirror the colors of the "buddy" logo used by WLM.  *Id.* ¶ 20.

Although Microsoft does not track the number of users participating in the **i'm** initiative, it does track the messages sent by participants and the corresponding selected organization.  *See* Suppl. Conf. Kriese Decl. ¶ 3.  Given the volume of instant messages sent through the initiative, Microsoft believes that thousands of users are participating in the **i'm** initiative.  *Id.*

### 3.    Microsoft's Advertising and Promotion of the i'm Initiative

The **i'm** initiative and Website officially launched on March 1, 2007 and was the subject of significant media attention.[9]  Kriese Decl. ¶¶ 24-25.  The ten participating organizations immediately engaged in outreach efforts to their respective supporters and the public through their websites, emails, newsletters, and blogs.  *Id.*, ¶ 26.  The **i'm** Website displays the "**i'm**" mark alongside the phrase "i'm making a difference" and other phrases, each relating to one of the social

---

[6] At the end of the year, Microsoft will determine each organization's share of the instant messaging advertising revenue designated for the initiative.  *Id.* ¶ 9.  Microsoft has put no cap on the amount that it will donate through the end of the year.  *Id.*.

[7] Users can modify their "Display Names" and include graphics in the name.  *Id.* ¶ 15, Exs. D-E.

[8] The **i'm** initiative is explained further in the Declaration of Tara Kriese at ¶¶ 8-18.

[9] Prior to its official launch, news of the **i'm** initiative became known in the public.  An influential fan website for instant messaging users posted the information.  Kriese Decl. ¶ 24, Ex. H.

cause organizations, such as:  "i'm providing a positive place for kids"; "i'm fighting AIDS"; and "i'm stopping global warming."  *Id.*, ¶ 11.  In a common website design, each phrase appears in sequence on the home page of the **i'm** Website until all appear together and then disappear.  *Id.* Ex. B.  These phrase are used in other advertising and promotional materials for the **i'm** initiative.

Microsoft followed the launch with an advertising campaign on its www.msn.com website and through the Windows Live network, including Windows Live Hotmail (Microsoft's email application), Spaces (a social networking website), and WLM, among others.  *Id.* ¶ 27.  Microsoft also engaged in a college outreach effort to promote the initiative.  *Id.* ¶ 34.  On May 15, 2007, Microsoft further expanded its advertising of the **i'm** initiative outside of Microsoft websites to other online media properties, print media and other venues designed specifically to reach socially-responsible, frequent instant messaging users.  *Id.* ¶¶ 28-35.  Microsoft does not advertise the **i'm** initiative through paid television or radio advertisements.  Kriese Decl. ¶ 37.  In addition to its formal advertising campaign, Microsoft also benefited from a word-of-mouth marketing campaign as individual users rapidly spread the word about the initiative.  *Id.* ¶ 27.  To date, Microsoft has spent millions of dollars on advertising the **i'm** initiative.  *See* Suppl. Conf. Kriese Decl. ¶ 8.

### 4.     Microsoft's Applications to Register the "i'm" Mark

Prior to launching the **i'm** initiative, Microsoft filed three "intent-to-use" applications with the PTO for the **i'm** mark.[10]  Cavanagh Decl. ¶ 2, Exs. A-C.  Microsoft is currently pursuing only one of its applications, the application filed in Class 36 for an online philanthropic program.[11]  *Id.*, ¶ 3, Ex. D.  The PTO has approved this application for publication.  *Id.*

### 5.     The "i'm" Initiative Is Unrelated to Instant Media's Products or Services

The **i'm** initiative is not similar to any of Instant Media's products or services.  Kriese Decl.

---

[10] An intent-to-use application grants a trademark applicant constructive use priority in the mark as of the date of filing the application when, *and if*, the applicant commences use of the mark and the application proceeds to registration.  The trademark does not become registered until the applicant provides evidence to the PTO of its use of the mark.  3 McCarthy §19:13.

[11] Microsoft abandoned two of its applications for **i'm** in the software and instant messaging areas because it will not be using the **i'm** mark to brand those goods and services.  Cavanagh Decl. ¶¶ 4-5, Exs. E-H.  Prior to filing its abandonments, Microsoft received correspondence from the PTO, that raised the same initial concerns regarding the use of the **i'm** mark on a software product as were raised by the PTO against Plaintiff's applications for registration of its I'M mark.  *Id.*

¶ 18.  It does not provide software regarding any audio, video, audiovisual or other content data.
Moreover, the **i'm** initiative does not provide:  software for subscribing to news or other
information; software implementing IPTV; or software for commercial transactions.  *Id.*

      **6.**      **Microsoft's Acquisition of aQuantive is Irrelevant to Instant Media's Claims**

      Microsoft's recent acquisition of aQuantive, mentioned in the Motion, is wholly unrelated to
Microsoft's WLM service and to Microsoft's **i'm** initiative.  *See* Kriese ¶ 43; Declaration of Que
Thanh Luu ("Luu Decl.") ¶¶ 2-4.  aQuantive sells sophisticated back-end infrastructure and services
for purchasing and displaying advertisements over the Internet.  *Id.*  Microsoft has not used, does not
use and does not intend to use its **i'm** mark in connection with aQuantive.  *Id.*

**B.**      <u>Instant Media, Inc. and Its I'M Player</u>

      **1.**      **Instant Media's I'M Player**

      Instant Media announced its I'M player in approximately May 2006.  Cavanagh Decl. Ex. I.
Plaintiff's I'M player is downloadable software that enables users to view selected high definition
video files distributed through the player by Instant Media's content-provider business partners.[12]
Cavanagh Decl. ¶¶ 17-19; Plaintiff's Decl. of Andrew Leak ¶ 3.  Among other things, Plaintiff
licenses its I'M player software to business partners, advertisers and content providers to support
the delivery of video content over the Internet.  Motion 2.  In advertising to these business
customers, Plaintiff states that "I'M presents a superior viewing experience that fully expresses your
brand and your professional production values."  Cavanagh Decl. Ex. N.  Plaintiff's trademark
applications describe the services offered under the I'M mark as follows: "electronic retailing
services," "developing on-line promotional campaigns for others in the field of entertainment,"
"software for subscribing to news, information, audio, video and audiovisual programs, feeds and
services," "software implementing IPTV and Internet based content, television and movie
subscription services," and "software for conducting commercial transactions."  *See* Motion 2-3.

