1
2
3
4
5
6
7
8
9        UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA

11            OAKLAND DIVISION

12

13  INSTANT MEDIA, INC., a Delaware        )   Case No. CV 07-02639 SBA
    corporation,                          )
14                                        )
                    Plaintiff,            )   **[PROPOSED] ORDER DENYING PLAINTIFF**
15                                        )   **INSTANT MEDIA, INC.'S MOTION FOR**
         v.                               )   **PRELIMINARY INJUNCTION**
16                                        )
    MICROSOFT CORPORATION, a              )
17  Washington corporation,               )
                                          )   Judge:    Hon. Saundra Brown Armstrong
18                  Defendant.            )   Date:     July 24, 2007
                                          )   Time:     1:00 p.m.
19  _____      )   Ctrm.:    3

20
21
22
23
24
25
26
27
28

1    Plaintiff Instant Media, Inc.'s ("Instant Media's") motion for a preliminary injunction to

2    enjoin defendant Microsoft Corporation ("Microsoft") from using its **i'm** trademark during the

3    pendency of this action came on regularly for hearing by the Court on July 24, 2007, the Honorable

4    Saundra B. Armstrong presiding.  Upon consideration of the evidence, memoranda of points and

5    authorities and oral argument presented by the parties, the Court hereby determines that Instant

6    Media has not demonstrated that it is likely to succeed on the merits of its trademark infringement

7    claims against Microsoft, that it will suffer irreparable injury, or that the balance of hardships tips

8    sharply in its favor.  Therefore, the motion for a preliminary injunction is DENIED.

9                          I.     **FACTUAL BACKGROUND**

10   A.     **Instant Media, Inc. and Its I'M Player**

11                  1.     **Instant Media's I'M Player**

12          Instant Media unveiled a high-definition, online media player in May 2006.  That media

13   player consists of downloadable software that enables users to view high definition video files

14   distributed through the player by Instant Media and its content-provider business partners.  Users of

15   the I'M media player cannot engage in instant messaging with other users, nor is the player

16   designed to permit any other peer-to-peer file sharing.  Among other things, Instant Media licenses

17   its I'M player software to business partners, advertisers and content providers to support the

18   delivery of video content over the Internet by those entities.  Consumers may download the I'M

19   player from Instant Media's Internet websites.  According to Instant Media, more than 700,000

20   copies of its software have been downloaded from the Internet to date.

21                  2.     **Instant Media's Advertising and Promotion of Its I'M Services**

22          In 2006, Instant Media spent over $1 million advertising its media player and the I'M mark.

23   Instant Media ran television commercials advertising its im.com website.  Those commercials are

24   posted on one of its websites, on YouTube.com and on Facebook.com.  Instant Media further

25   promotes its software through public relations efforts that target journalists and industry analysts

26   and through media coverage in computer trade journals and technology blogs.  Instant Media also

27   promotes its I'M player through paid advertisements on Internet search engines.

28                                      - 1 -

1    Instant Media has two distinct websites that target different customer bases:  (1) its principal

2    website at www.im.com (the "IM.com Website"), which is aimed at businesses and content

3    providers; and (2) its secondary website located at www.im.com/main.aspx (the "Consumer

4    Website"), which is a consumer-facing website that promotes downloading the Instant Media player

5    for its content and its media management functions.  It is the business-directed IM.com Website,

6    and not the Consumer Website, that appears in search engine results when a user searches for the

7    term "I'M" using Google or Windows Live Search.  To locate the Consumer Website, a consumer

8    must search for the term "instant media," not "I'M," in a search engine.

9    **3.    Instant Media's Trademarks**

10    Instant Media's I'M mark is depicted in its advertising and on its websites in all capital

11    letters, in white lettering against an orange circle.  It often appears with the "Instant Media" mark as

12    follows:  "I'M Instant Media."

