1    Justin L. Allamano, State Bar No. 229764
     LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2    Rincon Center II
     121 Spear St., Suite 200
3    San Francisco, California 94105-1582

4    Mitchell P. Brook, State Bar No. 172105
     Michael H. Bierman, State Bar No. 89156
5    Jeffrey D. Wexler, State Bar No. 132256
     Andrea M. Kimball, State Bar No. 196485
6    Michael J. Mancuso, State Bar No. 228669
     LUCE, FORWARD, HAMILTON & SCRIPPS LLP
7    11988 El Camino Real, Suite 200
     San Diego, California 92130-2594
8    Telephone No.: 858.720.6300
     Fax No.: 858.720.6306
9    E-Mail:    jallamano@luce.com
                mbrook@luce.com
10               mbierman@luce.com
                jwexler@luce.com
11               akimball@luce.com
                mmancuso@luce.com
12
     Attorneys for Instant Media, Inc.
13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                    OAKLAND DIVISION

17
     INSTANT MEDIA, INC.,              Case No. C 07-02639 SBA (MEJ)
18
                                       **PLAINTIFF INSTANT MEDIA, INC.'S REPLY**
19          Plaintiff,                 **MEMORANDUM OF POINTS AND**
                                       **AUTHORITIES IN SUPPORT OF MOTION**
20   v.                                **FOR PRELIMINARY INJUNCTION**

21   MICROSOFT CORPORATION,            Date:    July 24, 2007
                                       Time:    1:00 p.m.
22          Defendant.                 Ctrm.:   3

23                                     The Honorable Saundra Brown Armstrong, District
                                       Judge
24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3    INTRODUCTION..................................................................................................... 1

4    LEGAL ARGUMENT ............................................................................................. 2

5    I.      THE PARTIES' MARKS ARE IDENTICAL. .................................................... 3

6    II.     THE PARTIES' FREE DOWNLOADABLE INTERNET APPLICATIONS ARE
             CLOSELY RELATED AND OFFERED IN THE SAME CHANNELS OF
7            TRADE............................................................................................................ 5

8    III.    THE CROWDED FIELD DOCTRINE DOES NOT PERMIT MICROSOFT TO
             USE AN IDENTICAL MARK ON CLOSELY RELATED GOODS. ............... 8
9
     IV.     MICROSOFT HAS NOT NEGATED THE INFERENCE THAT IT HAS ACTED
10           DELIBERATELY. ......................................................................................... 10

11   V.      MICROSOFT'S SURVEY DOES NOT NEGATE THE LIKELIHOOD OF
             REVERSE CONFUSION. ............................................................................. 11
12
     VI.     INJUNCTIVE RELIEF IS APPROPRIATE IN THIS CASE. ......................... 14
13
     VII.    MICROSOFT HAS NOT SUPPORTED THE SIZE OF THE BOND
14           DEMANDED. ............................................................................................... 15

15   CONCLUSION ...................................................................................................... 15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness LLC,*
   447 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................ 8

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*
   166 F.3d 197 (3d Cir. 1999) ......................................................... 11

*AMF, Inc. v. Sleekcraft Boats,*
   599 F.2d 341 (9th Cir. 1979) ..................................................... 5, 11

*Bear U.S.A., Inc. v. Kim,*
   71 F. Supp. 2d 237 (S.D.N.Y. 1999),
   *aff'd without op.*, 216 F.3d 1071 (2d Cir. 2000) ................................. 9

*Brookfield Communs., Inc. v. West Coast Entertainment Corp.,*
   174 F.3d 1036 (9th Cir. 1999) ........................................................ 5

*CIT Group, Inc. v. Citicorp,*
   20 F. Supp. 2d 775 (D.N.J. 1998) .................................................. 13

*Conopco, Inc. v. Cosmair, Inc.,*
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) .......................................... 11, 12

*Cunningham v. Laser Golf Corp.,*
   222 F.3d 943 (Fed. Cir. 2000) ........................................................ 4

*Echo Drain v. Newsted,*
   307 F. Supp. 2d 1116 (C.D. Cal. 2003) ............................................. 8

*Entrepreneur Media, Inc. v. Smith,*
   279 F.3d 1135 (9th Cir. 2002) ........................................................ 7

*Fisons Horticulture, Inc. v. Vigoro Indus.,*
   30 F.3d 466 (3d Cir. 1994) .......................................................... 10

*Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.,*
   988 F. Supp. 322 (S.D.N.Y. 1997) ................................................. 12

*Glow Indus., Inc. v. Lopez,*
   252 F. Supp. 2d 962 (C.D. Cal. 2002) ............................................ 10

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000) ........................................ 4, 5, 6, 7, 8, 11, 13

*Gruner & Jahr USA Pub. v. Meredith Corp.,*
   991 F.2d 1072 (2d Cir. 1993) ...................................................... 3, 4

*Halo Mgmt., LLC v. Interland, Inc.,*
   308 F. Supp. 2d 1019 (N.D. Cal. 2003) .......................................... 8, 9

1

## TABLE OF AUTHORITIES
### (cont'd)

2
**Page**

3    *Jupiter Hosting Inc. v. Jupitermedia Corp.*,
            76 U.S.P.Q.2d 1042 (N.D. Cal. 2004) ............................................................ 5, 6

4

5    *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
            290 F. Supp. 2d 1083 (C.D. Cal. 2003),
            *aff'd without op.*, 2005 U.S. App. LEXIS 135 (9th Cir. 2005) ........................ 4

6

7    *Mejia & Assocs., Inc. v. International Bus. Mach. Corp.*,
            920 F. Supp. 540 (S.D.N.Y. 1996) ................................................................ 4

