1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

INSTANT MEDIA, INC.,                              No. C 07-02639 SBA

               Plaintiff,                **ORDER**

     v.                                      [Docket No. 8]

MICROSOFT CORPORATION,

               Defendant.

_____/

Currently before the Court is plaintiff Instant Media, Inc's ("Instant Media") motion for a preliminary injunction against defendant Microsoft Corporation ("Microsoft") [Docket No. 8]. For the reasons that follow, the Court DENIES the motion for a preliminary injunction.

**BACKGROUND**

**A.    Factual Background**

    **1.    Instant Media's Adoption and Use of the "I'M" Mark.**

Instant Media is a corporation headquartered in Palo Alto, California. Leak Decl., ¶ 2. Instant Media develops software and provides Internet media content delivery to the public and its business partners. *Id.* One of Instant Media's product offerings is software that is presently distributed as a client-side program (the "I'M player"), downloaded from the Internet and installed on clients' computers. *See id.* Instant Media's software is an Internet video platform for consumers, advertisers, and content providers, and is built on caching technology that delivers high-resolution video. *See id.*, ¶ 3.

The I'M player delivers full-screen video in DVD or HD quality. *See id.* The I'M player offers a designated list of audio and video clips and "shows" that users view or subscribe to with the I'M player. For example, users subscribe to a weekly "show" from Buy.com, which highlights products for sale at www.buy.com. Cavanagh Decl. ¶ 7, Ex. J. Reviews of the I'M player compare it to Apple Computer's popular iTunes software. *Id.*, ¶ 8, Exs. L-M. I'M player users cannot engage in instant messaging with other I'M player users. *Id.*, ¶ 20.

Instant Media licenses its I'M player software to business partners, advertisers and content providers to support the delivery of video content over the Internet. Mot. at 2. In advertising to these business customers, Plaintiff states that "I'M presents a superior viewing experience that fully expresses your brand and your professional production values." Cavanagh Decl., Ex. N. Instant Media's trademark applications describe the services offered under the "I'M" trademark as follows: "electronic retailing services," "developing on-line promotional campaigns for others in the field of entertainment," "software for subscribing to news, information, audio, video and audiovisual programs, feeds and services," "software implementing IPTV [Internet Protocol Television] and Internet based content, television and movie subscription services," and "software for conducting commercial transactions." *See* Mot. at 2-3.

Instant Media uses its **I'M** trademark (the "**I'M** mark") and the **I'M** family of trademarks in conducting its business and marketing its software. *See id.* According to Instant Media, the **I'M** mark is "extremely important" because Instant Media's branding is focused around consumers' ability to easily remember that mark and to associate it uniquely with Instant Media. *See* Leak Decl., ¶ 4. Instant Media also operates the website www.im.com. *See id.*, ¶ 5, Ex. A. Instant Media first used the word mark **I'M** in commerce on December 19, 2005. *See id.*, ¶ 6, Ex. B. Instant Media holds a federal trademark registration for the word mark "I'M," issued on September 26, 2006 based on an application filed on May 10, 2004. *See id.,* Ex. B. That registration, in International Class 35, recites as Instant Media's services "electronic retailing services via the Internet and other electronic communications networks, featuring general consumer merchandise, music, movies and related merchandise; developing

2

United States District Court
For the Northern District of California

1   on-line promotional campaigns for others in the field of entertainment." *Id.* On July 4, 2006, the PTO

2   allowed Instant Media's application, filed on May 10, 2004, to register a design mark consisting of the

3   letters **"I'M"** in a circle, in International Class 35 for the same services identified in the registration for

4   the word mark **I'M**. *See id.*, Ex. C.

5        On June 28, 2006, Instant Media filed an application to register the word mark **I'M** for goods

6   in International Class 9. *See id.*, Ex. D. That application presently describes the subject goods as

7   follows:

8        Software for receiving, accessing, extracting, encoding, decoding, storing, organizing,
         managing, viewing and outputting audio, video and audiovisual and other content data;
9        software for subscribing to news, information, audio, video and audiovisual programs,
         feeds and services; software for providing access to sites and data via the Internet;
10       software implementing IPTV and Internet based content, television and movie
         subscription services, software for conducting commercial transactions, namely
11       computer e-commerce software to perform electronic business transactions via a global
         computer network.

12  *Id.*

13

14       Over the past few years, Instant Media has created and promoted a marketing campaign centered

15  around the **I'M** marks. *See id.*, ¶ 9. Instant Media uses these marks and the associated marketing

16  campaign to build awareness for its software and services, with the goal of getting prospective users to

17  associate its registered **I'M** mark uniquely with Instant Media. *See id.* Consumers have downloaded

18  more than 700,000 copies of Instant Media's software from the Internet. *See id.*, ¶ 15. In 2006, Instant

19  Media spent more than $1 million to develop television commercials and to buy television and Internet

20  advertising for the **I'M** marketing campaigns. *See id.*

21       Instant Media claims that it has also spent significant resources in seeking publicity and media

22  coverage in magazines such as *Consumer Electronics*, *PC World*, technology blogs, and other forums.

23  *See id.*, ¶ 26. Instant Media states that it has engaged in a "massive public relations campaign" with

24  journalists to reinforce the mark **I'M** as being associated with only Instant Media. *See id.* For example,

25  as part of this "massive" campaign, in the summer of 2006, Instant Media sent custom-made t-shirts to

26  dozens of bloggers, journalists, and industry analysts using a theme "I'M <Journalist Name>." *See id.*

27  In the past, journalists and bloggers have promoted Instant Media's brand by, for example, entitling their

28                                                      3

1    articles "I'M Ready for TV" or "I'M – Instant Media." *See id.*

2

3         **2.        Microsoft's Adoption and Use of the "i'm" Mark**

4         Instant messaging is a form of electronic communication, enabling real-time communication

5    between people connected to a network such as the Internet. Kriese Decl., ¶ 2. Instant messaging is often

6    referred to as "IM" (pronounced "aye em") or "IM'ing." *Id.* According to Microsoft, its popular MSN

7    ("Microsoft Network") Messenger instant messaging software was upgraded and rebranded in 2006 as

8    Windows Live Messenger ("WLM"), and is used by millions of people every day. *See* Brook Decl., ¶

9    5, Ex. C. Microsoft represents that "Windows Live Messenger, the next version of MSN Messenger, is

10   the world's largest easy to use consumer instant messaging service," and that it is used "by more than

11   240 million active accounts each month." *Id.*, Ex. C. Microsoft touts Windows Live Messenger as:

12            [T]he next generation of MSN® Messenger, the world's most widely used instant
             messaging service. Windows Live Messenger goes beyond text IM to help people
13           connect and share with voice, video and more. It also acts as a window to the Internet,
             connecting people to their e-mail, blogs, search and other Windows Live services with
14           one click of the mouse.