---

[12] Microsoft has been unable to verify certain statements made by Instant Media regarding its I'M
business and offerings.  *See* Cavanagh Decl. ¶¶ 6 & 20, Ex. I.  For example, Plaintiff claims that it
used the I'M mark since 2004 for "providing content delivery via two-way communications over
the Internet."  Motion 1.  However, Instant Media did not launch its player until mid-2006 nor does
the I'M player provide any "real-time" communications, and is not advertised for that purpose.  *Id.*

1    Users also can download the I'M player from Instant Media's websites. According to Instant

2    Media, more than 700,000 copies of its software have been downloaded from the Internet to date.

3    Leak Decl. ¶ 15. The player offers a designated list of audio and video clips and "shows" that users

4    view or subscribe to with the I'M player. For example, users subscribe to a weekly "show" from

5    Buy.com, which highlights products for sale at www.buy.com. Cavanagh Decl. ¶ 7, Ex. J. Reviews

6    of the I'M player compare it to the iTunes software by Apple Computer. *Id.*, ¶ 8, Exs. L-M. I'M

7    player users cannot engage in instant messaging with other I'M users, nor is the player designed to

8    permit any other peer-to-peer file sharing. *Id.* ¶ 20.

9         **2.    Instant Media's Advertising and Promotion of Its I'M Services**

10    Instant Media has engaged in a significant advertising campaign, spending over $1 million

11    advertising the player and the I'M mark. Leak Decl. ¶¶ 16, 17 & 26, Ex. H. In 2006, the company

12    ran television commercials that advertise its im.com website. *Id.* These commercials are posted on

13    its website and on Facebook. *Id.* ¶¶ 16-17. Plaintiff further promotes its I'M software through

14    public relations targeting journalists and industry analysts, and media coverage in, among others,

15    computer trade journals and "influential technology blogs." Motion 4.

16    The company also promotes its I'M player through its websites and paid advertisements on

17    search engines. Leak Decl. ¶¶ 5, Ex. A & ¶ 27. Plaintiff has two distinct websites that target different

18    customer bases: (1) its principal website at www.im.com (the "IM.com Website"), which is aimed at

19    businesses and content providers (Cavanagh Decl. ¶ 10, Ex. N; and (2) its secondary website at

20    www.im.com/main.aspx (the "Consumer Website"), which is a consumer-facing website promoting

21    downloading the Instant Media player for its content and its media management functions (*Id.* ¶ 11,

22    Ex. P).

23    The IM.com Website, and not the Consumer Website, appears in search engine results when

24    a user searches on the term "I'M" on Google or Windows Live Search. *Id.* ¶ 13, Ex. Q, R. (Instant

25    Media's websites do not appear in the first 100 listings of a search for "I'M" on Yahoo. *Id.*, Ex. ¶

26    14, Ex. S) Until recently, the listing that appeared in Google and Windows Live searches was:

27        I'M INSTANT MEDIA – The Leader In Internet TV
         The **Instant Media** platform is built on patent-pending caching technology that
28        delivers professional video. Unlike other video solutions that utilize ...

- 7 -

1    Leak Decl. Exs. K & L.  This website does not include the scrolling "I'M" phrases described in

2    Instant Media's motion.  *Compare* Cavanagh Decl. ¶ 11, Ex. O and Leak Decl. ¶ 14.

3            Instant Media's Consumer Website offers subscription content offerings to I'M player users.

4    Cavanagh Decl., ¶ 12, Ex. P.  Here, consumers can download Plaintiff's high-definition media

5    player, browse an inventory of available video content and learn how Instant Media will deliver

6    content to their computers.[13]  *Id.*  In another common website design (but unlike that of Microsoft's

7    **i'm** Website), the Consumer Website's homepage displays I'M phrases that appear one at a time on

8    the page, ending in "I'M INSTANT MEDIA."  *Id.*, Ex. O.  To locate the Consumer Website, a

9    consumer must search on the term "instant media", not "I'M" in a search engine.  *Id.* ¶ 15, Exs. T-

10   V.  The search engine results reveal that Instant Media appears to have only purchased sponsored

11   links or ads on the search engines only for the search term "instant media," not "I'M."  *Id.*

12           **3.    Instant Media's Trademarks**

13           Instant Media's I'M mark is distinctly different than Microsoft's **i'm** initiative.  The I'M

14   mark is depicted in its advertising and on its websites in all capital letters, in white lettering against

15   an orange circle.  Cavanagh Decl., Exs. N & O.  It often appears with the "Instant Media" mark as

16   follows:  I'M Instant Media.  *Id.*  Instant Media holds a single federal trademark registration for the

17   word mark "I'M".[14]  Leak Decl., Ex. B.  The PTO twice initially refused registration of Plaintiff's

18   "I'M" mark on the grounds that it was likely to cause confusion with eight previously-registered

19   marks and two pending registrations, each of which included a variation of "IM", "I'M" or "I AM"

20   on related products.  Cavanagh Decl., Ex. AA & CC.  In two filings made in mid-2005, Plaintiff

21   asserted that small differences in the design of its I'M mark, as compared to the prior third-party

22   registrations, were sufficient to avoid confusion among consumers.  *Id.*, Ex. at 4-8.  Plaintiff also

23   argued that consumer confusion among trademarks comprised of "I" and "M" was unlikely because

24

25   _____

26   [13] In order to download Instant Media's player, a consumer must:  click on a "download" icon;
     agree to install an executable file; open the file; accept the terms of Instant Media's license
     agreement; and select a setup method.  *Id.* ¶ 18, Ex. Y.

27   [14] Instant Media has pending applications for further I'M registrations.  The registration and
     applications declare that it first used I'M on December 19, 2005, *not* 2004.  Leak Decl. ¶ 13, Ex. B.

28

1   of the large number of IM, I'M or I AM marks already used by third parties.[15]  In light of the prior

2   similar registrations, Instant Media conceded the narrow scope of its proposed mark:

3           [O]wners of I'M or IM registrations are not entitled to a broad scope of protection
            for their marks  . . . , but instead may only claim protection with respect to closely
4           related goods or services. . . .

5   *Id.*  Only after receiving Instant Media's representations regarding the narrow scope of its mark did

6   the PTO permit Instant Media's registration of I'M.

7           Plaintiff also claims common law trademark rights in three phrases: **I'M CACHED**, **I'M**

8   **INTERESTED** and **I'M INTERACTIVE.**  But it has presented no evidence of their use as

9   trademarks or that consumers associate these phrases with Plaintiff.  The trademark applications

10  relied on by Plaintiff for these marks are "intent-to-use" applications and no registrations have

11  issued.  *See* Leak Decl. Exs. E-G.  There is no basis for a trademark infringement claim based on

12  these phrases.

13  **C.    Significant Harm Will Result From Entry of An Injunction**

14          Microsoft made a substantial investment in developing the **i'm** mark and logo, including

15  concept development, advertising, production, reporting, promotions and events, public relations,

16  the college ambassador program, and the **i'm** Agent, which is an automated "bot" inside WLM.

17  Kriese Decl. ¶ 44.  If Microsoft is ordered to stop using its **i'm** mark, it will lose that investment and

18  be forced to duplicate those efforts, as well as design, test and release a new mark to WLM users

19  worldwide.  *See Id.* ¶¶ 44-47; Suppl. Conf. Kriese Decl. ¶¶ 4-7.  In addition, the social-cause

20  organizations will be harmed by any required re-branding.  Declaration of Kristin Templin

21  ("Templin Decl.") ¶ 8.