13    Instant Media holds a single federal trademark registration for the word mark "I'M".[1]  The

14    United States Patent and Trademark Office ("PTO") twice refused registration of Instant Media's

15    "I'M" mark on the grounds that it was likely to cause confusion with eight previously-registered

16    marks and two pending registrations, each of which included a variation of "IM", "I'M" or "I AM."

17    In two filings in mid-2005, Instant Media asserted that certain differences in the design of its I'M

18    mark, as compared to the prior third-party registrations, were sufficient to avoid confusion among

19    consumers.  Instant Media also argued that consumer confusion among trademarks comprised of "I"

20    and "M" was unlikely because of the large number of IM, I'M or I AM marks already used by third

21    parties.[2]  In light of the prior similar registrations, Instant Media conceded the narrow scope of its

22    proposed mark:

23                [O]wners of I'M or IM registrations are not entitled to a broad scope
                 of protection for their marks . . . , but instead may only claim
24                protection with respect to closely related goods or services. . . .

25    [1] Instant Media has pending applications for further I'M registrations.

26    [2] Instant Media also stated that the PTO's searchable database of registered trademarks identified
     "over 600 registered marks containing a form of IM, I'M or I AM alone or with other words," of
27    which "over 50 registered marks [were] limited to the letters IM or I AM or I'M," "roughly 112"
     were registered in the same classes as Plaintiff's mark.

28

-2-

1   Only after receiving Instant Media's representations regarding the narrow scope of its mark did the

2   PTO permit Instant Media's registration of I'M.

3       Instant Media also claims common law trademark rights in: **I'M CACHED, I'M**

4   **INTERESTED** and **I'M INTERACTIVE.** Instant Media does not, however, rely upon any of

5   these marks to support its motion for a preliminary injunction. Accordingly, the Court does not

6   consider the validity of the marks. The Court notes, however, that Instant Media did not present

7   evidence of use of these marks as trademarks or that consumers associate them with Instant Media.

8   **B.**     **Microsoft Corporation, The "i'm" Initiative and Windows Live Messenger**

9       Microsoft's **i'm** initiative is a philanthropic marketing campaign used in connection with

10  Microsoft's Windows Live Messenger 8.1 ("WLM") instant messaging software. Under the

11  initiative, Microsoft will donate a portion of the advertising revenue generated by participating

12  WLM users to ten social cause organizations.

13      **1.**     **Windows Live Messenger**

14      Instant messaging is a form of electronic communication, enabling real-time communication

15  between people connected to a network (such as the Internet) and logged onto either the same or

16  compatible services. WLM is one of many popular competing instant messaging services. WLM is

17  not a media player or an Internet media platform. The WLM service does not enable users to

18  broadcast video or audio programs over the Internet, nor does the WLM service support a

19  subscription service by which video or audio files are automatically downloaded to the user's

20  computer. WLM has no caching technology for videos. Additionally, the WLM service does not

21  provide any retailing services.

22      **2.**     **Microsoft's "i'm" Initiative**

23      A WLM user may join Microsoft's **"i'm"** initiative for free by visiting a Microsoft website,

24  such as im.live.com (the **"i'm"** Website), and clicking on the "Join Now" button. The user then

25  identifies his or her country of residence for eligibility (only U.S. residents are eligible) and

26  designates one of the ten participating social cause organizations -- the Humane Society, American

27  Red Cross, UNICEF, Susan G. Komen Race for the Cure, Boys and Girls Clubs of America, National

28  AIDS Fund, National Multiple Sclerosis Society, Ninemillion.org, Sierra Club and

- 3 -

1    Stopglobalwarming.org -- to benefit from his or her instant messaging. Once a WLM user enrolls in

2    the **i'm** initiative, the **i'm** logo appears next to the "Display Name" of the user and is visible to the

3    participating user and to other WLM users with which he or she instant messages.

4         Thereafter, every time the participant sends an instant message using WLM, the organization

5    will be credited for that message. At the end of the year, Microsoft will determine each

6    organization's share of the instant messaging advertising revenue designated for the initiative.