8    *Sally Beauty Co., Inc. v. Beautyco., Inc.*,
            304 F.3d 964 (10th Cir. 2002) ........................................................................ 4

9

10   *Starter Corp. v. Converse, Inc.*,
            170 F.3d 286 (2d Cir. 1999) .......................................................................... 12

11   *Surfvivor Media, Inc. v. Survivor Prods.*,
            406 F.3d 625 (9th Cir. 2004) .......................................................................... 11

12

13   *Troublé v. Wet Seal, Inc.*,
            179 F. Supp. 2d 291 (S.D.N.Y. 2001) ..................................................... 11, 12, 13

14                              ## MISCELLANEOUS

15   J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 11:85 ......................... 9

16   J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 19:58 ......................... 4

17   J. McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 23:10 ......................... 13

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Microsoft is using a mark identical to Instant Media's **I'M** mark on a product that is closely related to Instant Media's product – Windows Live Messenger ("WLM"), a free downloadable Internet software application intended for computer users in general.  Microsoft adopted its **i'm** mark with complete disregard for Instant Media's rights to its **I'M** mark, and, through the continued use of that mark, Microsoft is compromising the integrity of Instant Media's **I'M** mark and threatening the very existence of that start-up company.

In its opposition, Microsoft makes four basic arguments to justify its use of the **i'm** mark in connection with WLM.  Each of its arguments is meritless.  First, Microsoft argues that its **i'm** mark is "starkly different" from Instant Media's **I'M** mark because both parties use the mark in logo form.  In fact, the record before the Court shows that both Microsoft and Instant Media frequently use their respective marks as word marks and not in logo form.  Moreover, Instant Media's federal registration is for a standard character mark not limited to any particular form, and its mark is therefore entitled to protection in all forms, not just when used in the form of Instant Media's current logo.  The marks are identical, and, in the Internet context, that factor is one of the three strong indicators of likelihood of confusion.

Second, Microsoft argues that it uses its **i'm** mark for charitable purposes, not software.  However, Microsoft does not dispute that: (1) it is using the **i'm** mark in connection with the distribution of its WLM software; or (2) its **i'm** mark appears prominently on the user's screen whenever that software is active on the user's computer.  WLM is a free downloadable Internet software application intended for computer users in general.  Instant Media uses its **I'M** mark in connection with its distribution of its free downloadable Internet software application, which is also intended for computer users in general.  Under Ninth Circuit precedent applicable to the Internet context, the two applications are closely related and use the same marketing channels; these two factors are the other two strong indicators of likelihood of confusion.

Third, Microsoft argues that Instant Media's **I'M** mark is not entitled to protection from reverse confusion because it exists in a crowded field.  While the crowded field doctrine may limit

Case No. C 07-02639 SBA (MEJ)
PLAINTIFF'S REPLY MEMO. OF Ps & As RE
MOTION FOR PRELIMINARY INJUNCTION

1   the scope of protection accorded Instant Media's mark against marks that are similar or used in

2   other fields, Instant Media is still entitled to the protection it seeks here – protection against an

3   identical mark in the same field.

4        Finally, Microsoft offers a consumer survey which, it claims, negates any likelihood of

5   confusion.  However, the survey, as designed, cannot validly measure lack of potential reverse

6   confusion because it never sought to determine how many of the subjects had been exposed to

7   Microsoft's **i'm** mark.  As Professor McCarthy has opined, reverse confusion surveys (like

8   Microsoft's) cannot be conducted before the junior user has saturated the market with its mark.

9   Microsoft began using its **i'm** mark only about four months ago.  It has not carried its burden of

10  showing that it has saturated the market, and its survey is inadmissible for lack of foundation.

11       Although Microsoft had actual or constructive knowledge of Instant Media's registered

12  **I'M** mark, it apparently decided to take its chances, gambling that it could successfully skirt the

13  legal obstacles to using an identical mark in connection with a closely related software application.

14  Now, Microsoft argues it should be allowed to continue using its copied **i'm** mark because

15  complying with an injunction would cost it money and would harm its partner charities.  Any

16  harm caused to Microsoft by its gamble was self-inflicted.[1]  Whatever costs Microsoft – a

17  multibillion dollar company – might incur in order to comply with a preliminary injunction pale in

18  comparison to the harm that threatens Instant Media if no injunction issues.

19                          **LEGAL ARGUMENT**

20       In its opposition, Microsoft does not dispute that: (1) this lawsuit presents the issue of

21  reverse confusion; or (2) Instant Media has correctly stated the standards applicable to claims of

22  reverse confusion.  *See* Docket 31 at 10:17 – 11:4.  Because irreparable injury is presumed, Instant

23  Media is entitled to a preliminary injunction upon a showing of likelihood of confusion.[2]

24

25  [1]   Any harm caused to Microsoft's partner charities could easily be mitigated by Microsoft continuing to contribute during any period that it is enjoined from using the term **i'm**.

26  [2]   Microsoft's contention to the contrary, Instant Media did not argue that "it may succeed on
27  its claim if consumers incorrectly believe that it is wrongly using *Microsoft*'s mark," absent a likelihood of confusion.  Docket 31 at 10 n.16.  Rather, it argued that the doctrine of reverse confusion protects against such an incorrect belief, and that it would be damaged if consumers
28  incorrectly believed it was infringing Microsoft's mark.  *See* Docket 8 at 2:2-3, 11:28 – 12:20.