15   *Id.*, Ex. E, at 2. Microsoft's WLM is one of many popular competing instant messaging services,

16   including America Online's ("AOL") AIM, ICQ, Yahoo! Messenger, and Google Talk. *Id.* Users

17   download WLM for free from a Microsoft website. According to Microsoft, WLM is distinct from

18   Instant Media's products or services in that

19            it does not enable users to broadcast video or audio programs over the Internet; it does
             not support a subscription service by which video or audio files are automatically
20           downloaded to the user's computer; it has no caching technology for videos; and it does
             not provide any retailing services – consumers cannot buy products through WLM.
21

22   Opp'n at 3.

23         On February 27, 2007, Microsoft filed three trademark applications for a stylized mark using a

24   lower-case "i" and "m" (the "**i'm** mark"). *See* Brook Decl., ¶ 3, Ex. A. Microsoft's **i'm** mark uses

25   lower-case, stylized letters, includes a speech balloon in the place of an apostrophe, and uses pale green

26   and blue coloring.  Microsoft argues that its mark is intended to appear "young" and "hip" and that the

27   use of the speech balloon next to the stylized "i" was intended to echo an icon of a speaking person.

28                                                    4

1   Kriese Decl. ¶ 20. Additionally, the colors in the logo mirror those of the so-called "buddy" icons used

2   in connection with WLM. *Id.*

3       The three applications were filed on an intent-to-use basis and sought to register the **i'm** mark:

4   (1) in International Class 9, for "computer software for connecting users to web messaging services and

5   for voice and video transmissions over the Internet and wireless networks"; (2) in International Class

6   36 for "philanthropic services concerning monetary donations made via the Internet and wireless

7   networks"; and (3) in International Class 38 for "web messaging services having voice and video

8   capabilities." *Id.*, Ex. A. In June 17, 2007 Office Actions, the Patent and Trademark Office ("PTO")

9   provisionally determined there may be a likelihood of confusion between Microsoft's **i'm** mark and an

10  "IM" word mark owned by SonicBox, Inc. related to "radio transmission routing services conducting

11  via a website on a global computer network." The PTO also noted that there may also be a likelihood

12  of confusion with Instant Media's **I'M** mark in International Class 9 in the event  that application

13  matures into a registration. Cavanagh Decl., Exs. E, F. On June 28, 2007, Microsoft abandoned these

14  two applications. *Id.*, Exs. G, H. The application in International Class 36 for "philanthropic services

15  concerning monetary donations made via the Internet and wireless networks"remains pending before

16  the PTO.

17      According to Microsoft, its so-called "**i'm** initiative" was launched on March 1, 2007, two days

18  after Microsoft filed its intent-to-use applications. *See* Brook Decl., Exs. A, B. Microsoft styles its "**i'm**

19  initiative" as a "philanthropic marketing program available only to Windows Live Messenger 8.1 users."

20  Kriese Decl., ¶ 8. Under the initiative, Microsoft will donate a portion of the advertising revenue

21  generated by participating WLM users to ten social cause organizations. Participating WLM users select

22  a specific organization that they wish to benefit from their instant messaging from any of the ten social-

23  cause organizations. *Id.*

24      The **i'm** initiative is free, voluntary, and only available to users of WLM 8.1. *Id.* ¶¶ 8, 10. A

25  WLM user joins the **i'm** initiative by visiting a Microsoft website, such as www.im.live.com, and

26  clicking on the "Join Now" button. *Id.*, ¶ 12. The user designates one of the ten participating social cause

27

28                                             5

**United States District Court**
For the Northern District of California

1   organizations[1] to benefit from his or her instant messaging. *Id.*, ¶¶ 9, 12, 13. Thereafter, every time the

2   participant sends an instant message using WLM, the organization will be credited for that message. The

3   **i'm** logo appears by the "Display Name" of the WLM user and is visible to the participating user and

4   other WLM users with which he or she instant messages. Kriese Decl., ¶ 13.

5       Despite its trademark applications to the contrary, Microsoft states that it "does not use and has

6   no intent to use its **i'm** mark to designate any other services." *Id.* Microsoft has pledged to donate a

7   minimum of $1 million dollars (*i.e.*, $100,000 each) at the end of 2007 to the ten designated

8   organizations, with the exact amount to be donated to each organization based upon the number of

9   instant messages sent by participating WLM users. *Id.*, ¶ 9. Microsoft states that it chose the mark "**i'm**"

10  for use with the initiative because it suggests "IM," the common abbreviation for "instant messaging,"

11  and because it indicates that participants are individually taking steps to be socially responsible (*e.g.*,

12  "i'm making a difference"). *Id.*, ¶ 19. In addition, the **i'm** logo suggests instant messaging by use of the

13  "i" next to a speech balloon instead of an apostrophe, and the logo mirrors the colors of the "buddy"

14  logo

15      Microsoft followed the launch of the **i'm** initiative with an advertising campaign on its

16  www.msn.com website and through the Windows Live network, including Windows Live Hotmail

17  (Microsoft's email application), Spaces (a social networking website), and WLM, among others. *Id.* ¶

18  27. Microsoft also engaged in a college outreach effort to promote the initiative. *Id.* ¶ 34. On May 15,

19  2007, Microsoft further expanded its advertising of the **i'm** initiative outside of Microsoft websites to

20  other online media properties, print media and other venues designed specifically to reach "socially

21  responsible" instant messaging users. *Id.* ¶¶ 28-35. To date, Microsoft has spent "millions of dollars"[2]

22  on advertising the **i'm** initiative. Opp'n at 5.

23      Computer users who sign on to Microsoft's web site, www.msn.com, are presented with a

---

25  [1]The Humane Society, American Red Cross, UNICEF, Susan G. Komen Race for the Cure, Boys
26  and Girls Clubs of America, National AIDS Fund, National Multiple Sclerosis Society, Ninemillion.org,
    Sierra Club, and Stopglobalwarming.org. *Id.*, ¶¶ 9, 12, 13.

27  [2]Microsoft does not specify the precise amount it has spent on advertising in its opposition brief.