22          **III.  PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION**

23          An injunction should not issue unless Instant Media can demonstrate it is likely to succeed

24  on its reverse confusion claim against Microsoft at trial; or that its claim raises serious questions

25

26  [15] Instant Media also stated that the PTO's searchable database of registered trademarks identified
    "over 600 registered marks containing a form of IM, I'M or I AM alone or with other words," of
27  which "over 50 registered marks [were] limited to the letters IM or I AM or I'M," "roughly 112"
    were registered in the same classes as Plaintiff's mark.  *Id.*, pp. 11-12 & Ex. A.

28

1    and that "a balance of hardships that tips sharply in its favor." *Moose Creek, Inc. v. Abercrombie &*

2    *Fitch Co.*, 331 F. Supp. 2d 1214, 1221 (C.D. Cal. 2004).  To succeed on its reverse confusion claim,

3    Plaintiff must prove that its trademark rights are valid and that Microsoft's use of its **i'm** mark "is

4    likely to confuse [Instant Media's] customers into believing that they are dealing with

5    [Microsoft]."[16]  *Id.*  Because Instant Media cannot meet its burden, its Motion should be denied.

6    **A.     Instant Media's Trademark Rights**

7           For purposes of this Motion, Microsoft does not challenge the validity of Instant Media's

8    registered I'M trademark other than to note the admittedly limited scope of Plaintiff's registration.

9    However, Plaintiff has not proven any rights in its purported I'M "family" of marks.  Microsoft is

10   not using any of these phrases and Instant Media has not demonstrated that it uses the I'M phrases

11   as trademarks or that consumers associate them with Plaintiff.  *See Dep't of Parks & Recreation v.*

12   *Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1126 (9th Cir. 2006).  Because Plaintiff has not established

13   trademark rights in its I'M phrases, it cannot prove infringement with respect to theses phrases.  *See*

14   *Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946, 958-59 (C.D. Cal. 2004).

15   **B.     No Likelihood Of Confusion Exists Between the Parties' Non-Competitive Goods**

16          **1.     Standard for Likelihood of Confusion in a Reverse Confusion Case**

17          Plaintiff must prove that Microsoft's **i'm** mark is likely to cause consumer confusion.

18   Confusion is tested by asking "whether a 'reasonably prudent consumer' in the marketplace is likely

19   to be confused as to the origin of the good or service bearing one of the marks."  *Dreamwerks Prod.*

20   *Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (1998).  Confusion must be "probable, not simply a

21   possibility."  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002).  No confusion exists here.

22          Instant Media accurately recites the *Sleekcraft* factors considered by the Ninth Circuit when

23   assessing likelihood of confusion.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th

24   Cir. 1979).  Plaintiff contends that three *Sleekcraft* factors are particularly relevant in the context of

25   _____

26   [16] Instant Media also argues that it may succeed on its claim if consumers wrongly believe that it is
     wrongly using *Microsoft*'s mark.  Motion 2, 12.  This is not the standard for reverse confusion.
     "Tarnishment may be a theory of liability or a type of harm, but it is not itself a factor to be

27   considered in determining whether consumer confusion is likely."  *Playmakers LLC v. ESPN, Inc.*,
     376 F.3d 894, 897 (9th Cir. 2004).  *See also* 4 McCarthy § 23.10, at pp. 23-58 to 23-59.

28

reverse confusion: (1) the strength of the plaintiff's mark; (2) the relatedness of the goods; and (3) the similarity of the marks. Motion 13. While these factors favor Microsoft here, even if they did not, an injunction should not be issued where the plaintiff's mark exists in a crowded field subject to narrow trademark protection (*see Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 992 (C.D. Cal. 2002)) or other evidence weighs strongly against confusion (*see Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003)). Substantial evidence supports denial of Plaintiff's motion, including the very narrow trademark rights that Instant Media holds in I'M, due to the crowded field of IM and I'M marks, and survey evidence demonstrating an absence of confusion among consumers.

### 2.    Instant Media's Mark Is Conceptually Weak but Commercially Stronger

In reverse confusion cases, courts consider the conceptual strength of the plaintiff's senior mark as compared to the commercial strength of the defendant's junior mark. *See Moose Creek*, 331 F. Supp. 2d at 1224. Absent a conceptually strong senior mark, the reverse confusion plaintiff will be unable to establish a likelihood of confusion, even if the junior user's commercial strength is likely to overwhelm the plaintiff in the marketplace. *See Glow Indus.*, 252 F. Supp. 2d at 992.

Trademarks are classified along a spectrum of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Moose Creek*, 331 F. Supp. 2d at 1222. Generic and descriptive marks are deemed weak; arbitrary marks are considered strong. *Id.* However, even "strong" marks will be deemed "weak" if they exist in a "crowded field" of similar marks. *See Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in part on other grounds by*, *Levi Strauss*, 778 F.2d at 1355. When a trademark exists in a "crowded field", the trademark owner cannot claim broad protection for its mark due to similar third-party uses of the mark, and "should have anticipated some confusion with legitimate competitors." *Glow Indus.*, 252 F. Supp. 2d at 987.

The rationale behind the "crowded field" doctrine is that:

> [A] mark that is hemmed in on all sides by similar marks on similar goods cannot be very "distinctive." It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

- 11 -

2 McCarthy § 11:85; *see also Jupiter Hosting v. Jupitermedia Corp.*, 76 U.S.P.Q.2d 1042, 1045-46 (N.D. Cal. 2004) (preliminary injunction denied based, in part, on finding of crowded field).  In a crowded field, "the ability of any member of th[e] field to prevent use by others is relatively weak." *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1034, 1037 (N.D. Cal. 2003) (strength of plaintiff's "HALO" mark was "not substantial" where "the relevant mark field is a particularly 'crowded' one;" injunction denied).

        Here, Instant Media claims that its I'M mark is arbitrary and, thus, conceptually strong. Plaintiff contends that "[t]he conjunction 'I'm' -- meaning 'I am' -- neither describes nor suggests the services offered by Instant Media."  Motion, p. 14.  However, there is no evidence in the record to support the allegedly arbitrary meaning ascribed to the I'M mark by Instant Media.  *Compare Glow Indus.*, 252 F. Supp. 2d at 966 (founder of plaintiff company submitted declaration explaining the selection of the company's name).  Plaintiff's own marketing materials stress the association between I'M and the company name Instant Media.  Cavanagh Decl., Exs. N-P.  It is more logical to understand the I'M mark, which uses two capital letters, as an abbreviation of "Instant Media," which is itself either descriptive or suggestive of its video services and, thus conceptually weak.