7    Microsoft has pledged to donate a minimum of $1 million dollars (*i.e.*, $100,000 each) at the end of

8    2007 to the ten designated organizations, with the exact amount to be donated to each organization

9    based upon the number of instant messages sent by participating WLM users. Microsoft has put no

10   cap on the amount that it will donate through the end of the year.

11        Microsoft chose the mark "**i'm**" for use with the initiative because it suggests "IM", the

12   common abbreviation for "instant messaging," and it indicates that participants are individually

13   taking steps to be socially responsible (*e.g.*, "i'm making a difference"). In addition, the **i'm** logo

14   suggests instant messaging by use of the "i" next to a speech balloon instead of an apostrophe, and

15   the logo mirror the colors of the "buddy" logo used by WLM. Microsoft does not use, and has no

16   intent to use, its **i'm** mark to designate any other services.

17        **3.    Microsoft's Advertising and Promotion of the i'm Initiative**

18        The **i'm** initiative and Website officially launched on March 1, 2007, and was the subject of

19   significant media attention. The ten participating organizations immediately engaged in outreach

20   efforts to their respective supporters and the public through their websites, emails, newsletters and

21   blogs. The Website displays the "**i'm**" mark alongside the phrase "i'm making a difference" and

22   other phrases relating to the social cause organizations, such as: "i'm providing a positive place for

23   kids"; "i'm fighting AIDS"; and "i'm stopping global warming." These phrases are used in other

24   promotional materials for the **i'm** initiative.

25        Microsoft followed the launch with an advertising campaign on its www.msn.com website

26   and through the Windows Live network. Microsoft also engaged in a college outreach effort to

27   promote the initiative. On May 15, 2007, Microsoft further expanded its advertising of the **i'm**

28   initiative to other online media properties, print media and other venues designed specifically to

- 4 -

1  reach socially-responsible, frequent instant messaging users.  Microsoft does not advertise the **i'm**

2  initiative through paid television or radio advertisements.  In addition to its formal advertising

3  campaign, Microsoft also benefited from free advertising and a word-of-mouth marketing campaign

4  as individual users rapidly spread the word about the initiative.  To date, Microsoft has spent

5  millions of dollars on its advertising of the **i'm** initiative.

6      **4.**    **Microsoft's Applications to Register the "i'm" Mark**

7      Prior to the launch of the **i'm** initiative, Microsoft filed three "intent-to-use" applications

8  with the PTO for the **i'm** mark.  Microsoft is currently pursuing only one of its applications, the

9  application filed in Class 36 for an online philanthropic program.  The PTO has approved this

10  application for publication.

11             **II.**    **PROCEDURAL HISTORY**

12      Instant Media filed its Complaint on May 17, 2007.  Microsoft timely filed its Answer on

13  June 22, 2007.

14      Instant Media filed its motion for a preliminary injunction on June 12, 2007.  That motion

15  was based on Instant Media's assertion that Microsoft's use of its **i'm** mark is likely to cause

16  reverse consumer confusion.  Microsoft filed its opposition papers on July 3, 2007, and Instant

17  Media filed its reply papers on July 10, 2007.

18             **III.**    **DISCUSSION**

19      "In order to obtain a preliminary injunction in a trademark case, a plaintiff must demonstrate

20  either:  (1) a probability of success on the merits and the possibility of irreparable injury; or (2) the

21  existence of serious questions going to the merits, and a balance of hardships that tips sharply in its

22  favor." *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1221 (C.D. Cal.

23  2004).  These two tests create a continuum: "the less certain the district court is of the likelihood of

24  success on the merits, the more plaintiffs must convince the district court that the public interest and

25  balance of hardships tip in their favor." *Southwest Voter Reg. Educ. Project v. Shelley*, 344 F.3d

26  914, 918 (9th Cir. 2003).