I.    **THE PARTIES' MARKS ARE IDENTICAL.**

Microsoft does not dispute that its **i'm** mark sounds identical to Instant Media's **I'M** mark. Instead, Microsoft contends that, as used, the parties' marks are not similar in appearance and mean different things. Both of these contentions are contrary to the evidence.

First, Microsoft asserts that its **i'm** mark appears "starkly different" than Instant Media's **I'M** mark. It claims that because Microsoft uses its **i'm** logo while Instant Media uses its **I'M** logo, "[t]he only commonality between the marks is the letter string 'i'm.'" *Id.* at 16:14 – 17:12. However, both Instant Media and Microsoft use their respective marks liberally as word marks in addition to logos. The home page on Instant Media's website uses the word mark **I'M** eight times (and the **I'M** ball mark three times), *see* Docket 40, Ex. N. at 2, and the word mark **I'M** is constantly used throughout that website, *see id.* at 3-25. While the home page for Microsoft's **i'm** initiative includes Microsoft's **i'm** logo at the top of the page in two places, the word mark **i'm** appears in text format on that page no fewer than *15* times. *See* Kriese Decl., Ex. A, at 1. At least twice on that web page – in the captions "WHAT IS I'M" and "HOW I'M WORKS" – Microsoft's **i'm** mark appears in capital letters. *See id.* The marks will also be identical when entered into a search engine, and the search results will be the same whether the letters are typed in lower case, upper case, or a combination thereof. Microsoft does not and cannot argue that its **i'm** mark, when appearing as text, differs significantly from Instant Media's **I'M** mark.

Even the parties' respective logos are similar in appearance, not "starkly different." As features, the common letter string predominates over the slight differences in font, the circle background, and the differences in color. Microsoft has cited no cases that suggest that the differences between the logos – in the absence of any difference in the words being used in the parties' respective marks – weigh against a finding of likelihood of confusion, especially given the doctrine that "similarities are weighed more heavily than differences."[3] *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

_____

[3]    Microsoft cites three cases for the proposition that the **I'M** mark and the **i'm** mark are not similar simply because they both contain "the letter string 'i'm.'" Docket 31 at 17:3-8. However, in none of the cited cases did the common letter string comprise the entire mark of both of the parties. *See Gruner & Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)

3

1    Moreover, the fact that Instant Media's federally registered mark is sometimes used in logo

2    form is immaterial to the infringement analysis for that mark.  Instant Media's federal registration

3    is for the typed drawing **I'M**.  *See* Leak Decl., Ex. B.  Microsoft does not dispute that, under

4    *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 949-50 (Fed. Cir. 2000), "[r]egistrations with

5    typed drawings are not limited to any particular rendition of the mark and, in particular, are not

6    limited to the mark as it is used in commerce."  *Id.  See, e.g., Sally Beauty Co., Inc. v. Beautyco,*

7    *Inc.*, 304 F.3d 964, 970 (10th Cir. 2002) (plaintiff's "mark is typed in capital letters in the principal

8    trademark register, which means that the registration covers all design features and is not limited

9    to any special form or lettering").  *See generally* J. McCarthy, *McCarthy on Trademarks & Unfair*

10    *Competition* ("*McCarthy*"), § 19:58 (2007).  Thus, in determining whether a federally registered

11    mark is being infringed, the applicable comparison is between the senior user's mark as registered

12    and the junior user's mark as used.  The senior user's form of use is irrelevant.

13    Microsoft also argues that the **i'm** and **I'M** marks "do not mean the same thing" because

14    the **I'M** mark is "an abbreviation for the name 'Instant Media'" while "'**i'm**' is a play on the IM

15    acronym for instant messaging and suggests an individual's socially-responsible acts."  Docket 31

16    at 17:13-18.  However, both marks have a dictionary definition of "I am," *see* Webster's Ninth

17    New Collegiate Dictionary at 600 (1987), a meaning confirmed by the parties' respective use of

18    their marks in phrases like Microsoft's "**i'm** MAKING A DIFFERENCE," Kriese Decl., Ex. A, at

19    1, and Instant Media's "**I'M INTERESTED**," Leak Decl., Ex. F.

20    In the Internet context, the three most important *Sleekcraft* factors for determining

21    likelihood of confusion are the similarity of the marks, the relatedness of the goods or services,

22    and the simultaneous use of the Web as a marketing channel.  *See GoTo.com, Inc.*, 202 F.3d at

23

24    (stylized logo of the word "parents" (with the word disclaimed) not infringed by "PARENTS
DIGEST" mark in a different font); *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,

25    290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003) (finding no likelihood of confusion because plaintiff
"uses the MATRIX name only with its M Logo" and "all Toyota MATRIX vehicles bear that

26    TOYOTA brand name as well as the MATRIX model name"), *aff'd without op.*, 2005 U.S. App.
LEXIS 135 (9th Cir. 2005); *Mejia & Assocs., Inc. v. International Bus. Mach. Corp.*, 920 F. Supp.

27    540, 543-44, 547 (S.D.N.Y. 1996) (mark "EduQuest: A Tradition for Tomorrow" not confusingly
similar to the "name 'EduQuest' closely tied with the name 'IBM' through a tagline 'The IBM

28    Educational Systems Company'").

4

1   1205 (citing *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054

2   n.16 (9th Cir. 1999). As the PTO recognized when refusing registration for two Microsoft

3   applications for its **i'm** mark, Microsoft's use of an identical mark creates a likelihood of

4   confusion.[4] *See Jupiter Hosting Inc. v. Jupitermedia Corp.*, 76 U.S.P.Q.2d 1042, 1044 (N.D. Cal.