28                                                6

**United States District Court**
For the Northern District of California

1   link using the **i'm** mark next to the word "messenger." *See* Leak Decl., ¶ 20, Ex. I. Users who click on

2   that link or visit the website for Windows Instant Messenger, www.im.live.com, are confronted with

3   repeated uses of the **i'm** mark. *See id.*, Ex. I. In its marketing campaign, Microsoft is using the **i'm** mark

4   in phrases such as "i'm saving animals," *see id.*, Ex. I. Microsoft is also using the **i'm** mark as part of

5   its Internet address for Windows Live Messenger – www.im.live.com. *See id.*, ¶ 20, Ex. I.

6          Clicking on the **i'm** Advertisement link on the MSN Messenger window takes the computer user

7   to another web page, the "**i'm** Home Page." *See id.*, ¶ 6, Ex. C. That web page states, under the caption

8   "WHAT IS I'M":

9          i'm is a new initiative from Windows Live Messenger.™ Every time you start a
           conversation using i'm, Microsoft shares a portion of the program's advertising revenue
10         with some of the world's most effective organizations dedicated to social causes. We've
           set no cap on the amount we'll donate to each organization. The sky's the limit.

11
*Id.* Like Instant Media's software, Microsoft's Windows Live Messenger/**i'm** software is downloaded
12
    free of charge from the Internet and installed on consumers' computers. *See* Leak Decl., ¶¶ 19, 23.
13
**B.    Procedural History**
14
           Instant Media filed its Complaint on May 17, 2007. The Complaint alleges six claims for relief
15
    for: (1) federal trademark infringement; (2) federal unfair competition and false designation of origin;
16
    (3) California trademark infringement and unfair competition; (4) common law trademark infringement
17
    and unfair competition; (5) unjust enrichment; and (6) misappropriation. Microsoft timely filed its
18
    Answer on June 22, 2007. Instant Media filed its motion for a preliminary injunction on June 12, 2007.
19
                                        **LEGAL STANDARD**
20
           The function of a preliminary injunction is to maintain the status quo *ante litem* pending
21
    determination of the action on the merits. *Jupiter Hosting Inc. v. Jupitermedia Corp.*, 76 U.S.P.Q.2d
22
    1042, 1043 (N.D. Cal. 2004) (citing *Wash. Capitols Basketball Club v. Barry*, 419 F.2d 472, 476 (9th
23
    Cir. 1969)). Federal Rule of Civil Procedure 65(b) and the Lanham Act, 15 U.S.C. § 1116(a), provide
24
    that a court has the "power to grant injunctions, according to the principles of equity and upon such
25
    terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark
26
    registered in the Patent and Trademark Office or to prevent a violation under section 1125(a) of this
27

28                                              7

**United States District Court**
For the Northern District of California

1    title." 15 U.S.C. § 1116(a).  A party seeking a preliminary injunction must show either (1) a combination

2    of probable success on the merits and the possibility of irreparable injury if relief is not granted or (2)

3    the existence of serious questions going to the merits and that the balance of hardships tips sharply in

4    its favor. *GoTo.com, Inc. v. Walt Disney* Co., 202 F.3d 1199, 1205 (9th Cir. 2000); *see also Ocean*

5    *Garden, Inc. v. Marktrade Company, Inc.*, 953 F.2d 500, 506 (9th Cir.1991). Both tests require the

6    moving party to prove a significant threat of irreparable injury.  *Hollywood Athletic Club Licensing*

7    *Corp. v. GHAC-CityWalk*, 938 F.Supp. 612, 614 (C.D. Cal. 1996).

8          These two tests are the opposite ends of a single continuum: "the less certain the district court

9    is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the

10   public interest and balance of hardships tip in their favor."  *Southwest Voter Reg. Educ. Project v.*

11   *Shelley*, 344 F.3d 914, 918 (9th Cir. 2003); *see also Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d

12   1215, 1217 (9th Cir. 1987).

13                              **DISCUSSION**

14   **A.      Likelihood of Success on the Merits and Possibility of Irreparable Harm**

15         Instant Media argues that Microsoft's conduct constitutes trademark infringement under the

16   doctrine of reverse confusion. Reverse confusion occurs when a larger, more powerful company uses

17   the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the

18   source of the senior user's goods or services. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,

19   166 F.3d 197, 207 (3d Cir. 1999); *see also JohnnyBlastoff, Inc. v. Los Angeles Rams Football Co.*, 188

20   F.3d 427, 436 (7th Cir. 1999) ("reverse confusion occurs when a large junior user saturates the market

21   with a trademark similar or identical to that of a smaller, senior user"). Instant Media argues that

22   Microsoft is in the process of "swamping" the goodwill that Instant Media has in its **I'M** marks,

23   essentially depriving Instant Media of the ability to use them as marks for its own goods and services.

24   According to Instant Media, "[b]efore Microsoft began using the **i'm** mark, consumers associated that

25   mark with Instant Media. As a result of Microsoft's marketing and publicity blizzard, consumers will

26   come to associate Instant Media's **I'M** mark with Microsoft, even when the mark is being used by

27

28                                          8

1    Instant Media in connection with its goods and services." Mot. at 11.

2        To succeed in its reverse confusion claim, Instant Media must prove that its trademark rights are

3    valid and that Microsoft's use of its **i'm** mark is likely to confuse Instant Media's customers into

4    believing that they are dealing with Microsoft. *See Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331

5    F. Supp. 2d 1214, 1221 (C.D. Cal. 2004). Confusion is tested by asking "whether a 'reasonably prudent

6    consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one

7    of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (1998). Confusion

8    must be "probable, not simply a possibility." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002).

9    Microsoft does not challenge the validity of Instant Media's registered **I'M** trademark.

10       The so-called *Sleekcraft* factors provide non-exhaustive guidance in determining the likelihood

11   of confusion. These eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity

12   of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the

13   degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and

14   (8) likelihood of expansion of the product lines. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,

15   109 F.3d 1394, 1404 (9th Cir. 1997)(citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.

16   1979)). While each of these factors are to be considered in reaching a decision on the issue of likelihood

17   of confusion, "'no mechanistic formula or list can set forth in advance' the variety of elements that

18   comprise the market context from which likelihood of confusion must be determined." *Dr. Seuss*

19   *Enterprises*, 109 F.3d at 1404 (*quoting* Restatement (Third) of Unfair Competition § 21, comment a

20   (1995)).

21       Courts have recognized that "three of the *Sleekcraft* factors are particularly important in

22   determining whether reverse confusion has occurred . . . : (1) the strength or arbitrariness of the mark;

23   (2) the relatedness (or proximity) of the parties' goods; and (3) the similarity of the marks." *Matrix*

24   *Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1090 (C.D. Cal. 2003); *see*

25   *also Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1130 (referring to these factors as "pivotal"); *Glow*

26   *Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002) ("[t]he Ninth Circuit has suggested that

27

28

[these] factors are especially pertinent in reverse confusion cases").