        In addition, Instant Media's mark is conceptually weak because the I'M mark exists in a crowded field of trademarks using variations of "IM," "I'm" and "I am."[17]  Instant Media only succeeded in registering I'M after convincing the PTO that I'M and IM marks senior to Plaintiff's existed in a crowded field.  Instant Media should not now be heard to complain that Microsoft infringes its mark simply because Microsoft also adopted a similar variation of IM or I'm.[18]  *See,*

-----

[17] The relevant field includes "I'M", "i'm" and "I AM" marks because a crowded field exists whenever a mark is "hemmed in on all sides" by "similar" marks. 2 McCarthy § 11:85.  The marks comprising the crowded field do not need to consist solely of the identical marks.  A crowded field may exist, for example, where numerous third parties:  use the disputed mark or variants of the disputed mark (*see Glow Indus.*, 252 F. Supp. 2d at 973); incorporate the disputed mark as a part of their marks (*see Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1143 (9th Cir. 2002)); *Jupiter Hosting*, 76 U.S.P.Q.2d at 1045); use entirely different marks that call to mind a disputed mark (*see Miss World*, 856 F.2d at 1449); or use an image that is representative of a word mark or vice versa (*see Moose Creek*, 331 F. Supp. 2d at 1224).

[18] Microsoft contends that its "**i'm**" mark does not exist in the same "field" as Instant Media's mark because the **i'm** initiative does not compete with Instant Media's offerings, is not software, and is not a complementary good or service.  The parties' different uses of their respective marks are unrelated and, thus, confusion is unlikely for these additional reasons.  *See infra* at 16-17.

1   *e.g., Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 476 (3d Cir. 2005) (whether

2   viewed "as judicial estoppel, an admission, waiver, or simply hoisting [the plaintiff] by its own

3   petard," the plaintiff's prior statements to the PTO regarding crowded field weighed against a

4   likelihood of confusion); *Petro Stopping Ctrs, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94

5   (4th Cir. 1997) (noting that plaintiff made prior statements to PTO admitting its narrow rights).

6           In its response to the PTO's initial refusal to register I'M, Instant Media admitted that it was

7   aware of "over 600 registered marks containing a form of IM, I'M or I AM," of which

8   approximately 185 were in the same International Classes in which Instant Media sought

9   registration of its marks.  Cavanagh Decl., Exs. AA & CC, at 11-12, Ex. A.  Microsoft's recent

10  research reveals an even greater number of registered marks containing a form of "IM," "I'M" or "I

11  AM," as well as dozens of additional unregistered common law marks that employ the same terms.

12  *Id.* ¶¶ 24-33, Exs. DD-OOO.  As set forth in the Cavanagh Declaration, the use of the marks "IM,"

13  "I'M" and "I AM," either alone or with other words, is ubiquitous in connection with Internet

14  websites, domain names and entertainment-related companies.[19]  *Id.*, ¶¶ 26-32, Exs. PP-OOO.

15          Because Instant Media's I'M mark admittedly operates in a crowded field, Instant Media

16  cannot establish a likelihood of confusion on the basis of the relative strengths of the parties' marks,

17  regardless of the alleged conceptual strength of its mark or the commercial strength of Microsoft's

18  mark.  *See Moose Creek*, 331 F. Supp. 2d at 1225-26.  In *Glow Indus.*, a reverse confusion case,

19  both parties sold beauty and bath products under the marks GLOW.  252 F. Supp. 2d 962. In light of

20  evidence of numerous uses of GLOW by third parties in the names of related products, the court

21  concluded that the plaintiff's mark was deemed weak and denied its request for an injunction

22  despite the defendant's significant commercial strength.  *Id.* at 1005.  The court explained, "while

23  defendants' commercial strength is likely to overwhelm plaintiff in the marketplace to the extent

24  their products compete, . . . [plaintiff] will not likely be able to prove that the strength of the mark

25  ─────────────

26  [19] This evidence is more than adequate to establish that the I'M marks exist in a crowded field.  *See,*
    *e.g.*, *PostX Corp. v. docSpace Co.*, 80 F. Supp. 2d 1056, 1061 (N.D. Cal. 1999) ("over a dozen"
27  marks similar to plaintiff's proved crowded field); *Matrix Motor*, 290 F. Supp. 2d at 1091 (30 third-
    party uses of "Matrix" outside the automotive or racing fields and 20 uses of the term in the
    automotive field, six in the racing field, proved weak mark).

28

1 | factor favors a finding of likelihood of confusion because its own mark is conceptually weak and

2 | operates in a crowded field." *Id.* at 992.  A similar conclusion applies here.

3 | Plaintiff also has not shown, for purposes of reverse confusion, that its mark is so

4 | commercially inferior to the **i'm** mark that it is the proverbial "David" pitted against "Goliath."  *See*

5 | *Moose Creek*, 331 F. Supp. 2d at 1226.  "Key factors in conducting this evaluation [are] the

6 | comparative commercial strength of the junior and senior users and any advertising or marketing

7 | campaign by the junior user that has resulted in 'a saturation in the public awareness of the junior

8 | user's mark.'"  *Glow Indus.*, 252 F. Supp. 2d at 989 (quoting *A& H Sportswear, Inc. v. Victoria's*

9 | *Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000)); *see also* 4 McCarthy § 11:85 ("A reverse

10 | confusion case is proven only if the evidence shows that the junior user was able to swamp the

11 | reputation of the senior user with a relatively much larger advertising campaign.").

12 | Plaintiff has represented that it has made "massive" advertising expenditures and efforts to

13 | promote its downloadable media player (Leak Decl. ¶ 26); it spent "millions" on its advertising and

14 | developing goodwill for its "I'M" mark (Cavanagh Decl., ¶ 33, Ex. PPP); and has spent over $1

15 | million on television commercials in 2006 alone (Leak Decl., ¶ 16).  Finally, over 700,000 users

16 | have downloaded its high-definition video player.  *Id.*, ¶ 15.

17 | There is no evidence that Microsoft has "swamped" the market of consumers for the I'M

18 | player.  Instant Media's evidence (Motion, p. 15 (citing Brook Decl., Exs. C & E; Wexler Decl., ¶¶

19 | 10-12, Exs. A-G; Leak Decl., Ex. I)) does not prove that advertising for the **i'm** initiative has

20 | overwhelmed the market for Instant Media's product.[20]  The relevant inquiry for purposes of

21 | assessing the likelihood of reverse confusion is the degree of public recognition of the **i'm** mark as

22 | used in connection with a philanthropic campaign, not the MSN website or WLM.  *See Walter v.*

23 | *Mattel, Inc.*, 31 F. Supp. 2d 751, 758 (C.D. Cal. 1998) ("Plaintiff could easily show, and Mattel

24 |

25 | [20] Instant Media also cites a webpage indicating that "thousands" of WLM users have participated
26 | in Microsoft's "**i'm**" initiative.  (Plaintiff's Decl. of Mitchell Brook, Ex. B.)  Microsoft does not
deny that its initiative is popular.  However, Microsoft's initiative, and associated advertising,
27 | targets instant messaging users who are socially responsible and want to support one of the
Participating Organizations.  (Kriese Decl. ¶¶ 8, 16, 22, 30.)  This is not evidence that it has
28 | "swamped" the market that includes Instant Media's products and services.

- 14 -

1 would not contest, that Barbie has become a household name, but the same cannot be said with

2 respect to 'Pearl Beach Barbie,' and this is a crucial distinction.").