27      To succeed on its reverse confusion claim, Instant Media must prove that its trademark

28  rights are valid and that Microsoft's use of its **i'm** mark "is likely to confuse [Instant Media's]

1  customers into believing that they are dealing with [Microsoft]." *Moose Creek*, 331 F. Supp. 2d at

2  1221.

3  **A.      Instant Media's Trademark Rights**

4          Microsoft did not challenge the validity of Instant Media's registered I'M trademark -- the

5  only mark upon which its motion for a preliminary injunction was based -- for purposes of the

6  motion.

7  **B.      Likelihood Of Confusion**

8          **1.      Standard for Likelihood of Confusion in a Reverse Confusion Case**

9          Confusion is tested by asking "whether a 'reasonably prudent consumer' in the marketplace

10  is likely to be confused as to the origin of the good or service bearing one of the marks."

11  *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (1998). Confusion must be

12  "probable, not simply a possibility." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002). To

13  assist in determining the likelihood of confusion, the Ninth Circuit has enumerated a list of factors:

14  (1) strength of the marks; (2) proximity or relatedness of the goods; (3) similarity of sight, sound

15  and meaning; (4) type of goods and purchaser care; (5) marketing channels; (6) likelihood of

16  expansion; (7) intent; and (8) evidence of actual confusion. *See AMF, Inc. v. Sleekcraft Boats*, 599

17  F.2d 341, 348-49 (9th Cir. 1979). These factors "should not be rigidly weighed." *Dreamwerks*, 142

18  F.3d at 1129.

19          **2.      Strength of the Parties' Marks**

20          In reverse confusion cases, courts consider the conceptual strength of the plaintiff's senior

21  mark as compared to the commercial strength of the defendant's junior mark. *See Moose Creek*,

22  331 F. Supp. 2d at 1224. Absent a conceptually strong senior mark, the reverse confusion plaintiff

23  will be unable to establish a likelihood of confusion, even if the junior user's commercial strength is

24  likely to overwhelm the plaintiff in the marketplace. *See Glow Indus., Inc. v. Lopez*, 252 F. Supp.

25  2d 962, 992 (C.D. Cal. 2002).

26          Trademarks are classified along a spectrum of increasing distinctiveness: (1) generic;

27  (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Moose Creek*, 331 F. Supp. 2d at

28  1222. Generic and descriptive marks are deemed weak; arbitrary marks are considered strong. *Id.*

- 6 -

1    However, even "strong" marks will be deemed "weak" if they exist in a "crowded field" of similar

2    marks. *See Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988),

3    *abrogated in part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114,

4    1116 n.1 (9th Cir. 1990).

5           Instant Media argues that its I'M mark is arbitrary and, thus, conceptually strong.  However,

6    there is no evidence in the record of the meaning of the I'M mark which could establish that it is

7    arbitrary.  Moreover, regardless of the purported meaning of Instant Media's mark, the mark is

8    conceptually weak because it exists in a crowded field of trademarks using variations of "IM,"

9    "I'm" and "I am."  Instant Media only succeeded in registering I'M after convincing the PTO that

10   I'M and IM marks senior to its mark existed in a crowded field.  Instant Media cannot now

11   complain that Microsoft infringes its mark simply because Microsoft also adopted a similar

12   variation of IM or I'm.  *See, e.g., Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 476

13   (3d Cir. 2005) (whether viewed "as judicial estoppel, an admission, waiver, or simply hoisting [the

14   plaintiff] by its own petard," the plaintiff's prior statements to the PTO regarding crowded field

15   weighed against a likelihood of confusion); *Petro Stopping Ctrs, L.P. v. James River Petroleum,*

16   *Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (noting that plaintiff made prior statements to PTO admitting

17   its narrow rights).  In addition, Microsoft introduced evidence of prevalent third-party use of

18   variations of "IM," "I'm" and "I am."