5   2004) (noting the PTO's findings as to a likelihood of confusion in rejecting plaintiffs' contention

6   that the marks "Jupiter Hosting" and "Jupiter" "are not substantially similar because, as displayed

7   on their respective Internet websites, the marks have different fonts, color schemes and layouts").

## II.    THE PARTIES' FREE DOWNLOADABLE INTERNET APPLICATIONS ARE CLOSELY RELATED AND OFFERED IN THE SAME CHANNELS OF TRADE.

10      In this case, likelihood of confusion is strongly indicated by all three of the *Sleekcraft*

11   factors that are paramount in the Internet context. In addition to the marks being identical, the

12   goods or services are closely related, and both parties simultaneously use the Web as a marketing

13   channel. *See GoTo.com, Inc.*, 202 F.3d at 1205. Both parties use their respective marks in

14   connection with free downloadable Internet applications intended for computer users at large, and

15   both use the Internet as their marketing channel. These facts make the parties' respective goods

16   and services related even though their Internet applications differ.[5] *See id.* at 1206.[6] *See, e.g.,*

---

[4]     In June 17, 2007 Office Actions, the PTO provisionally determined there may be a likelihood of confusion between Microsoft's **i'm** mark in International Classes 9 (software) and 38 (web messaging) and Instant Media's **I'M** mark in International Class 9, once that application matured into a registration. [Docket 39, Exs. E, F.] On June 28, 2007, Microsoft abandoned the applications instead of refuting the provisional refusal. [*Id.*, Exs. G, H] On July 3, 2007, the PTO published for opposition Instant Media's application in International Class 9, the last step before allowance. *See* Wexler Decl., Ex. F.

     Microsoft is wrong in asserting that the rejections of its **i'm** applications only "raised the same initial concerns regarding the use of the **i'm** mark on a software product as were raised by the PTO against [Instant Media's] applications for registration of its I'M mark." Docket 31 at 5 n.11. These rejections were based on likelihood of confusion, ***not*** the crowded field issue that the PTO examiner raised in response to Instant Media's application. [Docket 39, Exs. G, H]

[5]     In fact, the two applications have some overlapping functionality. For example, WLM provides video capability, the core function of Instant Media's software. *See* Supp. Wexler Decl., Ex. C.

[6]     "With respect to Internet services, even services that are not identical are capable of confusing the public. Although even Web tyros can distinguish between a web site that, for example, provides discounted travel tickets and one that provides free Web-based e-mail, a user would almost certainly assume a common sponsorship if the sites' trademarks were the same." *GoTo.com, Inc.*, 202 F.3d at 1206.

Case No. C 07-02639 SBA (MEJ)
PLAINTIFF'S REPLY MEMO. OF Ps & As RE
MOTION FOR PRELIMINARY INJUNCTION

*Jupiter Hosting Inc.*, 76 U.S.P.Q.2d at 1044-45 (as long as "the public is likely to make an association between related producers and products," it is irrelevant whether the parties' Internet-related services are different).

Microsoft seeks to sidestep these similarities by contending that the parties "do not use their respective marks on services that are complementary or even similar in use or function" because "Microsoft uses its '**i'm**' mark in connection with a philanthropic campaign available only to WLM users." Docket 31 at 15:19 – 16:1. However, while Microsoft is using its **i'm** mark in part to brand a marketing campaign based on philanthropy, it is also using the mark in connection with the distribution of its WLM instant messaging software. Both the **i'm** initiative and Microsoft's use of the **i'm** mark itself are integral parts of Microsoft's advertising and promotion of WLM. Microsoft's primary goal is to increase the use of WLM among computer users. The **i'm** initiative is one feature of WLM that Microsoft hopes will induce users to choose WLM instead of its competitors' instant messaging software.[7]

First, to participate in the **i'm** initiative, computer users must download the latest version of Microsoft's WLM software from an **i'm**-branded web page; participation is possible only with WLM, not with competitors' instant messaging software. *See* Kriese Decl., Ex. A, at 1. Second, the **i'm** mark is used in the WLM software itself. It appears prominently on the user's computer screen whenever WLM is active. *See* Wexler Decl., Ex. A. Finally, Microsoft admits that the **i'm** Agent itself is a software application (an "automated 'bot'") that runs automated tasks inside messenger client. *See* Conf. Kriese Decl., ¶ 4; Kriese Decl., ¶ 44. Given these facts, it should be beyond dispute that Microsoft is using the **i'm** mark to attract consumers to WLM.

Until it faced this preliminary injunction motion, Microsoft itself stated that it intended to use its **i'm** mark for its instant messaging application. On February 27, 2007, Microsoft filed service mark applications declaring under penalty of perjury its intent to use the **i'm** mark in International Classes 9 and 38 for "computer software for connecting users to web messaging

---

[7]     As would be expected from a "philanthropic campaign" which is in fact largely promotional, Microsoft has spent and budgeted far more on advertising the initiative, *see* Conf. Kriese Decl., ¶ 8, than it is donating to its charities based on its users' participation – $28,138.91 to date. *See* Supp. Wexler Decl., Ex. A.

1    services and for voice and video transmissions over the Internet and wireless networks" and "web

2    messaging services having voice and video capabilities," respectively.[8]  [Docket 39, Exs. A, C.]

3         Microsoft does not deny that both parties offer their free Internet applications through the

4    same channels of trade: the Internet.  The facts that "both parties 'use the Web as a *substantial*

5    marketing and advertising channel'" and "the parties' marks 'are utilized in connection with Web-

6    based products'" demonstrate overlapping marketing channels.  *Entrepreneur Media, Inc. v.*

7    *Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) (citations omitted).  This factor also greatly increases

8    the likelihood of confusion  *See Goto.com, Inc.*, 202 F.3d at 1207 ("the Web, as a marketing

9    channel, is particularly susceptible to a likelihood of confusion since . . . it allows for competing

10   marks to be encountered at the same time, on the same screen").