Courts have also recognized that the Internet presents considerations that distinguish it from typical "brick and mortar" businesses. The Ninth Circuit has held that in the internet context, the three most important *Sleekcraft* factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the parties' simultaneous use of the Internet as a marketing channel. *GoTo.Com*, 202 F.3d at 1205. When this "controlling troika" or "internet trinity" suggests confusion is likely, the other factors must "weigh strongly" against a likelihood of confusion to avoid the finding of infringement. *Interstellar Starship Services, Ltd. v. Epix*, Inc., 304 F.3d 936, 942 (9th Cir. 2002) (citing *Brookfield*, 174 F.3d at 1058). If the internet trinity does not clearly indicate a likelihood of consumer confusion, a district court can conclude the infringement analysis only by balancing all the *Sleekcraft* factors within the unique context of each case. *Id.*

### 1.    The "Internet Trinity" Factors

#### i.    Similarity of the Marks

Instant Media repeatedly intones that the marks are "identical." *See, e.g.,* Reply at 1, 8, 9. "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. The Ninth Circuit considers the "similarity of the marks" factor to be a "critical question" in the likelihood of confusion analysis. *Id.* In assessing the similarity between marks, the court looks at the relevant marks as they appear in full in the marketplace, *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147-50 (9th Cir. 1999), in order to compare their appearance, meaning and sound. *Jupiter Hosting*, 76 U.S.P.Q.2d at 1044 (citing *Dreamwerks*, 142 F.3d at 1131).

#### a.    Sight

While Instant Media owns the federal registration for the **I'M** word mark, Instant Media's **I'M** mark generally appears in all capital letters, in thin white font, in a straight line, in an orange circle, and is often accompanied by the company name "Instant Media." Microsoft's **i'm** mark uses lower-case, stylized letters, includes a speech balloon in the place of an apostrophe, uses pale green and blue coloring, and has no shape surrounding the letters. Microsoft argues that its mark is intended to appear

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

"young" and "hip" and that the use of the speech balloon next to the stylized "i" was intended to echo an icon of a speaking person, in order to reinforce the notion that the more messages a participant in the i'm initiative sends, the more Microsoft will donate to the participating organizations.  Additionally, the colors in the logo mirror those of "buddy" icons used in connection with WLM.  In advertisements, the **i'm** mark often appears alongside the phrase "i'm making a difference" and the other slogans reflecting the goals of the different participating organizations.

Microsoft argues that the only commonality between the marks is the letter string "I'm," and that this is not sufficient to make the marks confusingly similar, as "I'm" is a common English word, frequently used in products, services, and websites on the Internet.  *See, e.g., Mejia & Assoc. v. IBM Corp.*, 920 F. Supp. 540, 547 (S.D.N.Y. 1996) (marks not similar "simply because they contain an identical or nearly identical word"); *Gruner + Jahr USA Publ'n v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) (dissimilar elements distinguished marks).

Instant Media counters that the fact that Instant Media's federally registered mark is sometimes used in logo form is immaterial to the infringement analysis for that mark. Instant Media's federal registration is for the typed drawing **I'M**. *See* Leak Decl., Ex. B. Under *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 949-50 (Fed. Cir. 2000), "[r]egistrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce." *Id. See*, *e.g.*, *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 970 (10th Cir. 2002) (plaintiff's "mark is typed in capital letters in the principal trademark register, which means that the registration covers all design features and is not limited to any special form or lettering"); *see generally* J. McCarthy, *McCarthy on Trademarks & Unfair Competition* ("*McCarthy*"), § 19:58 (2007). Thus, in determining whether a federally registered mark is being infringed, the applicable comparison is between the senior user's mark as registered and the junior user's mark as used.

In its trademark applications for the I'M mark, Instant Media was at pains to make fine distinctions between its "I'M" word mark and numerous other marks, some as stylized as Microsoft's, that made use of the letters I and M. *See* Cavanagh Decl., Ex AA. Instant Media relied heavily on the

11

**United States District Court**
For the Northern District of California

fact that most of the other marks used stylized fonts, graphics and coloring. As noted by Instant Media, "[t]he marks in question must be considered as a whole, not broken down into its [sic] components parts . . . it is improper to dissect the word portion of a mark from the design portion of the same mark and thus fail to consider the trademark in its entirety."*Id.* (*citing In re Hutchinson*, 852 F.2d 552 (Fed. Cir. 1988). Instant Media is correct in its statement of the appropriateness of attempts to separate the word portion of marks from the design portions, and the Court follows Instant Media's counsel on this score. *See Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 476 (3d Cir. 2005) (whether viewed "as judicial estoppel, an admission, waiver, or simply hoisting [the plaintiff] by its own petard," the plaintiff's prior statements to the PTO regarding crowded field weighed against a likelihood of confusion); *Petro Stopping Ctrs, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (noting that plaintiff's prior inconsistent statements to PTO undercut its current arguments to the court).

Considering Microsoft's **i'm** mark as used and Instant Media's mark as registered, the marks are not so similar as to raise the likelihood of confusion as a matter of law. While both marks make use of the letters I and M, Microsoft's mark uses them in lower-case, is a particular shade of blue-green, and uses especially stylized font designed to make the "i" appear anthropomorphic. Further, the apostrophe used by the Microsoft mark suggests a speech balloon, reinforcing the mark's connection with instant messaging. Simply put, the **i'm** mark is a highly stylized logo, more than merely the letters "i" and "m" strung together. This factor therefore weighs in favor of Microsoft.

### b. Sound

Instant Media argues that the two marks "sound the same" as both are the word "I'm." However, "IM" is a common abbreviation for "instant messaging"[3] and is pronounced "aye em" in two syllables, not "I'm" in one syllable. The pronunciation might therefore depend on whether a consumer believes the **i'm** mark is an abbreviation for "instant messaging" or is simply the word "I'm," and as such the

---

[3]*See, e.g., America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 823 (4th Cir. 2001) (approving district court's refusal, based on a finding of genericness, to enforce "IM" as trademark for AOL's instant messaging service, where district court concluded that "IM" is an initialism for "instant message" and district court stated that "IM stands for 'instant message' (as AOL admits), and because the primary significance of 'instant message' is to stand for an 'instant message,' the term ... is generic.").

**United States District Court**
For the Northern District of California

1  pronunciation of the **i'm** mark may be ambiguous. Moreover, Instant Media argued before the PTO that

2  it's I'M mark should be pronounced as the monosyllabic contraction "I'm" rather than in two syllables.