3       The parties are simply in different areas of commerce.  Microsoft's advertising of its **i'm**

4 initiative is directed towards socially-responsible users of WLM, while Plaintiff's advertising

5 efforts are primarily focused on its relationships with business partners and content providers.  *See*

6 Cavanagh Decl. ¶ 10, Ex. N.  Based on these facts alone, confusion is unlikely.

7       **3.      The Parties Do Not Use Their Marks In Connection With Related Goods**

8       Instant Media argues that its I'M media player and content delivery services are "identical or

9 very similar" to those offered by Microsoft's **i'm** initiative and Windows Live Messenger.  Motion

10 16.  The parties' respective services offered under the relevant marks are markedly different.  To

11 assess the relatedness of the parties' goods, "courts consider whether the goods are:

12 (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use or function."

13 *Moose Creek*, 331 F. Supp. 2d at 1226.  The mere fact that two products or services fall within the

14 same general field, however, does not mean that they are sufficiently similar to create a likelihood

15 of confusion.[21]  *Matrix Motor*, 290 F. Supp. 2d at 1092.  In fact, as Instant Media stated to the PTO,

16 "it is noted that playing images or video is ubiquitous in computer software these days.  The fact

17 that any two software or Internet marks may involve images or video does not mean they are similar

18 for trademark purposes."  Cavanagh Decl. ¶¶ 21-22, Exs. AA at 13 & CC at 13.

19       Microsoft and Instant Media do not use their respective marks on services that are

20 complementary or even similar in use or function.  Microsoft uses its "**i'm**" mark in connection with

21

22 _____

[21] Even if two products are superficially within the same category of goods, such as online retail
23 stores, "[m]eaningful differences between the products and services are often cited as a factor
tending to negate reverse confusion."  *Id.  See also Sunenblick v. Harrell*, 895 F. Supp. 616, 629
24 (S.D.N.Y. 1995) (Dual "Uptown Records" marks for music recordings did not create a likelihood of
confusion where the recordings addressed distinctly different markets—jazz and rap), *aff'd*, 101
25 F.3d 684 (2d Cir. 1996); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003)
(undisputed that music bands Echo Drain and Echobrain play different types of music); *Harlem
26 Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. 1997)
(plaintiff's show basketball is distinct from NBA competitive basketball); *see also Strange Music,
27 Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 484 (S.D.N.Y. 2004) (reverse confusion unlikely
where plaintiff STRANGEMUSIC was a small composer in the "new music" genre and defendant
28 STRANGEMUSIC was used by defendant, a better-known hip-hop performer).

1  a philanthropic campaign available only to WLM users.  Kriese Decl., ¶ 8.  The **i'm** initiative does

2  not facilitate instant messaging, nor does it add any features to WLM.  *Id.* ¶ 10. Moreover, neither

3  the **i'm** initiative nor WLM is a video or audio player, nor do they provide for the delivery of TV

4  shows by content providers either on a broadcast basis or by subscription.  *Id.* ¶ 7. Instant Media, on

5  the other hand, uses its mark to promote its high-definition Internet TV media player software and

6  related subscription services, to business partners and some consumers.  Leak Decl., ¶¶ 2-3.  There

7  only similarity between the parties' products and services is that they are both offered over the

8  Internet, a similarity applies to thousands of products and services.

9           **4.      The Parties' Marks Are Not Similar**

10          This factor does not support entry of an injunction.  Although Plaintiff correctly concedes

11  that the Court should consider the marks as they are encountered by the relevant consumers in the

12  marketplace (Motion 16), it then proceeds to ignore the distinct visual images of the two marks and

13  their different meanings.  The differences between the marks eliminate any possible confusion.

14          **a.      The Parties' Marks Look Different**

15          The appearance of the respective marks are starkly different:

                                      

18          Plaintiff's I'M mark appears in all capital letters, in thin white font, in a straight line, in an

19  orange circle and is generally followed by the company name "Instant Media."  Cavanagh Decl.

20  ¶¶ 10-12, Exs. N-P.  Microsoft's **i'm** mark, on the other hand, is visually distinct and was designed

21  to appear young and hip.  Among the distinguishing features of the mark are the lower-case,

22  stylized letters; the insertion of a speech balloon in the place of an apostrophe; the use of pale green

23  and blue coloring; and the absence of any shape surrounding the letters.  Kriese Decl. ¶ 20.  The use

24  of the speech balloon next to the stylized "i" was intended to echo an icon of a speaking person, in

25  order to reinforce the notion that the more messages an **i'm** initiative participant sends, the more

26  Microsoft will donate to the Participating Organizations.  *Id.*  Moreover, the colors in the logo

27  mirror those of "buddy" icons used in connection with WLM, *e.g.*, to designate the user's "contact"

28  list of other WLM users.  *Id.*  In advertisements, the "**i'm**" mark often appears alongside the phrase

1  "i'm making a difference" and the other slogans reflecting the goals of the different participating

2  organizations. *Id.*, ¶¶ 11-36.

3       The only commonality between the marks is the letter string "i'm." This is not sufficient to

4  make the marks "confusingly similar." "I'm" is a common English word, frequently used as part of

5  products and services, in particular products, services, and websites on the Internet. *See, e.g., Mejia*

6  *& Assoc. v. IBM Corp.*, 920 F. Supp. 540, 547 (S.D.N.Y. 1996) (marks not similar "simply because

7  they contain an identical or nearly identical word"); *Gruner + Jahr USA Publ'g v. Meredith Corp.*,

8  991 F.2d 1072, 1078 (2d Cir. 1993) (dissimilar elements distinguished marks). "[T]he use of a

9  design as part of a mark minimizes any likelihood of confusion." *Matrix Motor*, 290 F. Supp. 2d at

10  1093. Design differences are particularly important when, as here, a mark exists in a crowded field

11  of similar marks.[22] Under such circumstances, visual differences between the parties' marks are

12  more significant. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005).

13                    **b.    Instant Media and Microsoft's Marks Have Different Meanings**

14       The parties' marks have different meanings. Instant Media alleges that its "I'M" mark's

15  meaning is a conjunction of "I am." Motion. p. 14. However, the obvious meanings of the I'M

16  mark as it used by Plaintiff is as an abbreviation for the name "Instant Media." Regardless, the two

17  marks do not mean the same thing: "**i'm**" is a play on the IM acronym for instant messaging and

18  suggests an individual's socially-responsible acts. Kriese Decl. ¶ 19.

19                    **5.    Instant Media's Customers Are Likely to Exercise a High Degree of Care**

20       Instant Media incorrectly concludes that, because both parties are using the respective marks

21  on free software and Internet services, this factor favors Plaintiff. Motion 18. Plaintiff's broad

22  conclusion does not address the applicable legal standard. "In a reverse confusion case, the degree

23  of care exercised by customers is determined with reference to the alleged senior user's customers

24  only." *Matrix Motor Co.*, 290 F. Supp. at 1095. Plaintiff has presented no evidence -- such as a

25  survey or expert opinion -- of the level of sophistication of Plaintiff's customers. Instant Media

26

27  [22] Indeed, differences in the capitalization and stylization of the letters, and whether the letters appeared in or next to another shape, are precisely the types of distinctions that Instant Media relied upon to convince the PTO to register the I'M mark. Cavanagh Decl., Exs. AA at 4-8 & CC at 4-8.