19          Instant Media also has not shown, for purposes of reverse confusion, that its mark is so

20   commercially inferior to the **i'm** mark that it is the proverbial "David" pitted against "Goliath." *See*

21   *Moose Creek*, 331 F. Supp. 2d at 1226.  "Key factors in conducting this evaluation are the

22   comparative commercial strength of the junior and senior users and any advertising or marketing

23   campaign by the junior user that has resulted in 'a saturation in the public awareness of the junior

24   user's mark.'" *Glow Indus.*, 252 F. Supp. 2d at 989 (quoting *A& H Sportswear, Inc. v. Victoria's*

25   *Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000); *see also* 4 McCarthy § 11:85 ("A reverse

26   confusion case is proven only if the evidence shows that the junior user was able to swamp the

27   reputation of the senior user with a relatively much larger advertising campaign.").  Instant Media

28   has represented that it has made "massive" advertising expenditures and efforts to promote its

- 7 -

1   downloadable media player, that it spent "millions" on its advertising and developing goodwill for

2   its "I'M" mark, that it spent over $1 million on television commercials in 2006 alone and that over

3   700,000 users have downloaded its high-definition video player. In contrast, Instant Media

4   presented no evidence that Microsoft has "swamped" the market of consumers for Instant Media's

5   I'M player.

6         **3.    Relatedness of the Parties' Goods**

7         To assess the relatedness of the parties' goods, "courts consider whether the goods are:

8   (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use or function."

9   *Moose Creek*, 331 F. Supp. 2d at 1226. The mere fact that two products or services fall within the

10  same general field, however, does not mean that they are sufficiently similar to create a likelihood

11  of confusion.[3] *See Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083,

12  1092 (C.D. Cal. 2003).

13        Microsoft and Instant Media do not use their respective marks on services that are

14  complementary or even similar in use or function. Microsoft uses its **"i'm"** mark in connection with

15  a philanthropic campaign available only to WLM users. The **i'm** initiative does not facilitate instant

16  messaging, nor does it add any features to WLM. Moreover, neither the initiative nor WLM is a

17  video or audio player, nor do they provide for the delivery of TV shows by content providers either

18  on a broadcast basis or by subscription. Instant Media, on the other hand, uses its mark to promote

19  its high-definition Internet TV media player software and related subscription services, to business

20  partners and some consumers. There is no similarity between the parties' products and services

21

22  [3] Even if two products are superficially within the same category of goods, such as online retail
    stores, "[m]eaningful differences between the products and services are often cited as a factor
23  tending to negate reverse confusion." *Id. See also Sunenblick v. Harrell*, 895 F. Supp. 616, 629
    (S.D.N.Y. 1995) (Dual "Uptown Records" marks for music recordings did not create a likelihood of
24  confusion where the recordings addressed distinctly different markets—jazz and rap), *aff'd*, 101
    F.3d 684 (2d Cir. 1996); *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003)
25  (undisputed that music bands Echo Drain and Echobrain play different types of music); *Harlem
    Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. 1997)
26  (plaintiff's show basketball is distinct from NBA competitive basketball); *see also Strange Music,
    Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481 (S.D.N.Y. 2004) (reverse confusion found unlikely
27  where plaintiff STRANGEMUSIC was a small composer in the "new music" genre and defendant
    STRANGEMUSIC was used by defendant, a better-known hip-hop performer).

28

Case No. C 07-02639 SBA
[PROPOSED] ORDER DENYING INSTANT MEDIA'S MOTION FOR PRELIMINARY INJUNCTION

1  other than they are both offered over the Internet, a similarity that could apply to thousands of

2  products and services.

3      **4.    Similarity of the Parties' Marks**

4      "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*

5  *Boats*, 599 F.2d at 348-49.