11        Instead, Microsoft argues that confusion is not likely because the parties' "predominant

12   customer audiences are different."  According to Microsoft, "Microsoft's **i'm** initiative

13   participants are predominantly current users of an instant messaging service," and "Instant

14   Media's IM.com Website targets prospective business customers."  Docket 31 at 19:11-24.

15        Because "[t]here are currently over 77,425,000 estimated instant messenger users in the

16   United States," Kriese Decl., ¶ 3 – a quarter of the country's population – Microsoft cannot show

17   that its target audience is distinct from Instant Media's target audience of computer users seeking

18   access to high-quality video over the Internet.  Microsoft's claim that Instant Media primarily

19   targets business customers, *see* Docket 31 at 1 n.1, 19:11-24, is contradicted by the facts that: (1)

20   Instant Media, like Microsoft, targets businesses and consumers; (2) **consumers** have downloaded

21   more than **700,000** copies of Instant Media's software; and (3) Instant Media's main website

22   offers consumers a prominent link taking them to a webpage where they may download Instant

23   Media's software.[9]  *See* Leak Decl., ¶¶ 15-17, Ex. A.

24   _____

25   [8]    On June 28, 2007, Microsoft acquiesced to these rejections by abandoning its applications to
     register the **i'm** mark in these two classes, ostensibly because the PTO examiner sent Office
26   Actions refusing registration on the grounds of likelihood of confusion with Instant Media's
     **"I'M"** mark.  [Docket 39, Exs. G, H.]

27   [9]    Microsoft observes that Instant Media's main "website does not include the scrolling 'I'M'
     phrases described in Instant Media's motion."  Docket 31 at 8:1-2.  In reality, that website links to
28   a web page for downloading Instant Media's products on which such scrolling phrases appear.

The use of similar marks on the Internet, alone, tends to create a likelihood of confusion:

> Our ever-growing dependence on the Web may force us eventually to evolve into increasingly sophisticated users of the medium, but, for now, we can safely conclude that the use of remarkably similar trademarks on different web sites creates a likelihood of confusion amongst Web users."

*GoTo.com*, 202 F.3d at 1206.  Clearly, consumers might reasonably believe that the same company might offer both the services offered by Microsoft under the **i'm** mark – WLM, with an associated charitable giving program – and the services offered by Instant Media under the **I'M** mark – a media player and subscription service.

## III.   THE CROWDED FIELD DOCTRINE DOES NOT PERMIT MICROSOFT TO USE AN IDENTICAL MARK ON CLOSELY RELATED GOODS.

Microsoft does not dispute that "[i]n a reverse confusion case, the court evaluates the conceptual strength of the senior user's mark and the commercial strength of the junior user's mark." *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1123 (C.D. Cal. 2003).  Rather, it contends that its use of its **i'm** mark is permitted because: (1) the crowded field of marks using variations of "IM," "I'm" and "I am" makes Instant Media's **I'M** mark conceptually weak and so unprotectable against reverse confusion; and (2) the potential commercial strength of Microsoft's **i'm** mark is not significant.[10]  *See* Docket 31 at 12:16 – 15:2 & n.17.  Both contentions are incorrect.

No authority suggests that the crowded field doctrine allows a defendant to use an identical mark on closely related goods or services.  As Microsoft implicitly acknowledges, *see id.* at 12 n.18, the crowded field analysis focuses on the use of similar marks on goods and services within the same field, not on unrelated goods and services.  *See, e.g.*, *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness LLC*, 447 F. Supp. 2d 266, 273 (S.D.N.Y. 2006) (considering "third-party use in the relevant field of fitness"); *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1034

---

*See* Supp. Wexler Decl., Exs. D, E.

[10]   Microsoft also argues briefly that Instant Media's **I'M** marks should be understood "as an abbreviation of 'Instant Media,' which is itself either descriptive or suggestive of its video services and, thus conceptually weak," Docket 31 at 12:12-15, but it cites no authority in support of this analysis, nor does it dispute that the apostrophe changes the connotation of the mark.

1    n.15 (N.D. Cal. 2003) ("the 'field' must be defined with particular reference to the context in

2    which a particular mark is used"); *McCarthy*, § 11:85.

3         While Microsoft has introduced evidence of many marks including "IM," "I'm," and "I

4    am," *see* Dockets 41-45, Exs. DD-OOO, it has not shown that the ***relevant field*** is crowded.  It has

5    not identified even one mark in the welter it has presented that is being used in the same field as

6    Instant Media's **I'M** mark.  *See, e.g., Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 255 (S.D.N.Y.

7    1999) (finding that the existence of 225 applications and registered marks for clothing which

8    include the word "bear" did not demonstrate a crowded field where only seven of the marks were

9    active marks or pending applications using the word on jackets or parkas, and the remaining marks

10   were not used on clothing or were not valid), *aff'd without op.*, 216 F.3d 1071 (2d Cir. 2000).

11        For all the marks cited by Microsoft, Instant Media's **I'M** mark and Microsoft's **i'm** mark

12   are virtually the only marks in the pertinent field of use that consist only of the terms "I'M" or "I

13   AM."  Microsoft cites no authority suggesting that the crowded field doctrine precludes an

14   infringement action against a defendant that is using the ***identical*** mark on closely related goods,

15   as Microsoft is doing.[11]  *See, e.g., Halo Mgmt., LLC*, 308 F. Supp. 2d at 1034.