3  *See* Cavanagh Decl., Ex. AA at 11. Thus, Instant Media has not established for the purposes of the

4  present motion that the marks sound the same.

5  **c.    Meaning**

6   Microsoft argues that the parties' marks have different meanings. Instant Media argues that both

7  mark's meaning is a conjunction of "I am." However, one apparent meaning of the I'M mark as it is used

8  by Instant Media is as an abbreviation for the name "Instant Media," and Microsoft introduced evidence

9  that its "i'm" mark is a play on the IM acronym for instant messaging. Accordingly, Instant Media has

10  not demonstrated that the marks necessarily have the same meaning.

11  **ii.    Relatedness of the Goods or Services**

12   The second *Sleekcraft* factor and member of the "controlling troika" is the theorem that

13  "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers

14  of the goods." *Brookfield*, 174 F.3d at 1055. The Ninth Circuit has observed that, in the Internet

15  context, "even services that are not identical are capable of confusing the public." *GoTo.com*, 202 F.3d

16  at 1206. In *GoTo.com*, the Ninth Circuit ruled that, because the Internet is a unique medium in which

17  companies routinely offer a variety of services under a single banner or mark, it introduces problems

18  into the standard analysis of relatedness: "The ever-growing number of tentacled conglomerates may

19  force us to conclude that even one hundred and one products could all be sponsored by a single

20  consortium." *Id.* Thus, "[w]hereas in the world of bricks and mortar, one may be able to distinguish

21  easily between [distinct businesses], the Web is a very different world." *Id.* (internal citations omitted).

22   Instant Media argues that the goods are closely related because "[b]oth parties use their

23  respective marks in connection with free downloadable Internet applications intended for computer users

24  at large, and both use the Internet as their marketing channel." Reply at 5:13-14. Therefore, Instant

25  Media argues, "[t]hese facts make the parties' respective goods and services related even though their

26  Internet applications differ." *Id.* The description of the respective programs as  "free downloadable

27

28  13

United States District Court

For the Northern District of California

Internet applications intended for computer users at large," which "use the Internet as their marketing channel" encompasses vast swaths of internet-related businesses and is exceedingly broad. Nevertheless, Instant Media cites *Jupiter Hosting* for the proposition that as long as "the public is likely to make an association between related producers and products," it is irrelevant whether the parties' Internet related services are different. *Jupiter Hosting Inc.*, 76 U.S.P.Q.2d at 1044-45.

*Jupiter Hosting*, a 2004 case, relied heavily on *GoTo.com*'s estimation of the internet user's ability, circa 2000, to distinguish between various Internet-related services. Moreover, in *Goto.com* the court was faced with two internet search engines that directly competed with each other, using marks that were, in the court's words "overwhelmingly similar,"[4] and in finding a likelihood of confusion relied heavily on the fact that the marks were exceedingly similar and that the parties offered very similar services. *GoTo.com*, 202 F.3d at 1206. However, the *GoTo.com* court noted that "[o]ur ever-growing dependence on the Web may force us eventually to evolve into increasingly sophisticated users of the medium." *Id.* at 1206 -1207. *GoTo.com* was decided seven years ago – aeons in Internet terms – and the moment of our evolution into "increasingly sophisticated users of the medium" is upon us. While it may have been plausible in 2000 to suggest that consumers could not easily discriminate between content-delivery programs such as the I'M player or iTunes on the one hand and instant messaging programs such as WLM or AIM on the other, in 2007, where iPods and instant messaging are household concepts, this Court cannot say that, as a matter of law, "it is irrelevant whether the parties' Internet related services are different." Therefore, the issue of the relatedness of the goods and services at issue should be examined on its merits, and not simply subsumed under the generic rubric of "Internet-related services," though special care should be given to distinct nature of the Internet for the reasons noted in *GoTo.com*. Indeed, apparently talking out of both sides of mouth, Instant Media conceded this point in its trademark applications when it stated that "playing images or video in

---

[4]In *GoTo.com*, both logos at issue consisted of white capital letters in an almost identical sans serif font rendered on a green circle, which was matted by a square yellow background; both products at issue were internet search engines. 202 F.3d at 1206.

14

United States District Court
For the Northern District of California

computer software is ubiquitous these days. The fact that any two software or Internet marks may involve images or video does not mean they are similar for trademark purposes." Cavanagh Decl., Ex. CC at 15.

Microsoft argues that its services under the relevant marks are different because its **i'm** initiative is a philanthropic marketing campaign, and not a software application, while Instant Media uses its mark to promote its high-definition Internet TV media player.  Opp'n at 15:20-16:6. However, while Microsoft styles its advertising campaign as a "philanthropic marketing program," this is not the end of the story. While Microsoft argues that it "does not use and has no intent to use its i'm mark to designate any other services," this claim is plainly belied by Microsoft's application for the trademark in connection with WLM in addition to its application in connection with the **i'm** initiative. It is clear that Microsoft  abandoned the application, at least in part, in response to the present litigation. Undoubtedly, the true intent behind the **i'm** initiative is to saturate the market with the "**i'm**" mark and thereby cultivate the association of the mark with WLM in consumers' minds, as demonstrated by the manifest illogic of spending "[multiple] millions of dollars" to advertise and develop a "philanthropic campaign" whereby Microsoft has pledged to contribute $1 million to charities, and has to date contributed less than $40,000, and presumably with an eye to eventually appropriating some form of the "IM" abbreviation for instant messaging as a trademark. Accordingly, the Court will analyze this factor taking WLM to be the relevant service, rather than a thinly-veiled "philanthropic" WLM marketing campaign.