28

- 17 -

1  instead presumes that "customers are likely to exercise less care when dealing with inexpensive

2  products." Motion 18 (internal quotation omitted). However, the facts rebut any presumption that

3  Instant Media's customers do not exercise care when selecting its I'M player.

### a.      Instant Media's Individual Consumers

5  Users considering downloading Instant Media's I'M player must exercise a certain degree of

6  care before doing so. Cavanagh Decl., ¶¶ 17-19, Ex. Y. Given the specialized nature of the product

7  and the multiple steps involved in downloading it, including accepting Instant Media's license

8  terms, it is not likely that a user would carelessly download Instant Media's video player. *Id.*

9  Moreover, the apparent purpose in downloading the I'M player is to subscribe to or to view the

10  content on the player provided by Instant Media. *Id.* Accordingly, a user would take some care in

11  determining whether the content offered by the player is acceptable and desirable. *Id.*

### b.      Instant Media's Business Customers

13  As discussed above, the IM.com Website solicits business partners and content providers.

14  Cavanagh Decl. ¶ 10, Ex. N. These entities' purchase of Instant Media's services requires more

15  than the downloading of free software from the Internet. Corporate customers and buyers with a

16  certain level of expertise are presumed to exercise greater care than the ordinary consumer. *See*,

17  *e.g*, *Moose Creek*, 331 F. Supp. 2d at 1228; *Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp.

18  2d 1193, 1200-1202 (D. Colo. 2002) (sophisticated professional clients of the senior user were

19  unlikely to be confused). None of these customers will be confused by the **i'm** initiative.

20  The totality of the circumstances suggests that Instant Media's customers, both consumers

21  and businesses, are likely to exercise a relatively high degree of care, and are unlikely to be

22  confused.[23]

23

24  _____

[23] It is also relevant here that Instant Media's I'M mark exists in a crowded field. The Ninth Circuit

25  has held that when a crowded field exists, consumers have learned to make distinctions between
products with similar names. *See Miss World*, 856 F.2d at 1449; *Halo Mgmt.*, 308 F. Supp. 2d at

26  1038. Instant Media acknowledged this point to the PTO when it stated: "The more similar marks
there are on the Register, the *less likely* that consumers will be confused as to origin because no one

27  single source can be identified for goods or services bearing the mark." Cavanagh Decl. Exs. AA &
CC (emphasis added.)

28

- 18 -

### 6.    The Parties' Marketing Channels Are Distinct

Instant Media contends that this factor supports its Motion because (1) both parties offer free downloadable software over the Internet; (2) both parties "seek publicity and positive product reviews in the same trade journals'" (Motion 17-18); and (3) "[b]oth companies actively reach out to the same target consumers -- Internet users" (Leak Decl., ¶ 23). These alleged similarities are so overbroad as to be meaningless. Currently, the number of companies that offer software over the Internet, seek positive coverage from the computer press, and market to "Internet users" is in the thousands, and encompasses numerous unrelated goods and services. While both companies market over the Internet to Internet users, Microsoft's and Instant Media's targeted users are distinct and their marketing efforts directed at these groups do not meaningfully overlap.

A correct application of this factor requires consideration of "whether the predominate purchasers of the parties' goods are similar or different, and whether the marketing approaches used resemble each other." *Glow Indus.*, 252 F. Supp. 2d at 1000. Although two parties may market their products in similar ways, if their predominant customer audiences are different, this factor weighs against confusion. *See Moose Creek*, 331 F. Supp. 2d at 1229-30. Here, Microsoft's **i'm** initiative participants are predominantly current users of an instant messaging service, who are attracted to a philanthropic program such as the **i'm** initiative. Kriese Decl. ¶ 16. By comparison, Instant Media's IM.com Website targets prospective business customers. The parties also do not market their products in similar ways. The **i'm** initiative is not a software product and Microsoft does not seek to promote it through technology trade journals or "influential technology blogs." Microsoft's advertising, which is directed to socially-responsible instant messaging users, is focused on socially-conscious websites, college ambassadors, and the efforts of the numerous organizations participating in the initiative. Kriese Decl., ¶¶ 27-36. Moreover, Microsoft does not advertise its "**i'm**" initiative through television commercials. *Id.*, ¶ 37.

Finally, the parties' respective consumer websites do not appear on the same search engine result lists. A search on the term "i'm" on Google and Windows Live Search produces results that include both Microsoft's **i'm** website and Plaintiff's IM.com Website for its business customers. (The IM.com Website does not appear on a search for I'M on Yahoo.) Cavanagh Decl. ¶¶ 13-14,

1    Exs. Q-S.  Plaintiff's Consumer Website is found through a search on "instant media," and its paid

2    advertising appears only with "instant media" searches.[24]  *Id.* ¶ 15, Exs. T-V.  Microsoft's **i'm**

3    initiative does not appear in the results of a search for "instant media."  There is no likelihood of

4    confusion through search engines.

5              **7.        There is No Evidence That the Parties Are Likely to Expand Their Use**

6              Instant Media argues that because Microsoft is a large technology company, consumers

7    expect it to expand into the market in which Instant Media's I'M player operates.  Motion 19.

8    Plaintiff cites Microsoft's recent acquisition of a company that provides the infrastructure for online

9    advertising as supporting evidence.  *Id.*  Instant Media's argument does not reflect the proper

10   analysis of the "expansion" factor as applied in the Ninth Circuit.

11             The proper focus is on Plaintiff's expansion plans, not consumer speculation.  In *Sleekcraft*,

12   the Ninth Circuit explained that this factor considers whether "either party may expand his business

13   to compete with the other."  *Sleekcraft*, 599 F.2d at 354.  In a recent reverse confusion case, the

14   Ninth Circuit stated, "[t]o resolve this factor, we must determine whether existence of the allegedly

15   infringing mark is hindering the plaintiff's expansion plans."  *Surfvivor Media,* 406 F.3d at 634.

16   Moreover, a plaintiff must submit evidence to support its alleged expansion plans.  Vague assertions

17   are insufficient to demonstrate that the parties' uses of their respective marks are likely to converge.

18   *See id.* (plaintiff's "complete inability to adduce any concrete evidence of expansion plans tilts this

19   factor in favor of" defendant); *see also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447

20   F. Supp. 2d 266, 277 (S.D.N.Y. 2006) (speculative intentions insufficient).

21             Properly applied here, this test does not favor an injunction.  Instant Media has provided *no*

22   concrete evidence of its alleged expansion plans.  *See* Leak Decl., ¶ 25.  It offers no specifics

23   regarding how or when its purported "long-range" plans might be implemented.  Moreover, Plaintiff

24   has not explained how its plans are impacted by Microsoft's **i'm** initiative.