6      **a.   *Sight***

7      The parties' marks appear in the marketplace in the following manner:

8

9   

10  Instant Media's I'M mark appears in all capital letters, in thin white font, in a straight line, in an

11  orange circle and is generally followed by the company name "Instant Media." Microsoft's **i'm**

12  mark uses lower-case, stylized letters; includes a speech balloon in the place of an apostrophe; uses

13  pale green and blue coloring; and has no shape surrounding the letters. Microsoft presented

14  evidence that its mark is intended to appear "young" and "hip" and that the use of the speech

15  balloon next to the stylized "i" was intended to echo an icon of a speaking person, in order to

16  reinforce the notion that the more messages a participant in the **i'm** initiative sends, the more

17  Microsoft will donate to the participating organizations. Moreover, the colors in the logo mirror

18  those of "buddy" icons used in connection with WLM. In advertisements, the "**i'm**" mark often

19  appears alongside the phrase "i'm making a difference" and the other slogans reflecting the goals of

20  the different participating organizations. These design differences are important, particularly

21  where, as here, the marks exist in a crowded field of similar marks. *See Surfvivor Media, Inc. v.*

22  *Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005).

23      The only commonality between the marks is the letter string "i'm." This is not sufficient to

24  make the marks "confusingly similar." "I'm" is a common English word, frequently used as part of

25  products and services, in particular products, services, and websites on the Internet. *See, e.g., Mejia*

26  *& Assoc. v. IBM Corp.*, 920 F. Supp. 540, 547 (S.D.N.Y. 1996) (marks not similar "simply because

27

28

1   they contain an identical or nearly identical word"); *Gruner + Jahr USA Publ'n v. Meredith Corp.*,

2   991 F.2d 1072, 1078 (2d Cir. 1993) (dissimilar elements distinguished marks).

3          **b.    *Meaning***

4          The parties' marks have different meanings.  Instant Media argues, without citation to

5   evidence, that its "I'M" mark's meaning is a conjunction of "I am."  However, the obvious meaning

6   of the I'M mark as it used by Instant Media is as an abbreviation for the name "Instant Media."

7   Regardless, the two marks do not mean the same thing:  Microsoft introduced evidence that its

8   "**i'm**" mark is a play on the IM acronym for instant messaging and suggests an individual's

9   socially-responsible acts.

10         **5.    Degree of Care**

11         "In a reverse confusion case, the degree of care exercised by customers is determined with

12  reference to the alleged senior user's customers only."  *Matrix Motor Co.*, 290 F. Supp. at 1095.

13  Instant Media presented no evidence -- such as a survey or expert opinion -- of the level of

14  sophistication of its customers.  Instant Media instead presumes that customers are likely to exercise

15  less care when dealing with inexpensive products.  However, the fact that Instant Media's websites

16  appear to be directed primarily at commercial clients, that its media player is a relatively specialized

17  product designed to view only certain types of video content and that an individual wishing to

18  download its media player must go through a multi-step process and agree to various terms and

19  conditions rebut any presumption that Instant Media's customers do not exercise a high degree of

20  care.  Moreover, the fact that Instant Media's I'M mark exists in a crowded field indicates that

21  consumers will have learned to make distinctions between products with similar names.  *See Miss*

22  *World*, 856 F.2d at 1449.

23         **6.    Marketing Channels**

24         This factor requires consideration of "whether the predominate purchasers of the parties'

25  goods are similar or different, and whether the marketing approaches used resemble each other."

26  *Glow Indus.*, 252 F. Supp. 2d at 1000.  Although two parties may market their products in similar

27  ways, if their predominant customer audiences are different, this factor weighs against confusion.

28  *See Moose Creek*, 331 F. Supp. 2d at 1229-30.  Participants in Microsoft's **i'm** initiative are

- 10 -

1     predominantly current users of an instant messaging service, who are attracted to a philanthropic

2     program such as the **i'm** initiative. By comparison, Instant Media's IM.com Website targets

3     prospective business customers.

4           The parties also do not market their products in similar ways. The **i'm** initiative is not a

5     software product, and Microsoft does not seek to promote it through technology trade journals or

6     technology blogs. Microsoft's advertising, which is directed to socially-responsible instant

7     messaging users, is focused on socially-conscious websites, college ambassadors and the efforts of

8     the numerous organizations participating in the initiative. Moreover, Microsoft does not advertise

9     its "**i'm**" initiative through television commercials. Finally, the parties' respective consumer

10    websites do not appear on the same search engine result lists.