16        Microsoft can hardly deny the obvious potential commercial strength of its **i'm** mark.  It

17   argues only that Instant Media "has not shown, for purposes of reverse confusion, that its mark is

18   so commercially inferior to the **i'm** mark that it is the proverbial 'David' pitted against 'Goliath,'"

19   noting that Instant Media has spent considerable amounts in advertising and that its video player

_____

20   [11]   Microsoft also argues that the **I'M** mark should be considered weak because of statements
21   made by Instant Media's counsel to the PTO in order to obtain registration of the **I'M** mark.  *See*
     Docket 31 at 12:17 – 13:5.  Microsoft takes those statements out of context.  The statements made
22   by counsel to the PTO were that: (1) each of the marks cited in the initial Office Action lacked an
     apostrophe and therefore was not confusingly similar to Instant Media's **I'M** mark; (2) the PTO's
23   TESS system identified "over 50 registered marks [that] are limited to the letters IM or I AM or
     I'M only"; (3) "owners of I'M or IM registrations are not entitled to a broad scope of protection
24   for their marks barring [Instant Media's] mark, but instead may only claim protection with respect
     to closely related goods or services"; and (4) "[w]hen the goods in question are not identical or
25   competitive, and are not related or marketed in such a way that they would be encountered by the
     same people in situations that would create the incorrect assumption that all the goods come from
26   the same source, then even where the marks are identical, confusion is not likely."  [Docket 41,
     Ex. CC, at 5-14]  In short, the position taken by Instant Media's counsel before the PTO is
27   ***precisely the same*** as the position taken by Instant Media in this case: Instant Media's **I'M** mark is
     entitled to protection against Microsoft's use of that mark in connection with related goods or
28   services and in a manner that would be likely to cause confusion as to affiliation.

has been downloaded by more than 700,000 viewers.  Docket 31 at 14:3 – 15:20.  However, the Confidential Declaration of Tara Kriese acknowledges the huge number of users of WLM and Microsoft's expenditures on marketing the **i'm** mark.  Microsoft does not dispute that its website and search engine are hugely popular or that each day it displays its **i'm** mark to the ***millions of computer users*** who sign on to the www.msn.com website or use WLM.  Microsoft indisputably subjects computer users to billions of impressions of its *i'm* mark each month.  In terms of commercial strength, this case does pit David against Goliath.

## IV.    MICROSOFT HAS NOT NEGATED THE INFERENCE THAT IT HAS ACTED DELIBERATELY.

Microsoft does not dispute that, in a reverse confusion case, the intent inquiry focuses on the question whether the defendant "consider[ed] the likelihood of confusion with other companies' marks and products."  *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 480 (3d Cir. 1994).  "Knowing adoption of a mark closely similar to another is a sound basis for inferring an intent to deceive."  *Glow Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962, 1002 (C.D. Cal. 2002).

In its opposition, Microsoft does not offer any evidence refuting the inference that its adoption of its **i'm** mark was a deliberate gamble, taken with knowledge of Instant Media's federally registered service mark.  The carefully worded Kriese Declaration states in conclusory fashion that "Microsoft has no intent to trade off Instant Media's alleged goodwill and had no intent to be associated with Instant Media or its services."  Kriese Decl., ¶ 19.  It is silent on whether Microsoft knew its adoption of its **i'm** mark might swamp Instant Media's mark, causing reverse confusion.  While Ms. Kriese declares that she "had no knowledge of Instant Media or its I'M trademark when [she] participated in selecting the name and logo for the **i'm** initiative," *id.*, she does not: (1) assert that ***Microsoft*** was unaware of Instant Media and its **I'M** marks; or (2) deny that she became aware of Instant Media and its **I'M** marks at some time after the name and logo for the **i'm** initiative were selected but before the **i'm** initiative was rolled out.  Microsoft's

undisputed actual or constructive knowledge of Instant Media's **I'M** mark supports an inference of

wrongful intent. *See Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).[12]

## V. **MICROSOFT'S SURVEY DOES NOT NEGATE THE LIKELIHOOD OF REVERSE CONFUSION.**

Microsoft argues that its expert's consumer survey demonstrates that its **i'm** mark is not

likely to cause reverse confusion. *See* Docket 31 at 21:16 – 22:15. However, surveys with the

design of Microsoft's cannot negate reverse confusion unless the junior user has finished

saturating the market. Because Microsoft has not, and cannot, prove this foundational fact, its

survey is inadmissible to negate likelihood of reverse confusion.

In this case, as Microsoft acknowledges, the issue to be tested by the survey is whether

"individual consumers will be confused by Microsoft's **i'm** mark." Docket 31 at 21:19. To be

admissible, a likelihood of confusion survey must "be designed to examine the impression

presented to the consumer by the accused product." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp.

2d 242, 253 (S.D.N.Y. 1999). *See Troublé v. Wet Seal, Inc.,* 179 F. Supp.2d 291, 308 (S.D.N.Y.

2001). Without a showing of market saturation, Microsoft's survey cannot answer this question,

and it therefore is inadmissible.