As described above, the I'M player is a platform for delivering high-definition videos to consumers, whereas WLM is an instant messaging program. The two applications do have some overlapping functionality in that Microsoft's WLM provides video capability, which is the core function of Instant Media's software. *Id*. at 5:24-25. Microsoft argues that neither the **i'm** initiative nor WLM is a video or audio player, nor do they provide for the delivery of TV shows by content providers either on a broadcast basis or by subscription. *Id*. at 16:2-8.  The only similarity between the parties' products and services, Microsoft argues, is that they are both offered over the Internet, a similarity that applies

15

to thousands, if not millions, of products and services. *Id.*

In *M2 Software, Inc. v. Madacy*, 421 F.3d 1073, 1082 (9th Cir. 2005), the court found no likelihood of confusion, and that the relatedness factor, "if it can support plaintiff's case at all, does so very slightly," where the products, though within the same industry, were in different consumer genres. *Id.* Plaintiff M2 Software made business management and interactive media software applications for the film and music industry. *Id.* at 1076. One line of software included acid-jazz audio CDs and a website that provided audio content for downloading. *Id.* at 1082. Defendant Madacy was a new record label venture using its trademark to distribute sports-related music. *Id.* Both M2 Software and Madacy distributed music and CDs. *Id.* Nevertheless, the court held that the relatedness factor weighed in M2 Software's favor, but only slightly, because the genres of the music CDs were very significantly different. *Id.*

In this case, the similarities between WLM and Instant Media's player are that they are both freely downloadable software, are both offered over the Internet, and both have some video capability. However, these similarities are superficial and are far overshadowed by significant and fundamental differences in functionality. Just as the court in *M2 Software* found that the different genres of music counterbalanced the similarity that both parties distributed some music and CDs over the internet, in this case, the similarity that both parties offer downloadable Internet applications is counterbalanced by the different software involved – instant messaging and video delivery.

Furthermore, even though WLM has some video capability, it is fundamentally an instant messaging program, whereas Instant Media's software is a video player. WLM does not enable users to broadcast video or audio programs over the Internet; it does not support a subscription service by which video or audio files are automatically downloaded to the user's computer; it has no caching technology for videos, and it does not provide any retailing services – consumers cannot buy products through WLM. Opp'n at 3:10-14. As in *Interstellar*, where the parties' goods shared a superficial connection to digital imaging, here the parties' goods also superficially overlap with regard to video capability. 304 F.3d at 939. However, the products, WLM and Instant Media's video player, are

16

1    extraordinarily different within the context of the Internet.  This factor thus weighs in favor of

2    Microsoft.

3              **iii.        The Parties' Simultaneous Use of the Internet as a Marketing Channel**

4              While Microsoft attempts to distinguish its marketing channels by pointing out that, unlike

5    Instant Media, it does not advertise the i'm initiative on television but does advertise via college

6    campuses, there is no real dispute that both parties rely heavily on internet advertising. Accordingly, the

7    factor weighs in favor of Instant Media.

8              **2.        Strength of the Marks**

9              The strength of the marks is a salient factor in reverse-confusion cases.  *See Dreamwerks*, 142

10   F.3d at 1130. In reverse confusion cases, courts consider the conceptual strength of the plaintiff's senior

11   mark as compared to the commercial strength of the defendant's junior mark.  *See Moose Creek*, 331 F.

12   Supp. 2d at 1224.  Absent a conceptually strong senior mark, the reverse confusion plaintiff will be

13   unable to establish a likelihood of confusion, even if the junior user's commercial strength is likely to

14   overwhelm the plaintiff in the marketplace.  *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 992

15   (C.D. Cal. 2002).

16             Trademarks are classified along a spectrum of increasing distinctiveness:  (1) generic; (2)

17   descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *See Moose Creek*, 331 F. Supp. 2d at 1222.

18   Generic and descriptive marks are deemed weak; arbitrary marks are considered strong.  *Id.*  However,

19   even "strong" marks will be deemed "weak" if they exist in a "crowded field" of similar marks.  *See*

20   *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in*

21   *part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir.

22   1990). Where a plaintiff's mark resides in a crowded field, "hemmed in on all sides by similar marks on

23   similar goods," that mark is weak as a matter of law. *PostX Corp. v. docSpace Co.*, Inc., 80 F.Supp.2d

24   1056, 1061 (N.D. Cal. 1999) (Whyte, J.). Where the market is inundated by products using the particular

25   trademarked word, there is a corresponding likelihood that consumers "will not likely be confused by

26   any two in the crowd." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). As

27

28                                                                        17

stated by Professor McCarthy:

> [A] mark that is hemmed in on all sides by similar marks on similar goods cannot be very "distinctive." It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.

2 McCarthy § 11:85; *see also Jupiter Hosting*, 76 U.S.P.Q.2d at 1045-46 (preliminary injunction denied based, in part, on finding of crowded field). In a crowded field, "the ability of any member of th[e] field to prevent use by others is relatively weak." *Halo Mgmt., LLC v. Interland, Inc.,* 308 F. Supp. 2d 1019, 1034, 1037 (N.D. Cal. 2003)

Instant Media claims that its I'M mark is arbitrary and, thus, conceptually strong. Plaintiff contends that "[t]he conjunction 'I'm' -- meaning 'I am' -- neither describes nor suggests the services offered by Instant Media." Mot. at 14. However, Instant Media's mark is conceptually weak because the I'M mark exists in a crowded field of trademarks using variations of "IM," "I'm" and "I am." Instant Media only succeeded in registering I'M after convincing the PTO that I'M and IM marks senior to Plaintiff's existed in a crowded field. In its response to the PTO's initial refusal to register I'M, Instant Media admitted that it was aware of "over 600 registered marks containing a form of IM, I'M or I AM," of which approximately 185 were in the same International Classes in which Instant Media sought registration of its marks. Cavanagh Decl., Exs. AA & CC, at 11-12. Moreover, the use of the marks "IM," "I'M" and "I AM," either alone or with other words, is ubiquitous in connection with Internet websites, domain names and entertainment-related companies. *Id.*, ¶¶ 26-32, Exs. PP-OOO.

Additionally, as Microsoft points out, the **I'M** mark may be viewed as a stylized abbreviation of "Instant Media," a clearly suggestive term. Moreover, as discussed above, the term "IM" is widely recognized as referring to "instant messaging," and marks that make use of those letters may be considered suggestive of instant messaging, regardless of whether such an association was intended. A suggestive mark is one that "subtly connote[s] something about [its] products," *Sleekcraft*, 599 F.2d at 349, or that "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature," *Brookfield Communications, Inc.*, 174 F.3d at 1058 n.19. Indeed, it is conceivable that Instant Media in fact sought to indirectly trade on this

18

**United States District Court**
For the Northern District of California

1    suggestiveness in choosing a mark that makes use of a term that is widely recognized as being internet-

2    related.

3         The trademark universe as a whole is a crowded one, and the field of "I'M"-related marks is

4    particularly crowded, as amply illustrated by Instant Media's trademark applications. This crowdedness

5    countervails any strength Instant Media's marks may have as a result of their alleged arbitrariness.