25   _____

26   [24] Instant Media complains that its IM.com Website has fallen in the results of natural searches on
     the Windows Live Search engine for "I'M."  Motion 8.  Any changes in the search engine results is

27   not trademark-related.  Thousands of other websites use the term "I'M" and the search engine's
     algorithm determines the natural search results.  Microsoft does not give preferences to Microsoft-
     related sites in its search results.  Kriese Decl., ¶ 42.

28

                                                            - 20 -

Plaintiff's reference to Microsoft's recent acquisition of aQuantive is a red herring and does not suggest Microsoft's expansion of its use of the **i'm** mark into areas of Instant Media's business. aQuantive is completely unrelated to the **i'm** initiative and WLM, and does not use any mark including I'M or i'm. Luu Decl., ¶¶ 2-4. aQuantive does not offer consumer products; it provides sophisticated infrastructure and services for efficiently and effectively purchasing and displaying advertisements over the Internet. *Id.* Microsoft has affirmed that it has no plans to expand its use of "**i'm**" into any field competitive with Instant Media's I'M player. Kriese Decl. ¶¶ 8, 18.

**8.     There Is No Evidence That Microsoft Has Acted With the Intent to Infringe**

Instant Media argues that Microsoft acted in bad faith because it should have known that its use of "**i'm**" was likely to cause confusion with Instant Media's mark. Motion, p. 18. "[T]here is no presumption of bad faith just because someone knew that a senior user existed." *Playmakers LLC v. ESPN Inc.*, 297 F. Supp. 2d 1277, 1284 (W.D. Wash. 2003). There is no evidence of intent here. Microsoft had no intention of adopting a mark for its **i'm** initiative that would infringe anyone's mark. Kriese Decl, ¶ 19.

**9.     Microsoft's Evidence Affirmatively Demonstrates the Absence of Confusion**

**a.     Consumer Survey Proves No Likelihood of Reverse Confusion**

Although the evidence demonstrates that Instant Media's main website is its IM.com Website and its predominant group of customers is other businesses, Plaintiff's Motion is premised on its assertion that individual consumers will be confused by Microsoft's **i'm** mark. Microsoft's survey evidence refutes Plaintiff's claim of consumer confusion.

A consumer survey is direct and non-circumstantial evidence on the question of likelihood of confusion. A survey testing for possible confusion may demonstrate the likelihood of confusion, *or* it may provide affirmative evidence of the *absence* of confusion. Survey results of less than 10% confusion are evidence that confusion is not likely. *See* 6 McCarthy § 32:189 ("When the percentage results of a confusion survey dip below 10 percent, they can become evidence which will indicate that confusion is not likely.") (citing *Levi Strauss*, 778 F.2d 1352 (results of less than 2% support conclusion of no likelihood of confusion)). *See also Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (survey results of only 6.9% confusion favored defendants).

- 21 -

1  Here, the survey evidence is overwhelming – it proves less than 1% confusion has occurred

2  among consumers as a result of Microsoft's adoption of **i'm** for its philanthropic initiative.[25]  Ford

3  Decl. ¶ 33, Ex. A.  The survey was conducted from June 14, 2007 to June 21, 2007, following

4  Microsoft's expansive marketing campaign and very public launch of the **i'm** initiative in March.

5  *Id.* ¶ 19.  The survey questioned prospective users of Plaintiff's software in nine major metropolitan

6  markets within the U.S.  Survey participants viewed Plaintiff's Consumer Website and were asked

7  questions about their beliefs regarding the source of the I'M media player.[26]  The survey found that

8  *less than one percent* of prospective consumers indicated any confusion between Microsoft, its **i'm**

9  initiative, or WLM, on one hand, and Plaintiff's I'M media player, on the other.[27]  *Id.* ¶ 33, Ex. A.

10  These unequivocal survey results are direct proof of the absence of confusion and are entitled to

11  more weight than circumstantial evidence considered under the other *Sleekcraft* factors.[28]

12  Instant Media's failure to submit its own survey further supports the conclusion that no

13  confusion exists.  *See Echo Drain*, 307 F. Supp. 2d at 1126.  Its failure may support an inference

14  that Plaintiff predicted that the results of such a survey would be unfavorable.  *See Playboy Enters.,*

15  *Inc. v. Netscape*, 55 F. Supp. 2d 1070, 1083-84 (C.D. Cal. 1999); *Cairns*, 24 F. Supp. 2d at 1041.

16  _____

17  [25] Survey evidence is admissible if conducted according to generally-acceptable principles.  *See
    Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1137, 1143 n. 8 (9th Cir. 1997).  Here, as

18  detailed in the Declaration of Dr. Gerald Ford ("Ford Decl."), the survey was conducted in
    compliance with the Federal Judicial Center's *Manual for Complex Litigation*.  Ford Decl. ¶ 7.  Due

19  to time constraints imposed by Plaintiff's Motion, Dr. Ford conducted a survey of over 100
    respondents and is confident that more respondents would not alter the results.  *Id.* ¶¶ 2, 5.

20  [26] Some respondents mentioned AOL's AIM service after viewing the IM.com Website.  *See* Ford
    Dec. Ex. A, App. A (*see, e.g.*, responses 1202, 1309).  The I'M and AIM marks are similar.

21  Cavanagh Decl., Ex. SS.

22  [27] A control cell was used to determine what proportion of "confusion" responses result from the
    trademark at issue and what proportion of "confusion" responses are "false positives" resulting from

23  causes other than the element (name) at issue; responses such as familiarity of a source solely
    because of its market share and the types of products it makes, or responses resulting from simply

24  guessing or misunderstanding the questions.  Even without properly eliminating for the control's
    "false positives," the number of respondents who said "Microsoft" in their responses is still only

25  8%.  *Id.* at page 28, n. 18 and Table 19 at page 27.

26  [28] Any attempt by Instant Media to discredit the survey by claiming that it occurred too early should
    be rejected.  The **i'm** initiative launched on March 1, 2007, and different parties advertised it since

27  to instant messaging users.  Kriese Decl., ¶¶ 24-36.  Microsoft also conducted a significant amount
    of advertising in the month prior to the survey.  In fact, Instant Media claims Microsoft has engaged
    in a "marketing and advertising blizzard."  Motion 12.