11         **7.**     **Expansion of Use**

12           To resolve this factor, the Court "must determine whether existence of the allegedly

13    infringing mark is hindering the plaintiff's expansion plans." *Surfvivor Media*, 406 F.3d at 634.

14    Any purported expansion plans must be properly supported by admissible evidence; vague

15    assertions are insufficient to demonstrate that the parties' uses of their respective marks are likely to

16    converge. *See id.* (plaintiff's "complete inability to adduce any concrete evidence of expansion

17    plans tilts this factor in favor of" defendant); *see also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca*

18    *Fitness, LLC*, 447 F. Supp. 2d 266, 273-274 (S.D.N.Y. 2006) (speculative intentions are

19    insufficient).

20           Instant Media has provided *no* concrete evidence of its alleged expansion plans. It fails to

21    offer any specifics regarding how or when its purported "long-range" plans might be implemented.

22    Moreover, Instant Media has not explained how its purported plans are impacted by Microsoft's use

23    of the **i'm** mark in connection with a philanthropic marketing initiative.

24           For its part, Microsoft has affirmed that it has no plans to expand its use of "**i'm**" into any

25    field competitive with Instant Media's I'M player.

26         **8.**     **Intent**

27           Instant Media argues, without evidence, that Microsoft acted in bad faith because it should

28    have known that its use of "**i'm**" was likely to cause confusion with Instant Media's mark. "[T]here

- 11 -

1  is no presumption of bad faith just because someone knew that a senior user existed." *Playmakers,*

2  *LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1284 (W.D. Wash. 2003). Microsoft introduced evidence

3  that it had no intention of adopting a mark for its **i'm** initiative that would infringe anyone's mark.

4       **9.  Actual Confusion**

5       Instant Media's purported "evidence" of actual reverse confusion consists of the following

6  single sentence from the declaration of its CEO: "Instant Media has received a number of phone

7  calls and website inquiries from a number of consumers with questions concerning instant

8  messaging." This evidence is inadmissible and does not, in any event, establish consumer

9  confusion.

10      A summary of purported telephone calls and written inquiries constitutes inadmissible

11 hearsay. *See* Fed. R. Evid. 801 & 802.; *see also Duluth News-Tribune v. Mesabi Publ'n Co.*, 84

12 F.3d 1093, 1098 (8th Cir. 1996) (evidence of misdirected phone calls and mail is hearsay and

13 particularly unreliable); *Alchemy II v. Yes! Entm't Corp.*, 844 F. Supp. 560, 569-70 (C.D. Cal. 1994)

14 (excluding hearsay evidence of telephone calls from customers). The statement also violates the

15 "best evidence rule" (Fed. R. Evid. 1002): Instant Media should have submitted copies of written

16 inquiries and telephone logs reflecting consumer calls.

17      Moreover, even if admissible, vague evidence of some unknown number of calls over some

18 unknown period of time from consumers who mention neither Microsoft, WLM, nor the **i'm**

19 initiative is not evidence of actual confusion. Confusion in the abstract is not trademark confusion.

20 *See Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148 (CD Cal. 1998). Relevant

21 confusion is that which affects purchasing decisions, not confusion generally. *See Echo Drain*, 307

22 F. Supp. 2d at 1126. For its part, Microsoft has monitored the emails it has received regarding its

23 **i'm** initiative, as well as public comments about the initiative, and is aware of no evidence that any

24 consumers are confused and believe that Microsoft and Instant Media are somehow related.