The survey, in essence, asked about 100 people likely to download free software from the

Internet to view a version of Instant Media's website. *See* Ford Decl., ¶ 5 [Docket 34]. The web

pages they were shown all displayed both the **I'M** mark and Instant Media's name. *See id.*, Ex. A,

at 6-11. The participants were asked "Who or what company do you believe puts out this software

with this name I apostrophe M." *Id.*, ¶ 21. They were also asked the reason for their answer. *See*

---

[12] The remaining *Sleekcraft* factors also continue to indicate likelihood of confusion: (1) for actual confusion, Microsoft makes no attempt to explain what factor – other than Microsoft's adoption of its **i'm** mark – could explain the dramatic increase in the number of inquiries that Instant Media has received concerning instant messaging since Microsoft adopted that mark, *see* Leak Decl., ¶ 33; (2) for degree of care, Microsoft's argument that Instant Media's corporate customers are likely to exercise greater care disregards the doctrine that where a product is sold to less and more sophisticated parties, "'the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer,'" *Goto.com, Inc.*, 202 F.3d at 1209; and (3) for likelihood of expansion, Microsoft has not disputed that the consuming public might expect Microsoft to enter Instant Media's market (as it has already done), *see A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 234 (3d Cir. 1999).

Case No. C 07-02639 SBA (MEJ)
PLAINTIFF'S REPLY MEMO. OF Ps & As RE
MOTION FOR PRELIMINARY INJUNCTION

1    *id.* Of the 108 respondents, 52 stated that they did not know; 30 respondents named Instant

2    Media; nine named "I'M;" four named "Microsoft or Windows;" and 13 gave other answers. *See*

3    *id.*, Ex. A, Vol. 1 Tab B.2. at 21-29. Of the 39 who answered either "Instant Media" or "I'M," all

4    but four (Respondent Nos. 1107, 1301, 1309, and 1705) stated that their answer resulted from

5    reading "Instant Media" or "I'M" on the website they had just viewed. *See id.*

6    What the survey did ***not*** measure was how many of the participants had, prior to the

7    survey, been exposed to Microsoft's **i'm** mark. Unless the survey measured the responses of

8    people who had already been exposed to Microsoft's mark, it could not even theoretically measure

9    the potential confusion that would be caused for people when they are exposed to such mark.[13]

10   "To have substantial probative value, a survey, in addition to testing the proper universe, must also

11   be designed to examine the impression presented to the consumer by the accused product."

12   *Conopco, Inc.*, 49 F. Supp. 2d at 253. *See Troublé,* 179 F. Supp. 2d at 308 (survey excluded

13   because it "never actually used the stimuli to test for confusion.").

14   As conducted, Microsoft's survey is little more than a "memory test," measuring how

15   many respondents who had just read the source indicators "Instant Media" and "I'M" on a website

16   could accurately recall them. For this reason also, it should be excluded from evidence or heavily

17   discounted. *See, e.g., Starter Corp. v. Converse, Inc.* 170 F.3d 286, 297 (2nd Cir. 1999) (affirming

18   exclusion of survey that "was little more than a memory test, testing the ability of the participants

19   to remember the names of the shoes they had just been shown and gave no indication of whether

20   there was a likelihood of confusion in the marketplace"); *Franklin Resources, Inc. v. Franklin*

21   *Credit Mgmt. Corp.*, 988 F. Supp. 322, 334-35 (S.D.N.Y. 1997) (excluding survey where subjects

22   were shown a booklet containing an advertisement from one of four companies and were then

23   shown letters from three companies and were asked whether the products referenced in the letters

24   were from the same source as the products in the booklet; "[s]urveys which do nothing more than

25

26   _____

     [13]    The significance of the survey would vary dramatically depending on the number of
27   respondents aware of Microsoft's **i'm** mark. For example, if only six of the respondents had been
     exposed to Microsoft's mark and four of them thought that Microsoft put out the Instant Media
28   software, those results would demonstrate very strong potential for actual confusion.

1  demonstrate the respondents' ability to read are not probative on the issue of likelihood of

2  consumer confusion").

3      When Microsoft has saturated the market with its **i'm** mark, a survey such as Microsoft's

4  might validly negate reverse confusion.  At that point, the exposure to Microsoft's mark would

5  have reached its maximum.  If no confusion were shown, an inference could be drawn either that

6  the two sets of consumers do not have significant overlap or that consumers exposed to both

7  marks are not confused.  In this case, where Microsoft's publicity campaign started only four

8  months ago, neither inference is valid.  Until saturation is reached, a survey like Microsoft's could

9  demonstrate a likelihood of reverse confusion – if the results showed confusion – but it could not

10  negate reverse confusion.  *See Troublé*, 179 F. Supp.2d at 308 n.12 ("[i]f an interviewee

11  spontaneously answered 'Agnes b.' [the senior user's mark] when asked the second question

12  [about whether the junior user was affiliated with any other women's clothing company] there

13  would be some evidence of confusion.  But . . . the fact that the majority of interviewees answered

14  'no' to the second question does little to establish that they would not be confused if they

15  encountered both marks").

16      As Professor McCarthy states: "In the author's opinion, a survey cannot be run in a reverse

17  confusion case prior to the junior user's saturation of the market with its mark because, until that

18  time, consumers have not been exposed to the relatively large advertising and promotion of the

19  junior user that is the hallmark of a reverse confusion case."[14]  *McCarthy*, § 23:10.  *See CIT*

20  *Group, Inc. v. Citicorp*, 20 F. Supp. 2d 775 (D.N.J. 1998) (Professor McCarthy's observation is

21  "generally correct," but inapplicable where the dominant feature of the new mark had saturated the

22  market for many years).

23

24

---

25  [14]    Given this authority, there is no basis for Microsoft's speculation that Instant Media
  "predicted that the results of such a survey would be unfavorable."  Docket 31 at 22:12-15.  In any
26  event, Instant Media had no reason to conduct a survey to prove what is obvious as a matter of
  common sense: Microsoft's use of a mark identical to Instant Media's mark in connection with
27  services that are closely related to Instant Media's services is likely to cause confusion.  *See*
  *GoTo.com, Inc.*, 202 F.3d at 1208 ("even if Disney could show *GoTo's* study was pure fantasy and
28  that no one was actually confused, it would by no means refute a likelihood of confusion").