6    Accordingly, this factor weighs in favor of Microsoft.

7             **3.**     **The Remaining *Sleekcraft* Factors**

8         The remaining *Sleekcraft* factors are relatively unimportant to the likelihood of confusion

9    analysis in Internet-related cases, *GoTo.com*, 202 F.3d at 120. However, as the internet trinity of

10   *Sleekcraft* factors does not clearly indicate a likelihood of consumer confusion, the Court can

11   conclude its infringement analysis only by balancing all the *Sleekcraft* factors within the context

12   this case. *Interstellar*, 304 F.3d at 942. The Court addresses them in turn.

13                 **i.**     **Evidence of Actual Confusion**

14        Instant Media's "evidence" of actual reverse confusion consists of the following single

15   sentence from the declaration of its CEO: "Instant Media has received a number of phone calls and

16   website inquiries from a number of consumers with questions concerning instant messaging." A

17   summary of purported telephone calls and written inquiries constitutes inadmissible hearsay. *See*

18   Fed. R. Evid. 801 & 802.; *see also Duluth News-Tribune v. Mesabi Publ'n Co.*, 84 F.3d 1093, 1098

19   (8th Cir. 1996) (evidence of misdirected phone calls is hearsay and particularly unreliable given

20   the lack of an opportunity for cross-examination of the caller regarding the reason for the

21   "confusion"); *Alchemy II v. Yes! Entm't Corp.*, 844 F. Supp. 560, 569-70 (C.D. Cal. 1994)

22   (excluding hearsay evidence of telephone calls from customers). Moreover, even if admissible,

23   vague evidence of an unknown number of calls, during some unknown period of time, not

24   specifically related to Microsoft's products, is not evidence of actual confusion; confusion in the

25   abstract is not actual confusion. See *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148

26   (CD Cal. 1998) ("Befuddlement is part of the human condition. No matter how clear the markings,

27

28                                         19

United States District Court
For the Northern District of California

1   no matter how different the names, no matter how distinctive the [products], some confusion is

2   inevitable."). Relevant confusion is that which affects purchasing decisions, not confusion

3   generally. *See Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1126-27 (C.D. Cal 2003). In fact, any

4   such consumer confusion indicated by these calls is at least as likely a result of the common

5   association of the term "IM" with instant messaging than with any association with Microsoft.

6       Microsoft submitted a consumer survey which purportedly indicates that reverse confusion

7   is unlikely. However, as Instant Media points out, the survey was poorly designed, to the point of

8   being laughable, and is indicative of nothing beyond the survey participant's ability to remember

9   the I'M mark presented to them at the beginning of the survey. To be admissible, a likelihood of

10  confusion survey must "be designed to examine the impression presented to the consumer by the

11  accused product." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999); *see*

12  *also Troublé v. Wet Seal, Inc.*,179 F. Supp.2d 291, 308 (S.D.N.Y. 2001).

13      The survey, in essence, asked about 100 people likely to download free software from the

14  Internet to view a version of Instant Media's website. *See* Ford Decl., ¶ 5. The web pages they were

15  shown all displayed both the I'M mark and Instant Media's name. *See id.*, Ex. A, at 6-11. The

16  participants were asked "Who or what company do you believe puts out this software with this

17  name I apostrophe M." *Id.*, ¶ 21. They were also asked the reason for their answer. *See id.* Of the

18  108 respondents, 52 stated that they did not know; 30 respondents named Instant Media; nine

19  named "I'M;" four named "Microsoft or Windows;" and 13 gave other answers. *See id.*, Ex. A, Vol.

20  1 Tab B.2. at 21-29. Of the 39 who answered either "Instant Media" or "I'M," all but four

21  (Respondent Nos. 1107, 1301, 1309, and 1705) stated that their answer resulted from reading

22  "Instant Media" or "I'M" on the website they had just viewed. *See id.*

23      The survey did not measure how many of the participants had, prior to the survey, been

24  exposed to Microsoft's **i'm** mark, nor did the survey, as would have been expected, examine levels

25  of confusion among respondents who were simultaneously shown both marks. Thus, the survey did

26  not measure the potential confusion that would be caused when consumers are exposed to such

27

28

marks. "To have substantial probative value, a survey, in addition to testing the proper universe, must also be designed to examine the impression presented to the consumer by the accused product." *Conopco, Inc.*, 49 F. Supp. 2d at 253; *also Troublé*, 179 F. Supp. 2d at 308 ("Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions.").

As noted by Instant Media, Microsoft's survey is little more than a "memory test," measuring how many respondents who had just read the source indicators "Instant Media" and "I'M" on a website could accurately recall them. Such a survey is useless in the Court's analysis in likelihood of confusion. *See, e.g.*, *Starter Corp. v. Converse, Inc.* 170 F.3d 286, 297 (2nd Cir. 1999) (affirming exclusion of survey that "was little more than a memory test, testing the ability of the participants to remember the names of the shoes they had just been shown and gave no indication of whether there was a likelihood of confusion in the marketplace"); *Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 334-35 (S.D.N.Y. 1997) ( "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion."). Moreover, as Professor McCarthy observes, "a survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case."14 McCarthy, § 23:10; s*ee also CIT Group, Inc. v. Citicorp*, 20 F. Supp. 2d 775 (D.N.J. 1998). Thus, Microsoft's survey does nothing to demonstrate any unlikeliness of confusion.

Conversely, Instant Media's failure to submit its own survey may support an inference that Instant Media predicted that the results of such a survey would be unfavorable. *See Playboy Enter., Inc. v. Netscape*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999); *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1041-42 (C.D. Cal.1998) ("[A] plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so may lead to an inference that the results of such a survey would be unfavorable.") However, Microsoft's **i'm** initiative is barely four months old, and

21

1   the market has not yet been fully saturated with the **i'm** mark. Accordingly, Instant Media may yet

2   be able to develop its case for actual confusion although, paradoxically, to do so it will need to

3   prove the very harm which it seeks now to prevent. Nevertheless, the lack of evidence of actual

4   confusion favors Microsoft.

5           **ii.      Type of Goods and Degree of Purchaser Care**

6           The sixth factor concerns the type of goods at issue and the degree of care a purchaser

7   would likely use when selecting the product. "When the buyer has expertise in the field, a higher

8   standard is proper though it will not preclude a finding that confusion is likely." *Sleekcraft,* 599

9   F.2d at 353. "Similarly, when the goods are expensive, the buyer can be expected to exercise

10  greater care in his purchases; again, though, confusion may still be likely." *Id.*

11          "In a reverse confusion case, the degree of care exercised by customers is determined with

12  reference to the alleged senior user's customers only." *Matrix Motor Co.*, 290 F. Supp. at 1095.

13  Instant Media presents no evidence of the level of sophistication of its customers. Instant Media

14  instead presumes that customers are likely to exercise less care when dealing with free products.