28

### b.    Plaintiff Has No Evidence of Actual Confusion

Plaintiff contends that it has "evidence" of actual reverse confusion, relying on the statement by Mr. Leak that "Instant Media has received a number of phone calls and website inquiries from a number of consumers with questions concerning instant messaging."  Leak Decl. ¶ 33.  Evidence of an unknown number of calls over an unknown period of time from consumers who mention neither Microsoft, WLM, nor the **i'm** initiative is not evidence of actual confusion.  Mr. Leak's statement is inadmissible hearsay[29] and should be stricken.  *See* Microsoft's Obj. to Evid.  The statement also violates the "best evidence rule":  these inquiries, if received, should have been submitted.  *Id.*

The most significant shortcoming of this "evidence" is that it does not suggest actionable confusion.  Confusion in the abstract is not trademark confusion.  *See Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148 (CD Cal. 1998).  Relevant confusion is that which affects purchasing decisions, not confusion generally.  *See Echo Drain*, 307 F. Supp. 2d at 1126-27.  For example, in *Jupiter Hosting*, 76 U.S.P.Q.2d at 1046, the court concluded that evidence of callers "inquiring about services similar to those offered by Plaintiff" was not confusion evidence without proof that these callers "intended to call Plaintiff or were confused or misled in their inquiries by Plaintiff's advertising of its products or services."  *Id.*  Inquiries about instant messaging, without more, and particularly without reference to Microsoft or WLM, do not constitute evidence of confusion arising from Microsoft's **i'm** mark.  There is no evidence that any of the inquiries Instant Media received intended to contact Microsoft, believed that Instant Media is related to Microsoft, or that the calls or inquiries were related to Microsoft, WLM, or Microsoft's "**i'm**" mark.[30]

Microsoft monitors the emails it receives regarding its **i'm** initiative, as well as public comments about the initiative, and is aware of no evidence of confusion, or that users believe Microsoft and Instant Media are somehow related.  Kriese Decl., ¶¶ 39-41; Templin Decl. ¶ 7.

---

[29] Fed. R. Evid. 801 & 802.  *See, e.g., Duluth News-Tribune v. Mesabi Publ'n Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (evidence of misdirected phone calls is hearsay); *Alchemy II Inc. v. Yes! Entm't Corp.*, 844 F. Supp. 560, 570 n 12 (C.D. Cal. 1994) (excluding evidence of phone calls).

[30] Users may make inquires about instant messaging because the I'M logo was previously used to identify "Instant Messaging, Inc.", an apparent predecessor of Instant Media.  Cavanagh Decl. ¶ 16, Ex. W.  The similarity between AOL's AIM mark and the I'M mark is another explanation.  *See* Cavanagh Decl., Ex. SS and Ford Decl., Ex. A, App. A (*see, e.g.*, responses 1202, 1309).

- 23 -

1                    *    *    *    *    *

2          In summary, the *Sleekcraft* factors weigh against a finding of likelihood of reverse

3    confusion.  Microsoft's consumer survey demonstrates the absence of confusion among Instant

4    Media's prospective consumers.  *See supra* at 21.  Moreover, because Plaintiff's I'M mark exists in

5    a crowded field of I'M and IM marks – as Instant Media conceded to the PTO – the Motion should

6    be denied, even if some *Sleekcraft* factors weigh in Plaintiff's favor.  *See Jupiter Hosting*, 76

7    U.S.P.Q.2d at 1046 (despite the fact that the "strength of the marks," "similarity of the marks" and

8    "relatedness of the goods" factors favored movant, "substantial evidence suggesting that

9    Defendant's mark has been rendered weak by a crowded field" supported denial of injunction

10   motion); *Halo Mgmt.*, 308 F. Supp. 2d at 1036-37 (same); *Glow Indus.*, 252 F. Supp. 2d at 992,

11   1003 (mark existed in crowded field; preliminary injunction motion denied).  Instant Media has

12   failed to demonstrate that it is likely to prevail on its reverse confusion claim against Microsoft.

13   **C.      Instant Media Has Presented No Evidence Of Irreparable Harm**

14         "Where a party demonstrates a likelihood of succeeding on a trademark infringement claim,

15   irreparable harm is presumed."  *Glow Indus.*, 252 F. Supp. 2d at 1003.  Conversely, where a

16   plaintiff does not show a likelihood of confusion, it "is not entitled to the presumption of irreparable

17   injury."  *PostX*, 80 F. Supp. 2d at 1064.  No harm should be presumed here.

18   **D.      The Balance Of Hardships Tips Sharply In Microsoft's Favor**

19         Under the alternate test for injunctive relief, a court may issue a preliminary injunction

20   where a plaintiff demonstrates the existence of serious questions going to the merits of the case, *and*

21   a balance of hardships that tips sharply in its favor.  *See GoTo.com v. Walt Disney Co.*, 202 F.3d

22   1199, 1205 (9th Cir. 2000).  "In evaluating the balance of hardships a court must consider the

23   impact granting or denying a motion for a preliminary injunction will have on the respective

24   enterprises."  *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

25         Instant Media failed to introduce evidence of any material harm that it may suffer if a

26   preliminary injunction is not issued.  In contrast, Microsoft presents evidence that, if a preliminary

27   injunction issues and it is ordered to stop using its "**i'm**" mark during the pendency of this lawsuit, the

28   order will inflict significant harm on both Microsoft and the organizations benefiting from in the **i'm**

                                           - 24 -

1    initiative.  Kriese Decl., ¶¶ 44-48; Conf. Suppl. Kriese Decl. ¶¶4-8.  Consideration of the public interest

2    also weighs against the issuance of an injunction here.  *See Southwest Voter Registration Educ. Project*

3    *v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).  Instant Media's failure to demonstrate that it is likely to

4    prevail on its trademark claim tips the public interest in Microsoft's favor.  The public interest is best

5    served by the uninterrupted continuance of the "**i'm**" initiative.  Kriese Decl. ¶ 48.

## IV.  INSTANT MEDIA SHOULD BE REQUIRED TO POST A BOND

7        The Federal Rules of Civil Procedure expressly condition the issuance of a preliminary

8    injunction upon the moving party's provision of a security bond to the issuing court.  The purpose

9    of such a bond is to offset any damages that may be incurred by the enjoined party if the injunction

10    is later found to have been improperly issued.  *See* Fed. R. Civ. P. 65.  If the Court grants Plaintiff's

11    motion, its grant should be conditioned upon Instant Media's posting of a bond of $8 million.  This

12    amount is appropriately based on the costs that Microsoft will be forced to incur, including among

13    others, re-branding costs (*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed Cir. 2006))

14    and costs to re-implement Microsoft's philanthropic marketing initiative (*CyberMedia, Inc. v.*

15    *Symantec Corp.*, 19 F. Supp. 2d 1070, 1080 (N.D. Cal. 1998)).  *See* Suppl. Conf. Kriese Decl. ¶¶ 4-

16    8; Templin Decl. ¶ 8.

## V.  CONCLUSION

18        Instant Media's motion for a preliminary injunction should be denied.  Plaintiff has not

19    demonstrated either a probability of success on the merits of its claim for reverse confusion or the

20    possibility of irreparable injury if an injunction is not issued.  Instant Media also fails to show the

21    existence of serious questions going to the merits of its infringement claims or that the balance of

22    hardships tips sharply in its favor.

24    Dated:  July 3, 2007                  ARNOLD & PORTER

27                         By:  /S/  Suzanne V. Wilson
                           Suzanne V. Wilson
                           Attorneys for Defendant
                           Microsoft Corporation

- 25 -