25      In addition, Microsoft submitted a consumer survey which indicates that reverse confusion

26 is unlikely. A consumer survey is direct and non-circumstantial evidence on the question of

27 likelihood of confusion. A survey testing for possible confusion may demonstrate the likelihood of

28 confusion, *or* it may provide affirmative evidence of the *absence* of confusion. Survey results of

1   less than 10% confusion are evidence that confusion is not likely. *See* 6 McCarthy§ 32:189 ("When

2   the percentage results of a confusion survey dip below 10 percent, they can become evidence which

3   will indicate that confusion is not likely.") (citing *Levi Strauss*, 778 F.2d 1352 (results of less than

4   2% support conclusion of no likelihood of confusion)). *See also Cairns v. Franklin Mint Co.*, 24 F.

5   Supp.2d 1013, 1040 (C.D. Cal. 1998) (survey results of only 6.9% confusion favored defendants).

6          Microsoft's survey of prospective users of Plaintiff's software in nine major metropolitan

7   markets within the U.S. indicates less than 1% confusion has occurred among consumers as a result

8   of Microsoft's adoption of **i'm** for its philanthropic initiative.

9          Instant Media's failure to submit its own survey further supports the conclusion that no

10  confusion exists. *See Echo Drain*, 307 F. Supp. 2d at 1126. Its failure may support an inference

11  that Plaintiff predicted that the results of such a survey would be unfavorable. *See Playboy Enter.,*

12  *Inc. v. Netscape*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999); *Cairns*, 24 F. Supp. 2d at 1041.

13                                  *    *    *    *    *

14         In summary, each of the *Sleekcraft* factors weighs against a finding of likelihood of reverse

15  confusion.

16  **C.    Irreparable Injury**

17         "Where a party demonstrates a likelihood of succeeding on a trademark infringement claim,

18  irreparable harm is presumed." *Glow Indus.*, 252 F. Supp. 2d at 1003. Conversely, where a

19  plaintiff does not show a likelihood of confusion, it "is not entitled to the presumption of irreparable

20  injury." *PostX Corp. v. docSpace Co.*, 80 F. Supp. 2d 1056, 1064 (N.D. Cal. 1999). Because

21  Instant Media has not established a likelihood of confusion, it is unlikely to prevail on its

22  infringement claims. Accordingly, no harm is presumed. Instant Media has not presented

23  independent evidence of irreparable injury.

24  **D.    Balance Of Hardships**

25         Under the alternate test for injunctive relief, a court may issue a preliminary injunction

26  where a plaintiff demonstrates the existence of serious questions going to the merits of the case, *and*

27  a balance of hardships that tips sharply in its favor. *See GoTo.com v. Walt Disney Co.*, 202 F.3d

28  1199 (9th Cir. 2000). "In evaluating the balance of hardships, a court must consider the impact

- 13 -

1    granting or denying a motion for a preliminary injunction will have on the respective enterprises."

2    *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 826 (9th Cir. 1993).

3         Instant Media failed to introduce evidence of any material harm that it may suffer if a

4    preliminary injunction is not issued.  In contrast, Microsoft presented evidence that, if a preliminary

5    injunction is issued and it is ordered to stop using its "**i'm**" mark during the pendency of this

6    lawsuit, the order will inflict significant harm on both Microsoft and the organizations benefiting

7    from the **i'm** initiative.

8                          IV.    **CONCLUSION**

9         Instant Media has not demonstrated either a probability of success on the merits of its claim

10    for reverse confusion or the possibility of irreparable injury if an injunction is not issued.  Instant

11    Media also fails to show the existence of serious questions going to the merits of its infringement

12    claims or that the balance of hardships tips sharply in its favor.  Therefore, Instant Media's motion

13    for a preliminary injunction is DENIED.

14         IT IS SO ORDERED.

15

16    Dated: _____          _____

17                                              The Honorable Saundra B. Armstrong
                                               United States District Judge

18

19    Submitted by:

20    ARNOLD & PORTER LLP
      Suzanne V. Wilson

21    Charles C. Cavanagh
      Catherine R. Rowland

22    Elizabeth G. Frank

23

24    By: _____/s/_____
              Suzanne V. Wilson

25            Attorneys for Defendant
              Microsoft Corporation

26    437569

27

28

                                   - 14 -