1   **VI.   <u>INJUNCTIVE RELIEF IS APPROPRIATE IN THIS CASE.</u>**

2       Microsoft concedes that if Instant Media demonstrates a likelihood of success on its

3   trademark infringement claim, it is entitled to a presumption of irreparable injury. *See* Docket 31

4   at 24:14-15. Accordingly, if the Court finds that Instant Media has demonstrated a likelihood of

5   success on the merits, it should issue a preliminary injunction.

6       Microsoft apparently does not dispute that Instant Media has shown serious questions

7   going to the merits, but it claims that the balance of hardships tips sharply in its favor, asserting

8   that "Instant Media failed to introduce evidence of any material harm that it may suffer if a

9   preliminary injunction is not issued," *id.* at 24:25 – 25:1. Microsoft simply ignores: (1) Instant

10  Media's uncontroverted evidence of the substantial time, effort, and money that it has invested in

11  building up its **I'M** marks, *see* Leak Decl., ¶¶ 15-17, Ex. H; and (2) the fact that the doctrine of

12  reverse confusion is predicated upon the material harm that a senior trademark user will suffer if a

13  junior user is permitted to destroy the senior user's goodwill in its mark.

14      Microsoft's claim of harm to it is based on the costs it claims it would need to incur in

15  order to comply with a preliminary injunction. *See* Docket 31 at 24:26 – 25:1 (citing Kriese Decl.,

16  ¶¶ 44-48, and Conf. Kriese Decl., ¶¶ 4-8). Given the evidence in this case strongly suggesting that

17  Microsoft adopted its **i'm** mark either knowing of Instant Media's **I'M** mark or keeping itself

18  deliberately ignorant of the mark, Microsoft is hardly in a position to argue that the costs it must

19  incur to correct its course should be considered "harm" for the purpose of weighing the equities.

20      Microsoft does not quantify the expenses it contends a preliminary injunction would cause

21  it to incur, but implies that the costs would be similar in scale to the costs it allegedly incurred in

22  developing the **i'm** mark and logo. *See* Conf. Kriese Decl., ¶¶ 4-8. These costs appear grossly

23  inflated, especially given Microsoft's ability to use its own employees to remove the infringing

24  mark from its websites. While Microsoft focuses on the expenses of testing and releasing a new

25  version of WLM, it appears that Microsoft will be doing so in the relatively near future in any

26  event because it has released a Beta version of WLM 8.5. *See* Supp. Wexler Decl., Ex. B.

27

28

Case No. C 07-02639 SBA (MEJ)
PLAINTIFF'S REPLY MEMO. OF Ps & As RE
MOTION FOR PRELIMINARY INJUNCTION

1    The respective hardships are: (1) the costs Microsoft (which had on hand cash, equivalents,

2    and short-term investments of $28.2 billion as of March 31, 2007[15]) would incur to comply with

3    the law; and (2) the irreparable harm that the much smaller Instant Media would suffer if

4    Microsoft continues to destroy its goodwill in its **I'M** marks.[16]  The way the balance tips is clear.

5    **VII.    MICROSOFT HAS NOT SUPPORTED THE SIZE OF THE BOND DEMANDED.**

6    Microsoft briefly argues that if the Court grants a preliminary injunction, "its grant should

7    be conditioned upon Instant Media's posting of a bond of $8 million," an amount "based on the

8    costs that Microsoft will be forced to incur."  Docket 31 at 25:6-16.  It seems unlikely that, as

9    Microsoft claims, the cost for changing the **i'm** mark to something less confusing would be the

10    same as the cost it incurred to develop and launch its entire **i'm** initiative in the first place.  Instant

11    Media suggests that the Court, if it decides to enter a preliminary injunction, require supplemental

12    briefing on the proper amount of the bond.

13    **CONCLUSION**

14    For the reasons set forth herein and in its moving papers, Instant Media respectfully asks

15    the Court to enter a preliminary injunction.

16    DATED: July 10, 2007                LUCE, FORWARD, HAMILTON & SCRIPPS LLP

17                                        By:    /s/ Jeffrey D. Wexler

18                                               Jeffrey D. Wexler
                                               Attorneys for Plaintiff Instant Media, Inc.

19    201002778.2

20

21

---

22    [15]    http://yahoo.brand.edgar-online.com/fetchFilingFrameset.aspx?dcn=0001193125-07-
23    091808&Type=HTML at 2.

24    [16]    Microsoft also suggests that its partner "social-cause organizations will be harmed by any
         required re-branding," Docket 31 at 9:19-21, relying on the declaration of an American Red Cross
         official that her organization would be required to "re-brand websites and content for newsletters."
25    Declaration of Kristine Templin, ¶ 8 [Docket 33].  Microsoft has introduced no evidence that any
         such expenses will be anything more than nominal.  There is no evidence that the charities – rather
26    than Microsoft – would bear the cost of any rebranding necessitated by a preliminary injunction.
         Microsoft does not argue that a preliminary injunction would adversely affect the amount of
27    money to be donated to the charities, perhaps because Microsoft plans to donate only $28,138.91
         to the charities as a result of consumers' participation in the **i'm** initiative during its first four
28    months.  *See* Supp. Wexler Decl., Ex. A.

                                        Case No. C 07-02639 SBA (MEJ)
                                        PLAINTIFF'S REPLY MEMO. OF Ps & As RE
                                        MOTION FOR PRELIMINARY INJUNCTION