15  However, the facts that its I'M player is a relatively specialized product designed to view only

16  certain types of video content and that an individual wishing to download its media player must go

17  through a multi-step process and agree to various terms and conditions militates against the

18  presumption that Instant Media's customers do not exercise a high degree of care. Moreover, given

19  common concerns regarding viruses and spyware potentially contained in free software, the Court

20  can hardly say that, as a matter of law, the average consumer exercises minimal care in deciding

21  which free, downloadable programs it chooses to install on his or her  increasingly all-important

22  lifeline to the Internet. This factor therefore favors Microsoft.

23          **iii.     Intent**

24          The seventh *Sleekcraft* factor concerns intent. "When the alleged infringer knowingly

25  adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his

26  purpose: that is, that the public will be deceived." *Sleekcraft,* 599 F.2d at 354. "Knowing adoption

27

28                                                    22

**United States District Court**
For the Northern District of California

1    of a mark closely similar to another is a sound basis for inferring an intent to deceive." *Glow Indus.*,

2    252 F. Supp. 2d at 1002.

3          The Court is not persuaded by Instant Media's argument that Microsoft intentionally

4    adopted a mark "similar to" Instant Media's mark.  Instant Media offers nothing more than pure

5    speculation that Microsoft acted with such intent. In any case, the intentional adoption of a mark

6    which appears to quite possibly have been specifically crafted to *avoid* infringing Instant Media's

7    mark, using as it does a different color scheme, case, font, and stylization elements, is evidence of

8    no unlawful intent. This factor favors Microsoft.

9                          **iv.    Likelihood of Expansion**

10          "Inasmuch as a trademark owner is afforded greater protection against competing goods,

11    a 'strong possibility' that either party may expand his business to compete with the other will weigh

12    in favor of finding that the present use is infringing." *Sleekcraft,* 599 F.2d at 354.  Any purported

13    expansion plans must be properly supported by admissible evidence; vague assertions are

14    insufficient to demonstrate that the parties' uses of their respective marks are likely to converge.

15    *See Surfvivor Media, Inc. v. Survivor Productions,* 406 F.3d 625, 634 (9th Cir. 2005) (plaintiff's

16    "complete inability to adduce any concrete evidence of expansion plans tilts this factor in favor of"

17    defendant); *see also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266,

18    277 (S.D.N.Y. 2006) (speculative intentions are insufficient to demonstrate likelihood of

19    expansion).

20          Instant Media has provided no evidence of any alleged expansion plans, either of itself or

21    Microsoft.  However, while Microsoft argues that it "does not use and has no intent to use its i'm

22    mark to designate any other services," other than the "philanthropic" initiative, this claim is plainly

23    belied by Microsoft's application for the trademark in connection with WLM. Moreover, Microsoft

24    is precisely the type of "tentacled conglomerate" that could simultaneously sponsor "one hundred

25    and one products." *GoTo.com*, 202 F.3d at 1206. Nevertheless, in the absence of any concrete

26    evidence that Microsoft plans to use the **i'm** mark in connection with the sort of product that would

27

28                                              23

United States District Court

For the Northern District of California

1    compete with the I'M player, this factor weighs slightly in Microsoft's favor.[5]

2    **B.    Balance of Hardships**

3    A preliminary injunction is appropriate only if there are serious questions going to the

4    merits and the balance of hardships tips sharply in favor of the moving party. *Ocean Garden, Inc.*,

5    953 F.2d at 506. In the instant case, even assuming that serious questions going to the merits exist,

6    the balance of hardships does not tip sharply in Instant Media's favor.

7    "In evaluating the balance of hardships a court must consider the impact granting or

8    denying a motion for a preliminary injunction will have on the respective enterprises."

9    *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). Instant

10   Media argues that the balance of hardship tips sharply in its favor because (1) Instant Media's has

11   expended substantial time, effort, and money in building up its **I'M** marks, *see* Leak Decl., ¶¶ 15-

12   17, Ex. H; and (2) the doctrine of reverse confusion is predicated upon the presumed material harm

13   that a senior trademark user will suffer if a junior user is permitted to destroy the senior user's

14   goodwill in its mark. However, Instant Media has presented absolutely no evidence of any *actual*

15   harm, and where, as here, a plaintiff has not shown any likelihood of confusion, it "is not entitled

16   to the presumption of irreparable injury." *PostX*, 80 F. Supp. 2d at 1064. Nor has Instant Media

17   offered any argument that any injury to it resulting from the alleged confusion would be

18   "irreparable" in the sense of not being amenable to remuneration via damages.

19   Microsoft's claim of harm to it is based on the costs it claims it would incur in order to

20   comply with a preliminary injunction. *See* Opp'n at 24:26 – 25:1 (citing Kriese Decl., ¶¶ 44-48, and

21   Conf. Kriese Decl., ¶¶ 4-8). A preliminary injunction would of necessity force Microsoft to rebrand

22   its "**i'm**" campaign, the expense of which would be likely more than minimal. *See* Conf. Kriese

23   Decl., ¶¶ 4-8. Additionally, Microsoft submitted a declaration from a charity involved in the **i'm**

24

25   [5]The Court notes that Microsoft has vigorously argued that it has no plans to use any **i'm**-related

26   mark directly in connection with WLM. By doing so, Microsoft has circumscribed its ability to so use any **i'm** related mark in the future. In the event that Microsoft attempts in the future to appropriate any

27   mark using the letters I and M in connection with WLM, it will almost certainly find itself "hoisted by its own petard." *See Card, Inc.*, 432 F.3d at 476.

28

1    initiative stating that an injunction will force it to rebrand its own websites and therefore incur costs

2    itself. Templin Decl., ¶ 8. Accordingly, the Court cannot say that the balance of hardship tips

3    sharply in Instant Media's favor.

4        Since Instant Media has not demonstrated that the balance of hardships tips sharply in its

5    favor, the Court denies Instant Media's Motion for Preliminary Injunction.

6    <u>**CONCLUSION**</u>

7        Perhaps in recognition of the strength of the arguments it made in its trademark applications,

8    and the estoppel associated therewith, Instant Media's current motion fundamentally rests on the

9    claims that both the respective marks and the respective services are identical. However, as

10    described in detail above, that is simply not the case. Neither the *Sleekcraft* factors nor the balance

11    of hardships militate in Instant Media's favor. Accordingly, Instant Media's Motion for Preliminary

12    Injunction is [Docket No. 8] DENIED.

13        IT IS SO ORDERED.

14

15    Dated: 8/13/07                 Saundra Brown Armstrong

16                         United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California